# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DEMARCUS ALI SEARS,

                Petitioner,

v.

BRUCE CHATMAN, Warden,

                Respondent.

1:10-cv-1983-WSD

## OPINION AND ORDER

This matter is before the Court on Petitioner Demarcus Ali Sears'
("Petitioner") Motions for Discovery and an Evidentiary Hearing [38], and
Respondent Bruce Chatman's ("Respondent") Motion to Exceed the Page
Limitation for Respondent's Brief [39].

## I.     BACKGROUND

### A.     Petitioner's Trial

On April 11, 1991, a Cobb County grand jury issued an indictment charging
Petitioner with one count of kidnapping with bodily injury (Count 1) and one count
of armed robbery (Count 2).  ([14.1] at 14-16).  The case went to trial.

> The evidence [presented at trial] showed that on the afternoon of
> October 7, 1990, Demarcus Sears and Phillip Williams were walking
> through Atlanta because their car had broken down.  Wanting to
> return home to Ohio, where they lived, they walked to a Waffle House

in Smyrna and tried to borrow money from several patrons in the restaurant. They told the patrons that their car had broken down and they needed money to go to Cincinnati. Sears carried a black briefcase that contained brass knuckles, knives and a set of old handcuffs that was missing a key. He opened the briefcase in the restaurant and tried to sell some of the items to a customer. After receiving directions and a couple of dollars for bus fare, Sears and Williams walked to a nearby Kroger food store. A police officer observed them loitering near the Kroger parking lot and briefly spoke with them before he left in response to a radio call. Subsequently, they decided to steal a car so they could drive back to Cincinnati.

They spotted the victim, Gloria Wilbur, when she parked her 1985 Buick and entered the Kroger. Around 8:00 p.m., Ms. Wilbur returned to her car and placed her groceries in the trunk. Sears approached her, struck her with the brass knuckles and forced her into the car. Williams then got behind the wheel and they drove north on I–75. Sears told Ms. Wilbur to keep quiet, pulled her into the back seat, and handcuffed her with her hands behind her back. When they stopped for gas and hamburgers, Sears wedged Ms. Wilbur down between the seats and covered her with book bags to prevent discovery. While they were driving through Tennessee, he raped her.

They crossed the border into Kentucky around 1:00 a.m. and stopped the car. Despite her pleas to remain in the car, Sears took the victim into the bushes along I–75 and stabbed her to death. Ms. Wilbur's body was found, still handcuffed, almost a week later. Her abandoned Buick was discovered in a Cincinnati suburb. Bloodstains in the car matched the victim and pubic hair taken from the back seat matched Sears.

Sears v. State, 493 S.E.2d 180, 182 (Ga. 1997). On September 22, 1993, a jury convicted Petitioner on both counts of the indictment. ([14.2] at 91).

B.     Petitioner's Sentencing

On September 23, 1993, at approximately 3:56 p.m., the jury began their

sentencing deliberations. ([15.22] at 80, 92). The jury was excused at 6:37 p.m.

and resumed their deliberations at 9 a.m. the next morning. ([15.22] at 94-95).

At 11:20 a.m., the trial court notified the parties of the following note from the

jury:

> Dear Judge Staley, several jurors are having a problem deciding
> whether rape and murder can be statutory aggravating circumstances
> in this case. They believe that since the Defendant was not charged or
> convicted—and convicted is underlined—of these charges in Georgia,
> they cannot consider these two crimes as statutory aggravating
> circumstances even though they may believe beyond a reasonable
> doubt that these crimes occurred in this case. Please provide the jury
> with guidance if you can.

([15.23] at 10). Following a colloquy with the parties, the trial court instructed the

jury:

> Under our law, a sentence of death shall not be imposed unless the
> jury finds beyond a reasonable doubt that at least one or more
> statutory aggravating circumstances exists; recommends the death
> sentence in its verdict; and designates in its verdict, in writing, the
> statutory aggravating circumstances or stances which it finds from the
> evidence to exist in this case beyond a reasonable doubt.

([15.23] at 17). The trial court also recharged the jury on reasonable doubt and the

statutory aggravating circumstances, and instructed the jury to "remember the

charge in its entirety and apply that entire charge to the facts and circumstances" of

the case.  ([15.23] at 16-20).  At 11:40 a.m., the jury returned to the jury room to continue their deliberations.  ([15.23] at 20).

At 12:30 p.m., the trial court notified the parties of a second jury note, which stated:  "The jury is at an eleven-one deadlock in favor of the death penalty.  How do we complete the verdict as to sentencing?  Will the jury be polled, and how should the eleven jurors answer if they don't agree with the one juror who has voted for life imprisonment?"  ([15.23] at 22).  Petitioner argued that the note indicated the jury had reached a verdict of life imprisonment.  ([15.23] at 23).  The trial court stated it would instruct the jury to continue their deliberations because they had only deliberated for six hours.  ([15.23] at 23-24).  At 12:34 p.m., the trial court instructed the jury as follows:

> You all have only been deliberating on this case for six hours.
> I would like you all to consider continuing your deliberations and see
> what you can do with the case.  I'm not putting any pressure on you
> to [do] anything one way or another.  Whatever your decision is,
> that's you[r] decision.  But I feel like you need to deliberate on the
> case longer.  I'm going to send you to lunch, and I want you to come
> back after you've had your lunch hour, and I want you to continue
> with your deliberations.

([15.23] at 25).

At approximately 2 p.m., following a lunch break, the jury resumed their deliberations.  ([15.23] at 27).  At 4:50 p.m., the trial court notified the parties of a third note from the jury, which stated:

> Dear Judge Staley, we have reviewed the case from start to finish and
> we are still deadlocked eleven to one in favor of the death penalty.
> All twelve jurors agree that there is a hopeless deadlock with no hope
> of resolution. Deliberations have ceased. What do we do now? All
> minds are closed.

([15.23] at 27). Petitioner asked the trial court "to accept the jury's non-unanimous

verdict and impose a sentence of life." ([15.23] at 28). The trial court denied

Petitioner's request, and provided the jury with supplemental instructions approved

by the Georgia Supreme Court in Romine v. State, 350 S.E.2d 446 (Ga. 1986):[1]

> I've received your note. And in light of your note, I believe it's
> appropriate to give you some further instructions at this time. You've
> been deliberating a while, and I deem it proper to advise you further in
> regards to the desirability of agreement, if possible.
>
> This case has been exhaustively and carefully tried by both sides. It
> has been submitted to you for a decision and verdict, if possible.
> While the verdict must be the conclusion of each juror, and not a mere
> acquiescence of the jurors in order to reach an agreement, it is still
> necessary for all of the jurors to examine the issues and questions
> submitted to them with candor and fairness and with proper regard
> and deference to the opinion of each other. A proper regard for the
> judgments of others will greatly aid us in forming our own judgments.

---

[1] The Georgia Supreme Court, in Romine, held that "(1) Where a jury is unable to agree on a verdict, that disagreement is not itself a verdict; and (2) whether a jury is hopelessly deadlocked is an evaluation we commit to the sound discretion of the trial court." Romine, 350 S.E.2d at 451. The Romine court approved a modified Allen charge for use at the sentencing phase of a death penalty case where the jury claims it is deadlocked. See Allen v. United States, 164 U.S. 492 (1896). "'An 'Allen charge' is a trial court's admonition to a deadlocked jury, instructing it to make further attempts to reach a verdict." United States v. Polar, 369 F.3d 1248, 1254 (11th Cir. 2004).

Each juror should listen to the arguments of other jurors. If the members of the jury differ in their views of the evidence, or the mitigating or aggravating circumstances, such differences of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their opinion. It's your duty to decide the issues that have been submitted to you, if you can conscientiously do so. Do not hesitate to change an opinion if you become convinced it's wrong. However, you should never surrender honest convictions or opinions in order to be congenial or reach a verdict solely because of the opinions of other jurors.

Members of the jury, the aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the Court.

I am going to send you to the hotel, and you'll have your dinner. And you'll have an evening hour to step away from all this. You've had a long day. Put this aside. Enjoy each other's company.

I'm going to let you think about this instruction, and think about all the instructions of the case in the morning. And I'm going to let you pick up your deliberations then.

([15.23] at 30-31). The jury was then excused for the day. ([15.23] at 32).

At 9 a.m. the next morning, the jury resumed their deliberations. ([15.24] at 10). At 10:25 a.m., the trial court told the parties:

Been a lot going on this morning. It started off with the foreman asking the deputies and the bailiffs to remove all of the magazines and reading material out of the jury room, and asking them to ask all the jurors to turn over any writing materials and things that weren't related to the case. Also, yesterday, there was an instance where one of the jurors was sitting [in] the jury room with a Sony Walkman on her head. And that was—she was asked to turn that over so she could participate in the deliberations. That happened yesterday.

This morning I have two notes. The first note came when I asked you all to come the first time. It goes as follows: In the jury selection process, each juror was read the charges in this case. Murder was not one of the charges. The reason that the juror who has steadfastly maintained blank position from the outset of deliberations has given for a blank decision is that blank cannot vote on the death penalty because the Defendant was not convicted of murder. And he's got another side. Blanks are to protect the gender of the juror.

Can you provide the jury with a transcript of the questions and answers as to their position on the death penalty? We need to know what questions were asked and how the jurors responded. We would also like for you to provide to the jury a definition of perjury and the penalty for the commission of perjury. Sanford L. Abrams, Foreperson.

Then I got another note. Dear Judge Staley, I am concerned about the actions of the foreman of this jury. This letter is in reference to the foreman's most recent letter to you. Mr. Abrams wrote this letter prior to our jury deliberations today. He informed us that he was submitting the letter to you whether we wanted him to or not. I don't think this type behavior [sic] is appropriate for a foreman. I will not sit on a jury where I am singled out. I am not being treated fairly in this deliberating process. I am also being singled out by the foreman—and, I guess, also—he is overstepping his boundaries as a foreman of the jury. To my understanding, a foreman should be a leader, not a dictator. Please explain the duties and responsibilities of a jury foreman. Should he be able—question a juror's response to the Court during jury selection? Sincerely, Angel Fisher.

([15.24] at 10-12).

Petitioner asked the trial court to declare a mistrial and sentence him to life in prison. ([15.24] at 19). The trial court denied Petitioner's motion on the grounds that the jury had not deliberated "long enough . . . to review all the

evidence and discuss with each other all the different issues involved." ([15.24] at 20). The trial court noted that "if somebody was listening to a Sony and reading magazines yesterday, we don't really know how much time they've spent deliberating." ([15.24] at 21). At Petitioner's request, the trial court agreed to instruct the jury that that (i) "[i]n matters of voting, all jurors stand the same," and (ii) "[i]t is inappropriate for any juror to do anything other than fully participate in jury deliberations." ([15.24] at 18-19, 24). At 11:31 a.m., the trial court instructed the jury:

> THE COURT: Mr. Abrams, I have your note from this morning. And, Ms. Fisher, I have yours as well. I perceive from that that there are four issues presented by the—I perceive that there are four issues presented by the two notes that I have. One is—discusses loosely whether the jury may impose the death penalty when the jury has not found the Defendant guilty of murder. That generally placed as one of the issues presented in your note to the Court. Another issue is a request to have the transcript read of the jury voir dire, jury questioning process. Another request is for a definition of perjury. And then from reading the two notes together, a definition of what a foreperson can do.
>
> I'm going to respond to those as follows: Now, as to the very first issue, whether you may impose the death penalty when you have not found the Defendant guilty of murder. First of all, I've given you thorough instructions on this area. It is your responsibility to recall in its entirety the instructions I gave you.
>
> Simply put, you may impose the death penalty if you find any of the four alleged statutory aggravating circumstances, that they exist beyond a reasonable doubt. Then you, the jury, may impose a life sentence or a death sentence, consistent with those instructions that I

gave you in their entirety, with the definitions of what constitute the alleged statutory aggravating circumstances, with the definitions of considering aggravating and mitigating evidence, with all those instructions and with the instruction of what beyond a reasonable doubt means.

Okay. On the issue of whether to read the transcript of the jury voir dire, I am not going to do that. Neither am I going to give you a definition of perjury.

As to a definition of what a foreperson can do—and it's a foreman, so I'm just going to say foreman. The foreman is the elected leader of the jury. His responsibilities are to lead the discussions and deliberations of the jury and sign the appropriate forms. The law does not closely define his conduct other than that—other than that. Basically, the foreperson is the elected person responsible for leading the deliberations, leading the discussion. In matters of voting, all jurors stand the same.

A juror is responsible to participate in the jury deliberations. A juror is supposed to listen to his or her fellow jurors. A juror is supposed to vote their ideas and their positions. A juror is supposed to participate. It is inappropriate for any juror to do anything other than fully participate in jury deliberations. Mr. Abrams, have you all been deliberating this morning at all?

THE FOREPERSON: Yes, ma'am.

THE COURT: Okay. With these instructions, I'm going to send you back to further your deliberations. If you have further questions, write me a note.

([15.24] at 29-31).

At 11:35 a.m., the jury resumed their deliberations. ([15.24] at 31).

At approximately 3:08 p.m., after a one-hour lunch break, the jury returned their

verdict, finding all of the statutory aggravating circumstances beyond a reasonable doubt and recommending a sentence of death. ([15.24] at 32-36; [14.2] at 102-107).[2] The jury was then polled. Each juror affirmed, in court, that the verdict announced was the verdict they reached, that it was still their verdict, and that it was freely and voluntarily entered. ([15.24] at 37-46). The trial court adopted the jury's recommendation and sentenced Petitioner to death for his kidnapping with bodily injury conviction. ([14.2] at 106-107). Petitioner was sentenced to life imprisonment on the armed robbery charge. ([14.2] at 108).

C.    Petitioner's Motion for a New Trial and his Direct Appeal

On October 14, 1993, Petitioner filed a motion for a new trial, which he later amended. ([14.2] at 111). Petitioner's motion argued, among other things, that "the jury's death verdict was impermissibly coerced," and that "there was misconduct on the part of jurors during the trial and sentencing deliberations." ([14.4] at 29, 100). The trial court denied Petitioner's motion on July 18, 1996. ([14.4] at 113). Petitioner appealed and, on December 3, 1997, the Georgia

---

[2]     The jury found, as aggravating circumstances, that Petitioner committed the offense of kidnapping with bodily injury while he was engaged in the capital felonies of armed robbery, rape and murder. The jury also found that Petitioner's commission of kidnapping with bodily injury was outrageously and wantonly vile, horrible, and inhuman in that it involved torture, depravity of mind, and aggravated battery. ([14.2] at 103-104).

Supreme Court affirmed Petitioner's convictions but remanded to develop the record on the alleged jury misconduct during sentencing. Sears v. State, 493 S.E.2d 180 (Ga. 1997).

On March 16 and 17, 1998, after Petitioner's defense team interviewed several members of the jury, including Angel Fisher ("Fisher"), the trial court held an evidentiary hearing on Petitioner's jury misconduct allegations. ([17.8]; [17.9] at 52-53). Fisher was called to testify at the hearing. ([17.9] at 35).[3] The trial court ruled that Fisher could testify about the following topics:

1. "Express and specific acts of violence," including "threats of violence." ([17.9] at 20).

2. "[O]vert acts of coercion." ([17.9] at 20).

3. Juror Kenneth Makant's "statements regarding the rape of his daughter." ([17.9] at 20).

4. Foreman Sanford Abrams' alleged claim that Fisher should be prosecuted for perjury. ([17.9] at 20).

Over Petitioner's objections, the trial court, citing O.C.G.A. § 17-9-41,[4] ruled that Fisher could not testify about:

---

[3]    Fisher, like Petitioner, is African-American. ([17.9] at 35). Two other members of the jury were African-American, and one was Hispanic. ([17.9] at 73).
[4]    O.C.G.A. § 17-9-41, at the time, provided that "The affidavits of jurors may be taken to sustain but not to impeach their verdict." Effective January 1, 2013,

1. "[T]he internal working of the deliberations of the jury with regard to the votes, the jury votes." ([17.9] at 20).

2. Comments allegedly made by other jurors that "if [Fisher's] sentence decision was life that that would lead to a situation where she or her sisters might be raped either by [Petitioner] or by other people." ([17.9] at 21-22).

Fisher testified that she holds a bachelor's degree in criminal justice, that she attended graduate school, that she works as a teacher, and that she previously worked as a caseworker for Georgia's Aid to Family with Dependent Children program, where she handled "lots" of cases at a time. ([17.9] at 49-51). She stated that, during the jury's sentencing deliberations, she was the lone hold-out for a life sentence. ([17.9] at 35-36). She said the foreman told her she "should be prosecuted for perjury" because she "apparently . . . did not believe in the death penalty" and thus must have "lied on voir dire." ([17.9] at 36-37, 57). Fisher testified that the foreman was "quite hostile" and that she was "afraid" because, although she knew she had not committed perjury and the foreman was not a lawyer, she believed "the system can be manipulated" and she "wasn't sure" if there was "some way" she could end up "on trial for perjury." ([17.9] at 36-37, 56). Fisher testified that she wrote a note to the trial court because the foreman

---

O.C.G.A. § 17-9-41 was replaced by O.C.G.A. § 24-6-606, which closely tracks Rule 606(b) of the Federal Rules of Evidence.

was "very abrasive" and "was just trying to tell [her] what to do," which she "didn't think . . . was fair." ([17.9] at 46). She believed "the note was ignored" because she "didn't hear a response" in the trial court's instructions to the jury. ([17.9] at 46). She wanted the trial court to "directly address the problems [she] was having with [the foreman]." ([17.9] at 70).

Fisher did not understand why the trial court instructed the jury to continue their deliberations after the jury reported they were eleven-to-one in favor of the death penalty: "To me, that was pressure that [the trial court] was saying to them to do whatever you can to get her to change her mind and, to me, to change my mind, that they wanted me—they wanted death." ([17.9] at 75-76).

Fisher testified that she felt "singled out" in "a discussion [among the jury] about what if your family member had been raped or if this had been done to one of your family members." ([17.9] at 41). Fisher stated:

> They were yelling at me. One particular member said, I can't believe that you're a teacher and you're teaching our children with your attitude. And they were just yelling. They were cursing. And, you know, just—I don't remember exactly, but I remembered being yelled at basically because I was—they were angry at me. They wanted me to change my mind. So they were insulting my character and things like that.

([17.9] at 45). Fisher testified that she put Walkman headphones on to "tune out" the other jurors during deliberations. ([17.9] at 61-62).

Fisher testified that she "changed [her] mind because [the other jurors] had—I mean I was ostracized. And I was just—I was basically made to change my mind by the other jury members." ([17.9] at 61). She stated:

> I thought that—that maybe they were all working together and maybe that they wanted me—to me, I felt like I was pressured. I didn't feel like I had any support, that no one was, you know, helping me. So I said, well, I just better change my mind because I see now that it seemed to be one sided. So I said, well, hey, what am I to do. I sent this note out, and I didn't think it was addressed.

([17.9] at 70). Fisher stated that her perjury discussion with the foreman was "part of the reason" she changed her mind and voted to sentence Petitioner to death. ([17.9] at 37). She stated that "after all these years what was done was wrong," that "[t]he way they made [her] change [her] mind was wrong," that she was "basically bullied into changing [her] mind," and that she is "sorry that [she] rendered that decision" because she now thinks she "should [not] have given in to the pressure from—the pressure from the other members of the jury." ([17.9] at 63-64, 74-75). When asked about her feelings regarding the prosecution's position in this case, Fisher testified:

> Sometimes I think that [the government] unfairly prosecute[s] black men who kill white women because I think they—statistically, I think people—prosecutors ask for the death penalty if it's a black person killing a white person. But if it's a black person killing another black person, a lot of times they don't ask for the death penalty. And I think that some people believe that a black life is not worth as much as a white life.

14

([17.9] at 69).

In May 1998, the trial court denied Petitioner's motion for a new trial and, in August 1998, the case returned to the Georgia Supreme Court. ([17.11] at 7-8; [17.13] at 6). On March 15, 1999, the Georgia Supreme Court affirmed Petitioner's death sentence after considering the "totality" of the evidence from the trial and the evidentiary hearing. Sears v. State, 514 S.E.2d 426 (Ga. 1999). The court found that the evidence did not establish juror misconduct, and that the trial court did not coerce the jury to render a verdict of death. Id. at 432-434. On October 12, 1999, the United States Supreme Court denied Petitioner's petition for a writ of certiorari. Sears v. Georgia, 528 U.S. 934 (1999).

D.    State Habeas Proceedings

On January 13, 2000, Petitioner filed his state habeas corpus petition in the Superior Court of Butts County, Georgia. ([17.24]; [18.21]-[18.22]). On January 9, 2008, the state court denied Petitioner's request for habeas relief. ([18.25]-[21.1]; [21.12]). On September 28, 2009, the Georgia Supreme Court denied Petitioner's application for a certificate of probable cause to appeal the denial of habeas relief. ([21.18]). On June 29, 2010, the United States Supreme Court issued its writ of certiorari and remanded the case on the grounds that the state habeas court "failed to apply the correct prejudice inquiry" in evaluating

whether Petitioner's counsel had been ineffective under Strickland v. Washington, 466 U.S. 668 (1984). Sears v. Upton, 561 U.S. 945, 946 (2010).[5] On August 15, 2011, the state habeas court again denied relief. ([21.36). On November 18, 2013, the Georgia Supreme Court affirmed the denial of relief. Sears v. Humphrey, 751 S.E.2d 365 (Ga. 2013). On May 19, 2014, the United States Supreme Court denied Petitioner's petition for writ of certiorari. Sears v. Chatman, 134 S. Ct. 2292 (2014).

      E.      Federal Habeas Proceedings

On June 25, 2010, Petitioner filed his Initial Petition for a Writ of Habeas Corpus by a Person in State Custody [1]. On August 4, 2014, Petitioner filed his First Amended Petition for Writ of Habeas Corpus by a Person in State Custody [28] ("Amended Federal Habeas Petition"), asserting a total of fifteen claims, many with subparts. ([28]). On April 8, 2016, the Court dismissed several of Petitioner's claims on the grounds that they are procedurally barred or not cognizable on federal habeas review. ([37]).

On May 9, 2016, Petitioner filed his Motions for Discovery and an Evidentiary Hearing [38]. Petitioner seeks an evidentiary hearing or discovery on

---

[5] The grounds for the Supreme Court's decision are not relevant to Petitioner's Motions for Discovery and an Evidentiary Hearing [38].

Claims III and IV of his Amended Federal Habeas Petition, which assert (i) that Fisher "was coerced into voting for a death sentence by her fellow jurors' extortionate and threatening behavior during deliberations" (Claim III), and (ii) that "the trial court violated [Petitioner's] rights to a fair trial, due process, and the uncoerced verdict of his jury when the court repeatedly instructed the jurors to continue to deliberate toward a verdict in the face of a deadlock" (Claim IV). ([38] at 1; [28] at 75, 82). Petitioner requests an evidentiary hearing or discovery to develop Fisher's testimony without the limitations imposed by the trial court during the March 1998 evidentiary hearing. ([38] at 4-5).

On April 24, 2017, the Court found that Petitioner is required to satisfy 28 U.S.C. § 2254(d) before he is allowed an evidentiary hearing or discovery on Claims III and IV, which were previously adjudicated on the merits in state court. ([49] at 13, 16). In May 2017, the parties filed briefs addressing whether the state court's adjudication of Claims III and IV "was based on an unreasonable determination of the facts" or "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d).

## II.    DISCUSSION

A.    Legal Standard Under 28 U.S.C. § 2254(d)

A habeas petitioner must satisfy section 2254(d) before he is allowed

discovery or an evidentiary hearing on claims previously adjudicated on the merits

in state court.  Landers v. Warden, Atty. Gen. of Ala., 776 F.3d 1288, 1295 (11th

Cir. 2015).  Section 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
>
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. § 2254(d).

Under subsection 2254(d)(1), "[t]he statutory phrase 'clearly established

Federal law' refers only to the holdings, as opposed to the dicta, of the Supreme

Court's decisions as of the time of the relevant state-court decision."

Heath v. Sec'y, Florida Dep't of Corr., 717 F.3d 1202, 1204 (11th Cir. 2013).

"A state court decision is 'contrary to' such law if the state court arrives at a

conclusion opposite to that reached by the Supreme Court on a question of law or

if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." Id.  A state court decision involves an "unreasonable application" of clearly established federal law if the state court (1) "identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Madison v. Comm'r, Alabama Dep't of Corr., 851 F.3d 1173, 1182 (11th Cir. 2017).  "The 'unreasonable application' inquiry focuses on whether the state court's application of Supreme Court precedent was objectively unreasonable, which requires the state court decision to be more than incorrect or erroneous." Id.  "[E]ven clear error will not suffice." White v. Woodall, 134 S. Ct. 1697, 1702 (2014); see Everett v. Sec'y, Florida Dep't of Corr., 779 F.3d 1212, 1239 (11th Cir. 2015) ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.").  "Under § 2254(d)(1), a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." White v. Wheeler, 136

S. Ct. 456, 460 (2015).  "As long as some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."  Everett, 779 F.3d at 1239.

Section 2254(d)(2) permits relief where the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "The question under [this provision] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  The state court's factual findings are entitled to "substantial deference," and will not be disturbed if "reasonable minds reviewing the record might disagree about the finding in question."  Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  Burt v. Titlow, 134 S. Ct. 10, 15 (2013).  "To be unreasonable, the error in the state court's finding must be so clear that there is no possibility for fairminded disagreement."  Holsey v. Warden, Georgia Diagnostic Prison, 694 F.3d 1230, 1260 (11th Cir. 2012).

Section 2254(d)'s requirements are "difficult to meet," <u>Woodall</u>, 134 S. Ct. at 1702, and "erect[] a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court," <u>Wheeler</u>, 136 S. Ct. at 460. The provision reflects a "highly deferential standard" and "demands that the petitioner carries the burden of proof, and that state-court decisions be given the benefit of the doubt." <u>Everett</u>, 779 F.3d at 1239. "The significant deference under § 2254(d) owed by the federal courts to state courts' decisions is rooted in [the statute's] commitment to comity, federalism, and the finality of judgments." <u>Tharpe v. Warden</u>, 834 F.3d 1323, 1338 (11th Cir. 2016); <u>see</u> <u>Holsey</u>, 694 F.3d at 1257 ("[Section 2254(d)] was designed to be difficult in order to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."). Section 2254(d) permits relief only in exceptional circumstances because federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

B.    Petitioner's Claim IV

Claim IV asserts that the trial court coerced the jury to render a verdict of death.  (See [51] at 10).  Specifically, Petitioner claims "the trial court's Romine charge, insufficient curative instructions [after receiving Fisher's note], and failure to impose a life sentence on the basis of a deadlock as to penalty denied Petitioner due process, a fair and impartial jury and a reliable determination of sentence." ([28] at 82).  Petitioner argues that the Georgia Supreme Court's denial of this claim was based on unreasonable factual determinations and an unreasonable application of Lowenfield v. Phelps, 484 U.S. 231 (1988).  ([28] at 85; [51] at 19).[6]

In Lowenfield, the jury informed the trial court that they were unable to reach a decision after deliberating for approximately one day.  Lowenfield, 484 U.S. at 234.  The trial court, in response, polled the jury, asking "Do you feel that any further deliberations will enable you to arrive at a verdict?"  Id.  Eleven jurors answered in the affirmative, and one juror answered in the negative.  Id. The trial court instructed the jury to continue their deliberations:

---

[6]    Petitioner's reliance on Jenkins v. United States, 380 U.S. 445 (1965) is misplaced because Jenkins does not apply to the section 2254(d) analysis.  See Early v. Packer, 537 U.S. 3, 10 (2002) (stating that Jenkins is "off the table as far as § 2254(d) is concerned" because it does not "set[] forth a rule applicable to state-court proceedings").

Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.

When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Id. at 235. Thirty minutes after this instruction was provided, the jury returned a death sentence verdict. The Supreme Court held that, "under all the circumstances," "the combination of the polling of the jury and the supplemental instruction was not 'coercive' in such a way as to deny petitioner any constitutional right." Id. at 237, 241. The court stated:

The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself.

Id. at 237.

At the time of Petitioner's direct appeal, <u>Lowenfield</u> was the only Supreme Court decision addressing the constitutional rule against coercive jury instructions. <u>See</u> <u>Wong v. Smith</u>, 131 S. Ct. 10, 11 (2010) (Alito, J., dissenting) ("Just one of this Court's decisions, <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 108 S. Ct. 546, 98 L.Ed.2d 568 (1988), has addressed the constitutional rule against coercive jury instructions.").[7]  "As a result, the clearly established law in this area provides very little specific guidance.  About all that can be said is that coercive instructions are unconstitutional, coerciveness must be judged on the totality of the circumstances, and the facts of <u>Lowenfield</u> (polling a deadlocked jury and reading a slightly modified <u>Allen</u> charge) were not unconstitutionally coercive."  <u>Id.</u> at 11-12. "A general standard such as this gives state courts wide latitude for reasonable decisionmaking under [section 2254(d)]."  <u>Id.</u>; <u>see</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

This latitude was illustrated in <u>Early v. Packer</u>, 537 U.S. 3 (2002), which was decided after Petitioner's direct appeal.  In <u>Packer</u>, "[a]fter 28 hours of deliberation, and after the jury had returned sealed verdict forms on all the other

---

[7]  Justice Alito issued the only written opinion in <u>Wong</u>, dissenting from the Supreme Court's summary denial of certiorari.  Justice Scalia and Chief Justice Roberts joined in Justice Alito's opinion.

charges," a juror, Eve Radcliff, asked to be excused due to "health problems." <u>Id.</u> at 4.  The trial judge met alone with the juror, and asked her to "hold out just a little bit longer" because "[o]therwise, [the jury] have to start deliberations all over again with another person." <u>Id.</u>  The juror agreed to continue.  "The next day, the foreman sent the judge a note stating that 'we can no longer deliberate,' that 'Eve Radcliff does not appear to be able to understand the rules as given by you,' that 'nearly all my fellow jurors question her ability to understand the rules and her ability to reason,' and that continuing will result in a 'hung jury based on one person's inability to reason or desire to be unreasonable.'" <u>Id.</u>  The judge called the jury into the courtroom, read the note aloud, and asked what the latest vote count was.  The foreman replied the vote was 11 to 1.  The judge said that jurors "have a right to disagree with everybody else" but that "[t]hey must deliberate and follow the rules and laws as I state it to them." <u>Id.</u> at 5.  The judge instructed the jury on how to find the elements of the crime, stating that "if [the defendant meets the elements of the offense] and you find unanimously they did that, you must follow the law and find them either guilty or not guilty of that charge." <u>Id.</u>

When the jury resumed their deliberations, juror Radcliff sent the judge another note asking to be dismissed from the jury.  The note "complained about 'feelings of distrust and disrespect from the other jurors,' and said that 'I have

reached a point of anger, and I don't believe I can be objective.'" Id. at 6. The

judge again met alone with Radcliff and asked her if she was continuing to

deliberate. Radcliff said she was "trying, but not to the satisfaction of the others."

Id. The judge sent her back to the jury room, and then met briefly with the

foreman to confirm Radcliff was participating in the deliberations. Days later, the

jury returned a guilty verdict on two murder counts.

The state court found that the trial court's actions were not coercive, and the

defendant sought federal habeas relief under section 2254. The Ninth Circuit

granted relief and the Supreme Court reversed, stating "[e]ven if we agreed with

the Ninth Circuit majority . . . that there was jury coercion here, it is at least

reasonable to conclude that there was not, which means that the state court's

determination to that effect must stand." Id. at 11.

The Court considers whether, in light of this authority, the Georgia Supreme

Court's adjudication of Claim IV was based on an unreasonable application of

Lowenfield or on unreasonable determinations of fact.

        1.    The Trial Court's Failure to Find the Jury Deadlocked

Petitioner first argues that "[t]he trial court's failure to adjourn jury

deliberations in light of an insurmountable deadlock and impose a life sentence on

the basis of the jury's non-unanimous verdict was erroneous and violated

Petitioner's constitutional rights."  ([28] at 83).  "The Supreme Court held long ago that a trial court may instruct a deadlocked jury to keep deliberating," even in capital cases.  United States v. Davis, 779 F.3d 1305, 1312 (11th Cir. 2015); see Jones v. United States, 527 U.S. 373, 382 n.5 (1999) ("We have . . . approved of the use of a supplemental charge to encourage a jury reporting itself as deadlocked to engage in further deliberations, even capital sentencing juries." (citation omitted)).  "It is not only permissible but proper for a trial judge to ask a jury to continue deliberating if it appears that further deliberation might be fruitful in helping the jury reach a unanimous verdict."  Coleman v. Quarterman, 456 F.3d 537, 548 (5th Cir. 2006).  "A [trial] court has broad discretion in this area but must not coerce any juror to give up an honest belief."  Davis, 779 F.3d at 1312. Whether a trial court's instructions are coercive depends on the totality of the circumstances.  See Lowenfield, 484 U.S. at 237.  "An instruction which appears to give a jury no choice but to return a verdict is impermissibly coercive." United States v. Jones, 504 F.3d 1218, 1219 (11th Cir. 2007).

On September 24, 1993, after approximately six hours of sentencing deliberations, the jury told the trial court they were "at an eleven-one deadlock in favor of the death penalty," and asked how to "complete the verdict as to sentencing."  ([15.23] at 22).  The trial court instructed the jury to continue their

deliberations because they had "only been deliberating on th[e] case for six hours." ([15.23] at 25). The court stated, "I'm not putting any pressure on you to [do] anything one way or another. Whatever your decision is, that's you[r] decision." ([15.23] at 25). Three hours later, the jury informed the trial court that they remained deadlocked and that there was "no hope of resolution." ([15.23] at 27). The court issued a <u>Romine</u> charge, instructing the jury to continue their deliberations. ([15.23] at 30-31). The jury returned their verdict approximately five hours later.

The Georgia Supreme Court found that the trial court's instructions to continue deliberations were not coercive:

> Although the jury twice stated that it was at an eleven to one "deadlock," the trial court was not bound by those pronouncements. <u>Todd v. State</u>, 243 Ga. 539, 542, 255 S.E.2d 5 (1979) (court is not required to accept jury's feeling that it is "hopelessly deadlocked"). On the contrary, the trial court, in the exercise of a sound discretion, was required to make its own determination as to whether further deliberations were in order. <u>Romine</u>, <u>supra</u> at 524, 350 S.E.2d 446.

> The jury first indicated it was deadlocked after only six hours of deliberation. And it announced it was deadlocked again, after just another three hours. We cannot say that the trial court abused its discretion in requiring the jury to deliberate further, <u>see</u> <u>United States v. Kramer</u>, 73 F.3d 1067 (11th Cir. 1996) (jury not deadlocked after deliberating seven days); <u>Holt v. State</u>, 192 Ga. App. 708, 709, 385 S.E.2d 787 (1989) (jury not deadlocked after four days, "more time than it had taken to try the case"), especially since, after the second announcement of a "deadlock," the jury deliberated more than five hours before reaching a verdict. <u>See</u> <u>Allen v. State</u>, 260 Ga. 147,

28

148, 390 S.E.2d 848 (1990) (fact that <u>Allen</u> charge was not coercive can be inferred from length of time jury continues to deliberate); <u>United States v. Norton</u>, <u>supra</u> (lapse of four hours following <u>Allen</u> charge suggests absence of coercion).

<u>Sears</u>, 514 S.E.2d at 432.

Petitioner has not shown that the Georgia Supreme Court's determinations were unreasonable under section 2254(d). The trial court declined to find the jury deadlocked after only six or nine hours of deliberations. Fisher refused to participate in some of these deliberations. ([15.24] at 21). "[T]he length of time of jury deliberations is a matter of trial court discretion," <u>United States v. White</u>, 589 F.2d 1283, 1290 (5th Cir. 1979), and courts routinely uphold instructions to continue jury deliberations under more extreme circumstances than those in this case. <u>See</u> <u>Packer</u>, 537 U.S. 3 (finding that the trial court's instruction to continue deliberations was not coercive where, after more than 28 hours of deliberations, the jury stated "we can no longer deliberate . . . and that continuing will result in a hung jury"); <u>United States v. Kramer</u>, 73 F.3d 1067, 1072 (11th Cir. 1996) (finding that an <u>Allen</u> charge was not coercive where the jury informed the trial court, after seven days of deliberations, that they were unable to reach a unanimous verdict); <u>United States v. Smalls</u>, 342 F. App'x 505, 508, 510 (11th Cir. 2009) (finding that the trial court's instructions to continue deliberations were not coercive where,

over the course of three days, the jury twice informed the court that they could not agree on a verdict).

Although the jury described itself as deadlocked, "the court is not required to accept the jury's pronouncement of a deadlock but must instead make its own determination." 23A Corpus Juris Secundum Criminal Procedure and Rights of the Accused § 1938 (June 2017 Update); see United States v. Kelley, 187 F. App'x 876, 882 (10th Cir. 2006) ("[A] court is not required to accept the judgment of a jury that is hopelessly deadlocked, and may require it to continue deliberating."); 2A Charles Alan Wright et al., Fed. Prac. & Proc. Crim. § 504 (4th ed. Apr. 2017 Update) (same). The trial court's determination that the jury had not reached a verdict was reasonable in light of the limited duration of their deliberations. See Davis, 779 F.3d at 1313 ("Some jurors deliberate for days before saying they are deadlocked. Others, like these, deliberate for only a few hours. Telling jurors who have deliberated for only a few hours to keep trying is not inherently coercive."); see also Lowenfield, 484 U.S. at 238 (stating that courts, in capital cases, "incontestably" may insist on further deliberations where the jury reports it is unable to achieve a unanimous verdict after deliberating for a short period). The jury also deliberated for approximately five hours after the court's instructions, "a time period not suggestive of a coercive or pressure-filled atmosphere." United

States v. Norton, 867 F.2d 1354, 1366 (11th Cir. 1989) (finding that four hours of additional deliberation suggests a lack of coercion). The Court notes further that, after the verdict, each juror, including Fisher, stated that the verdict announced was their verdict, that they entered it voluntarily and that it still was their verdict. ([15.24] at 37-46). The Court, having weighed the totality of the circumstances, finds that the Georgia Supreme Court had a sufficient basis to properly conclude that the trial court's instructions to the jury to continue their deliberations were not coercive.

2.      The Trial Court's Romine Charge

Petitioner next argues that the trial court's Romine charge was coercive. ([28] at 82, 84). "A Romine charge is the Georgia state-law equivalent of a federal Allen charge." Jones v. GDCP Warden, 815 F.3d 689, 706 (11th Cir. 2016). In Allen v. United States, 164 U.S. 492 (1896), the United States Supreme Court approved the following supplemental instructions, known as an "Allen charge," for use in death penalty cases where the jury is deadlocked:

> [I]n a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for

31

conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself.  If, []on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."

Id. at 501.  An Allen charge is permissible unless the totality of the circumstances shows it was coercive.  See Lowenfield, 484 U.S. at 237 (finding a modified Allen charge was not coercive under the totality of the circumstances); United States v. Woodard, 531 F.3d 1352, 1364 (11th Cir. 2008) ("In assessing whether the [Allen] charge was coercive, we consider the language of the charge and the totality of the circumstances under which it was delivered.").  Relevant circumstances include "(1) whether the charge instructed the jurors that they are not expected to give up their honest beliefs about the weight of the evidence; (2) whether the jury was polled before the charge was given; (3) whether the charge was given after a second notification from the jury that there was difficulty reaching a verdict; and (4) the amount of time between giving the charge and the announcement of the verdict."  United States v. Jones, 518 F. App'x 741, 743 (11th Cir. 2013) (citing Woodard, 531 F.3d at 1364); see Davis, 779 F.3d at 1312 (approving the list of factors set out in Jones).

On September 24, 1993, the trial court issued the following Romine charge to the jury after the jury stated they were deadlocked:

I've received your note.  And in light of your note, I believe it's appropriate to give you some further instructions at this time.  You've been deliberating a while, and I deem it proper to advise you further in regards to the desirability of agreement, if possible.

This case has been exhaustively and carefully tried by both sides.  It has been submitted to you for a decision and verdict, if possible.  While the verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard and deference to the opinion of each other.  A proper regard for the judgments of others will greatly aid us in forming our own judgments.  Each juror should listen to the arguments of other jurors.  If the members of the jury differ in their views of the evidence, or the mitigating or aggravating circumstances, such differences of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their opinion.  It's your duty to decide the issues that have been submitted to you, if you can conscientiously do so.  Do not hesitate to change an opinion if you become convinced it's wrong.  However, you should never surrender honest convictions or opinions in order to be congenial or reach a verdict solely because of the opinions of other jurors.

Members of the jury, the aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the Court.

([15.23] at 30-31).

The Georgia Supreme Court found that the trial court's instructions were not

coercive:

Although the trial court gave a modified <u>Allen</u> charge
(see <u>Allen v. United States</u>, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528
(1896); <u>Romine v. State</u>, 256 Ga. 521, 350 S.E.2d 446 (1986)), it
cannot be said that that charge was coercive.  The court made it clear

33

that, although the jurors should consider the opinions of other jurors, they must never surrender their honest opinions for the sake of expediency.  See Romine, supra; cf. Riggins v. State, 226 Ga. 381, 384, 174 S.E.2d 908 (1970) (trial court remarked that some jurors were "being a little unreasonable, stubborn").

The trial court's other instructions, urging the jury to reach a consensus, and to participate in the deliberations, were not coercive either.  They did not put pressure on the jurors "one way or the other," see Romine, supra at 525, 350 S.E.2d 446; they did not exhort "the minority to reexamine its views in deference to the majority, or to suggest that the majority's position is correct."  United States v. Norton, 867 F.2d 1354, 1366 (11th Cir.1989).  Nor did they urge the jurors "to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors. [Cit.]"  Harris v. State, 263 Ga. 526, 528, 435 S.E.2d 669 (1993). . . .  Moreover, it cannot be said that the verdict was coerced simply because the trial court gave a modified Allen charge after the jury revealed its numerical division (11-1 in favor of the death penalty).  See [Norton, 867 F.2d 1354]; Sanders v. United States, 415 F.2d 621, 631-32 (5th Cir. 1969) (court should not be precluded from giving Allen charge because jury volunteered nature and extent of its division).

Sears, 514 S.E.2d at 432-33.

Petitioner has not shown that the state court's conclusions were unreasonable under section 2254(d).  The trial court gave the Romine charge after the jury's second statement that they were deadlocked, and after the jury had deliberated for approximately nine hours.  See United States v. Bethel, 604 F. App'x 829, 831 (11th Cir. 2015) ("The timing of the charge was not inherently coercive.  The jury had deliberated for approximately five and a half hours before

the charge was issued, and the jury informed the court twice that it could not reach a unanimous verdict."); United States v. Bailey, 468 F.2d 652, 664 (5th Cir. 1972) (finding that giving an Allen charge 3.5 hours after deliberations began was not "improperly precipitous" and noting that a charge 1.5 hours into deliberations did not imply coercion). The trial court's Romine charge was substantially similar to the instructions approved by the Supreme Court in Allen. See Lowenfield, 484 U.S. at 237 ("The continuing validity of this Court's observations in Allen are beyond dispute."); cf. Davis, 779 F.3d at 1312 (stating that "the law of the circuit approves" Allen charges); United States v. Elkins, 885 F.2d 775, 783 (11th Cir. 1989).

The trial court protected against coercion by stating (1) "the verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors in order to reach an agreement," (2) a juror "should never surrender honest convictions or opinions in order to be congenial or reach a verdict solely because of the opinions of other jurors," and (3) "the aim ever to be kept in view is the truth as it appears from the evidence." See United States v. Douglas, 572 F. App'x 876, 877-78 (11th Cir. 2014) ("[A]n Allen charge is not coercive where the district court specifically states to the jury that no juror is expected to give up his or her honest belief regarding the evidence."); see also Davis, 779 F.3d at 1313 (noting that a jury

instruction had "elements that protected against coercion," including a statement that jurors should "not . . . give up an honest belief"). The court's instruction "did not contain any of the elements of the Allen instruction held to be most troublesome: the suggestions that a juror should not trust her own opinions in deliberation or that a member of the jury who found herself in the minority should reexamine her position." United States v. Watchmaker, 761 F.2d 1459, 1465 (11th Cir. 1985).

The jury deliberated for approximately five hours after the Allen charge, indicating that the charge was not coercive. See Bethel, 604 F. App'x at 831 ("[T]he jury deliberated for three hours after the Allen charge, indicating that the charge was not really coercive."). Although the jury, without prompting, disclosed their 11-to-1 vote in favor of the death penalty, this did not preclude the trial court from issuing the Romine charge. See Elkins, 885 F.2d at 784 (finding an Allen charge was not coercive where the judge "was aware of the split in the vote," including because the court "did not request that information"); Sanders v. United States, 415 F.2d 621, 631-32 (5th Cir. 1969) ("The fact that the jury contrary to the instructions of the court volunteered to the court the extent of their division and which way they stood is no reason why the court should be precluded from giving an otherwise proper Allen charge."); see also United States v. Brokemond, 959

F.2d 206, 209 (11th Cir. 1992) ("Unsolicited disclosure of the jury's division by a juror is not by itself grounds for a mistrial."); cf. Norton, 867 F.2d at 1365-66 ("Reversal may not be necessary even where the trial judge undertakes the inquiry [into the jury's vote] and thereafter follows it with an Allen charge, absent a showing that either incident or a combination of the two was inherently coercive."). Having considered the language in the Romine charge and the totality of the circumstances, the Court finds that the Georgia Supreme Court reasonably concluded the charge was not constitutionally coercive.[8]

---

[8] Petitioner complains that the Romine charge referred to "the desirability of agreement if possible" and "admonished the jury that it had a duty to reach a decision if possible." ([28] at 82, 84; [51] at 10-11). The trial court was permitted to include this language in its instruction, including because Georgia has "a strong interest" in obtaining a unanimous jury verdict in capital sentencing proceedings. Lowenfield, 484 U.S. at 238; see Jones, 527 U.S. at 382 ("[W]e have long been of the view that the very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves."); United States v. Rey, 811 F.2d 1453, 1461 (11th Cir. 1987) (upholding an Allen charge that stated "it's your duty to agree upon a verdict if you can do so"); Cornell v. State of Iowa, 628 F.2d 1044, 1046 (8th Cir. 1980) (upholding an Allen charge that referenced "the desirability of agreement if possible"); Walker v. United States, 342 F.2d 22, 26 (5th Cir. 1965) (noting that an Allen charge is intended, in part, to communicate "the desirability of agreement"). The Court notes that the trial judge repeatedly stated that a unanimous verdict should be reached only "if possible." This negates the coercion claimed by Petitioner, and shows the court acknowledged the possibility a unanimous decision might not be reached. Petitioner also complains that, in stating that the "case has been exhaustively and carefully tried by both sides," the trial court "improperly indicated that the inability to reach a unanimous verdict would result in a new

### 3. The Trial Court's Response to Fisher's Note

Petitioner argues that the trial court's response to Fisher's note was coercive because the court failed to "protect Ms. Fisher from her fellow jurors' misconduct" and "did nothing to ensure that each juror voted his conscience and was not influenced by improper considerations." ([28] at 83, 85). On the third day of the jury's deliberations, the foreman sent a note to the trial judge, requesting a definition of perjury and a transcript of the jurors' statements, during voir dire, "as to their position on the death penalty." Fisher also sent a note to the judge, complaining about the conduct of the foreman:

> I am concerned about the actions of the foreman of this jury. This letter is in reference to the foreman's most recent letter to you. Mr. Abrams wrote this letter prior to our jury deliberations today. He informed us that he was submitting the letter to you whether we wanted him to or not. I don't think this type behavior [sic] is appropriate for a foreman. I will not sit on a jury where I am singled out. I am not being treated fairly in this deliberating process. I am also being singled out by the foreman—and, I guess, also—he is overstepping his boundaries as a foreman of the jury. To my understanding, a foreman should be a leader, not a dictator. Please

---

trial." ([28] at 84). Petitioner's conclusion requires several inferential leaps not supported by the remainder of the charge. The trial court's references to the desirability of agreement and to the careful trying of the case were not "partial or one-sided, as neither would lead a reasonable juror to believe that either the majority's or minority's views on the evidence were correct." Douglas, 572 F. App'x at 878. "[N]either of the challenged comments expressed to the jurors that they had no choice but to return a verdict." Id.

explain the duties and responsibilities of a jury foreman. Should he be able—question a juror's response to the Court during jury selection?

([15.24] at 10-12).

The trial court instructed the jury on the responsibilities of the foreman, but declined to provide a voir dire transcript or a definition of perjury:

> On the issue of whether to read the transcript of the jury voir dire, I am not going to do that. Neither am I going to give you a definition of perjury. . . . The foreman is the elected leader of the jury. His responsibilities are to lead the discussions and deliberations of the jury and sign the appropriate forms. The law does not closely define his conduct other than that—other than that. Basically, the foreperson is the elected person responsible for leading the deliberations, leading the discussion. In matters of voting, all jurors stand the same. A juror is responsible to participate in the jury deliberations. A juror is supposed to listen to his or her fellow jurors. A juror is supposed to vote their ideas and their positions. A juror is supposed to participate. It is inappropriate for any juror to do anything other than fully participate in jury deliberations. . . . With these instructions, I'm going to send you back to further your deliberations.

([15.24] at 29-31). The jury returned their verdict approximately three hours after the trial court's instruction.

The Georgia Supreme Court found that the trial court's response to Fisher's note was not coercive. Sears, 514 S.E.2d at 432. Petitioner has not shown this conclusion was unreasonable under section 2254(d). The notes provided by Fisher and the foreman informed the judge (1) that Fisher was the lone hold-out juror, (2) that the foreman likely had accused Fisher of perjury because he believed she

would not vote for a death sentence under any circumstances, and (3) that Fisher felt "singled out" by the foreman during the jury's deliberations. This information did not require the trial court judge to inquire further into the jury's discussions, including because the notes conveyed tensions and disagreements that generally are part of the deliberation process. See United States v. Trucchio, No. 8:04-cr-348-T-24, 2007 WL 45571, at *3 (M.D. Fla. Jan. 5, 2007), aff'd, 273 F. App'x 836 (11th Cir. 2008) ("What Juror # 3 complains about—anger, frustration, disagreements, emotional reactions—are often part of the give and take of the deliberation process and intrinsic influences."); see also United States v. Knight, 58 F.3d 393, 396 (8th Cir. 1995) ("Jury duty can be unpleasant, but difficult, one-sided debate in the jury room does not require a mistrial."); Norton, 867 F.2d at 1366 (declining to "find error in the trial judge's decision not to question the juror regarding the 'duress' he may have experienced during jury deliberations"). The note was Fisher's first and only complaint about another juror, and it did not express concerns about members of the jury other than the foreman.

The trial court adequately protected against coercion by stating that "all jurors stand the same" and that each juror should "vote their ideas and their positions." That the trial court declined to provide the jury with a perjury definition or voir dire transcript also signaled to the jury that the perjury issue was

insignificant and irrelevant to their deliberations. The trial court had emphasized, only one day earlier, that (1) "the verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors in order to reach an agreement," and (2) a juror "should never surrender honest convictions or opinions in order to be congenial or reach a verdict solely because of the opinions of other jurors." See Spears v. Greiner, 459 F.3d 200, 206 (2d Cir. 2006) (finding a supplemental instruction non-coercive even though it did not include cautionary language, including because "the original charge, given to the jury earlier that day, did include cautionary language telling jurors that they had a right to stick to their arguments and stand up for their own strong opinions"); Santana v. Artus, No. 06-cv-7774, 2009 WL 6382488, at *19 (S.D.N.Y. July 1, 2009) (same). "[T]he jury deliberated for three hours after the [trial court's instruction], indicating that the charge was not really coercive." Bethel, 604 F. App'x at 831. The Georgia Supreme Court was permitted, under section 2254(d), to find that the trial court's response to Fisher's note was not coercive. Petitioner's motion for discovery or an evidentiary hearing on Claim IV is denied because Petitioner has not shown the state court's adjudication of this claim was unreasonable under section 2254(d).

C.     Petitioner's Claim III

Claim III asserts that Fisher "was coerced into voting for the death penalty by her fellow jurors' extortionate and threatening behavior," in violation of Petitioner's constitutional rights. ([28] at 75). Petitioner argues that the Georgia Supreme Court's adjudication of this claim was based on unreasonable factual determinations and on an unreasonable application of Lowenfield, 484 U.S. 231. ([28] at 80; [51] at 2, 16). In denying Petitioner's claim that Fisher was coerced to vote for the death penalty, the Georgia Supreme Court stated:

> Fisher, a school teacher, had a bachelor's degree in criminal justice and had attended graduate school. She was the lone holdout for a life sentence—until she changed her mind. Although she testified that she felt bullied by the threat of perjury, she knew that she had not lied under oath. She felt intense pressure from the other jurors. ("I remember being yelled at basically because I was—they were angry at me. They wanted me to change my mind. So they were insulting my character and things like that.") Ultimately, she gave in to that pressure. ("I changed my mind because they had—I mean I was ostracized. And I was just—I was basically made to change my mind by the other jury members.") Viewing Fisher's testimony as a whole, it is clear that she voted for the death penalty because she felt pressured to do so only as a result of the "normal dynamic of jury deliberations." United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990).

Sears, 514 S.E.2d at 433.

The Georgia Supreme Court's finding that Fisher changed her vote in light of the normal dynamic of jury deliberations was not unreasonable under

section 2254(d).  The "normal dynamic of jury deliberations" includes "intense

pressure," which is "often required to reach a unanimous decision."  United

States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990).  The evidence here is that

other jurors yelled and cursed at Fisher, "ostracized" and were "angry" with her,

and told her she "should be prosecuted for perjury" because they believed she

would not vote for a death sentence regardless of the evidence.  ([17.9] at 36-37,

45, 57, 61).  That Fisher was involved in heated—even belligerent—interactions

during the jury's sentencing deliberations is not unexpected, particularly in a death

penalty case, and does not constitute unconstitutional coercion or misconduct.  See

Goode v. Mazzuca, No. 00-cv-7932, 2004 WL 1794508, at *6 (S.D.N.Y. Aug. 11,

2004) ("Allegations of verbal intimidations among jurors, even to the point of

screaming and abusive language, do not rise to the level of clear and strong

evidence necessary to warrant habeas relief."); see, e.g., Mahoney v. Vondergritt,

938 F.2d 1490, 1491 (1st Cir. 1991) (juror's allegation that "she, and at least one

other juror, had been 'pressured' and 'badgered' into finding guilt" was "simply

part-and-parcel of the jury system, and provide[s] neither a basis for inquiry nor

grounds for undermining a verdict"); Jacobson v. Henderson, 765 F.2d 12, 14 (2d

Cir. 1985) (affirming denial of habeas relief under section 2254 where "there was

screaming, hysterical crying, fist banging, name calling, and the use of obscene

language" in the jury room, and "one of the jurors allegedly threw a chair at another, then broke down, crying and claiming that he was a sick man"); <u>United States v. Grieco</u>, 261 F.2d 414, 414 (2d Cir. 1958) (denying relief where a juror stated "she had wished to vote for acquittal, but being the only juror who did, another juror, a man, was 'very abusive,' so much so that she was 'shaking and crying' when she finally agreed to concur with the rest, and that she now wished 'to retract.'"); <u>see also</u> <u>Thompson v. Cain</u>, 161 F.3d 802, 810 (5th Cir. 1998) ("Jury deliberations in a capital case are typically anxiety producing.")

Intense feelings and emotional manifestations often accompany the free and unfettered exchange of views that is the hallmark of our jury system. Although Fisher may have been "singled out" in these exchanges, this is consistent with the fact that she was the only juror in the minority position. ([17.9] at 41).[9] "One would expect that [jurors] in the majority would argue and shout in an attempt to persuade those in the minority to accept the views of the majority." <u>United States v. Musto</u>, 540 F. Supp. 318, 344 (D.N.J. 1982); <u>see</u> <u>United States v. Jones</u>, 132 F.3d 232, 246 (5th Cir. 1998), <u>aff'd,</u> 527 U.S. 373 (1999) ("[M]ajority jurors [routinely] try to sway dissenting jurors in order to reach certain verdicts or

_____

[9] That Fisher was singled out also is understandable because she put headphones on and declined to participate in part of the jury's deliberations. ([17.9] at 61-62).

sentences."); Rey, 811 F.2d at 1460 ("[T]he duty of a juror is rigorous. Deliberations can be long, hard and heated. . . . A majority of jurors eager to go home can exert tremendous pressure on a minority juror."). Fisher, who holds a college degree in criminal justice, understood she had not committed perjury and confirmed in court that her sentencing vote was voluntary and freely entered. ([15.24] at 39, 57). She was a person that had the capacity to stand by her resolve. That she now regrets her decision, years after the verdict was entered, does not render her sentencing vote involuntary or otherwise warrant disturbing the jury's unanimous verdict, which she affirmed was her personal decision when polled. Cf. Jones, 132 F.3d at 246 ("An individual juror no longer exposed to the dynamic offered by jury deliberations often may question his vote once the jury has been dismissed. Such self-doubt would be expected once extrinsic influences bear down on the former jurors, especially in decisions of life and death. When polled, each juror affirmatively indicated that he had voted for the death penalty. We will not allow a juror to change his mind after the jury has rendered a verdict.").

Petitioner argues that the Georgia Supreme Court's decision was unreasonable because the evidentiary record does not clearly show why Fisher decided to change her sentencing vote to death. ([53] at 5, 13). The Court finds, however, that the evidence was sufficient to sustain the state court's findings.

45

Petitioner elicited extensive testimony from Fisher on the circumstances surrounding the jury's deliberations and the impact of those circumstances on her personally. The jury's notes, and the trial court's response to those notes, also were in the record. This evidence permitted the Georgia Supreme Court to determine whether unconstitutional jury coercion occurred, and to find it did not.

Petitioner's argument is based on the incorrect assumption that the state court could not reasonably deny his claims without evidence of Fisher's thought process. It is the objective circumstances surrounding the jury's deliberations, not the juror's subjective perception of those circumstances, that determines whether unconstitutional coercion occurred. See Anderson v. Miller, 346 F.3d 315, 329 (2d Cir. 2003) (denying habeas relief where "Jurors Nos. 2 and 11 felt themselves to be under pressure, perhaps even under duress, to vote in favor of conviction" but "a reasonable juror, standing in the shoes of Juror Nos. 2 and 11, would [not] have thought herself to be facing a physical assault if she refused to vote for conviction"); United States v. Green, 523 F.2d 229, 236 (2d Cir. 1975) ("[T]he proper approach in this case is to determine whether the court's statements were coercive, regardless of the subjective effect on the jurors.").[10] A rule

---

[10] The subjective perceptions of the jury may be relevant under some circumstances but are neither required nor controlling.

allowing a years-later inquiry into a juror's subjective perception of deliberations would undercut the finality of nearly every jury verdict, and result in inconsistent outcomes depending on the composition of the jury.  See Musto, 540 F. Supp. at 344 ("What constitutes pressure to one person will not necessarily constitute pressure to another. . . .  A juror taking a minority position might feel pressure if required to explain the position taken, but no one could seriously contend that such a demand by a foreperson or a majority of the jurors constitutes unfair or undue pressure upon a juror.").  The common law rule is that "the mental processes of the jury in its deliberations are not subject to judicial scrutiny."  United States v. Vincent, 648 F.2d 1046, 1049 (5th Cir. 1981); see Fed. R. Evid. 606(b)(1) ("[A] juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."); Norton, 867 F.2d at 1366 ("The alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict."); cf. Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 865 (2017) ("Some version of the no-impeachment rule is followed in every State and the District of Columbia.").

Petitioner's motion for discovery or an evidentiary hearing on Claim III is denied because he has not shown that the state court's adjudication of this claim was based on unreasonable factual determinations or on an unreasonable application of clearly established federal law.[11]

D.    Conclusion

The showing required under section 2254(d) is exceptionally demanding. Only "extreme malfunctions" in a state criminal justice system warrant relief. Ryan v. Gonzales, S. Ct. 696, 708 (2013). Petitioner has not made the showing required. He has not shown that no fair-minded jurist could agree with the Georgia Supreme Court's denial of Claims III and IV. See Everett, 779 F.3d at 1239 ("As long as some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."). The Court, having considered the totality of the circumstances, finds that the Georgia Supreme

---

[11]    Petitioner's Claim III also asserts that juror Kenneth Makant "did not provide truthful voir dire responses," and that Makant's presence on the jury thus deprived Petitioner of his Sixth Amendment right to a fair and impartial jury. ([28] at 80-81). It is unclear whether Petitioner seeks discovery or an evidentiary hearing on this claim. To the extent that he does, his request is denied for failure to meet his burden under section 2254(d). See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("The petitioner carries the burden of proof" under section 2254(d)). Petitioner failed to argue, in the briefing required by this Court, that the state court's adjudication of his Makant claim "was based on an unreasonable determination of the facts" or "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d).

Court's adjudication of Claims III and IV was not unreasonable under

section 2254(d).  Petitioner's Motions for Discovery and an Evidentiary

Hearing [38] thus are denied.[12]

**III.    CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Petitioner's Motions for Discovery and an

Evidentiary Hearing [38] are **DENIED**.

**IT IS FURTHER ORDERED** that Respondent's Motion to Exceed the

Page Limitation for Respondent's Brief [39] is **DENIED AS MOOT**.


**SO ORDERED** this 20th day of June, 2017.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[12]    Because Petitioner's Motions for Discovery and an Evidentiary Hearing are denied, Respondent's motion to exceed the page limitation in his response brief is denied as moot.