**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DEMARCUS ALI SEARS,** | |
| **Petitioner,** | **1:10-CV-1983-WSD** |
| **v.** | |
| **ERIC SELLERS, Warden, Georgia Diagnostic and Classification Prison,**[1] | **Death Penalty Habeas Corpus 28 U.S.C. § 2254** |
| **Respondent.** | |

## OPINION AND ORDER

This matter is now before the Court for consideration of the merits of the claims in the petition. After careful consideration, this Court concludes that Petitioner has failed to demonstrate that he is entitled to relief.

## I.    Background and Factual Summary

### A.    State Court Proceedings

On September 22, 1993, a jury sitting in Cobb County Superior Court convicted Petitioner Demarcus Ali Sears of armed robbery and kidnapping with bodily injury. On September 25, 1993, after a penalty phase hearing, the jury found four statutory aggravating circumstances and recommended that Petitioner

---

[1]      Pursuant to Fed. R. Civ. P. 25(d), the Court, in its January 2, 2018, Order [62], substituted Eric Sellers, the current Warden, as Respondent in this matter.

1

be sentenced to death. The trial court imposed a death sentence for the kidnapping with bodily injury conviction and a life sentence for the armed robbery conviction.

On July 18, 1996, the trial court denied Petitioner's motion for new trial. Petitioner appealed, and the Georgia Supreme Court affirmed Petitioner's convictions, but remanded the case as to Petitioner's death sentence to allow Petitioner to develop the record regarding his claim of jury misconduct. Sears v. State, 493 S.E.2d 180, 188 (1997). After the remand, the Georgia Supreme Court affirmed Petitioner's death sentence. Sears v. State, 514 S.E.2d 426, 437 (1999). The United States Supreme Court denied Petitioner's petition for a writ of certiorari on October 12, 1999.

Petitioner next filed a petition for a writ of habeas corpus in Butts County Superior Court, which court denied the petition on January 9, 2008. The Georgia Supreme Court denied Petitioner's certificate of probable cause to appeal the denial of his habeas corpus petition on September 28, 2009. The United States Supreme Court, however, granted Petitioner's writ of certiorari, and upon review of Petitioner's claims, vacated and remanded, holding that the Butts County Superior Court failed to apply the proper prejudice inquiry in determining that trial

counsel's facially inadequate mitigation investigation did not prejudice defendant. Sears v. Upton, 561 U.S. 945 (2010).

After the remand, the Georgia Supreme Court vacated its order denying the certificate of probable cause, vacated the Butts County Superior Court's order, and remanded the case for further proceedings consistent with the United States Supreme Court's opinion. On August 16, 2011, the Butts County Superior Court again denied Petitioner's habeas corpus petition, concluding that Petitioner could not demonstrate prejudice with respect to trial counsel's performance during the penalty phase of the trial and otherwise adopting the Butts County court's prior order denying relief. The Georgia Supreme Court granted Petitioner's certificate of probable cause, and, in an opinion issued on November 18, 2013, affirmed the lower court. Sears v. Humphrey, 751 S.E.2d 365 (Ga. 2013). The United States Supreme Court denied certiorari review on May 19, 2014. Sears v. Chatman, 134 S. Ct. 2292 (2014). The instant action was originally filed in 2010 after the Georgia Supreme Court denied Petitioner's certificate of probable cause to appeal the denial of habeas corpus relief. After the United States Supreme Court granted certiorari review in that action, this Court stayed this action to allow Petitioner to exhaust his state court remedies.

B.    Factual Summary of Petitioner's Crimes

According to the Georgia Supreme Court, the evidence presented at

Petitioner's trial was sufficient for the jury to find that:

> [O]n the afternoon of October 7, 1990, [Petitioner] and Phillip
> Williams were walking through Atlanta because their car had broken
> down.  Wanting to return home to Ohio, where they lived, they
> walked to a Waffle House in Smyrna and tried to borrow money from
> several patrons in the restaurant.  They told the patrons that their car
> had broken down and they needed money to go to Cincinnati.
> [Petitioner] carried a black briefcase that contained brass knuckles,
> knives and a set of old handcuffs that was missing a key.  He opened
> the briefcase in the restaurant and tried to sell some of the items to a
> customer.  After receiving directions and a couple of dollars for bus
> fare, [Petitioner] and Williams walked to a nearby Kroger food store.
> A police officer observed them loitering near the Kroger parking lot
> and briefly spoke with them before he left in response to a radio call.
> Subsequently, they decided to steal a car so they could drive back to
> Cincinnati.
>
> They spotted the victim, Gloria Wilbur, when she parked her 1985
> Buick and entered the Kroger.  Around 8:00 p.m., Ms. Wilbur
> returned to her car and placed her groceries in the trunk.  [Petitioner]
> approached her, struck her with the brass knuckles and forced her into
> the car.  Williams then got behind the wheel and they drove north on
> I-75.  [Petitioner] told Ms. Wilbur to keep quiet, pulled her into the
> back seat, and handcuffed her with her hands behind her back.  When
> they stopped for gas and hamburgers, [Petitioner] wedged Ms. Wilbur
> down between the seats and covered her with book bags to prevent
> discovery.  While they were driving through Tennessee, he raped her.
>
> They crossed the border into Kentucky around 1:00 a.m. and stopped
> the car.  Despite her pleas to remain in the car, [Petitioner] took the
> victim into the bushes along I-75 and stabbed her to death.

Ms. Wilbur's body was found, still handcuffed, almost a week later. Her abandoned Buick was discovered in a Cincinnati suburb. Bloodstains in the car matched the victim and pubic hair taken from the back seat matched [Petitioner].

Based on an identification by witnesses at the Waffle House and a tip from an Ohio informant, the police questioned Williams and [Petitioner]. Both men gave statements. [Petitioner] admitted that he had taken the Buick and kidnapped, raped and killed the victim. His statement matched Williams' statement, except that [Petitioner] claimed that it was Williams who had struck Ms. Wilbur with the brass knuckles and Williams claimed that it was [Petitioner]. Both men stated that only [Petitioner] had raped and stabbed her. [Petitioner] also consented to a search of his mother's house, where he lived, and was escorted by police to this residence. He took the police to his room and showed them the black briefcase and brass knuckles. Williams pled guilty in exchange for two life sentences and testified for the state at [Petitioner]'s trial.

Sears v. State, 493 S.E.2d at 182-83.

C.        Proceedings in This Court

On June 25, 2010, days before the United States Supreme Court granted

certiorari in his state court habeas corpus action, Petitioner filed the instant Petition

for Writ of Habeas Corpus. ([1]). On August 20, 2010, the Court stayed the action

pending resolution of the state habeas proceedings. ([9]). The Court held the

action in abeyance until May 29, 2014, when the Court ordered Respondent to file

the underlying record documents and set a deadline for Petitioner to file an

Amended Petition. ([13]). Petitioner filed a First Amended Petition on

August 4, 2014, asserting sixteen claims for relief.  ([28]).  On April 8, 2016, the

Court reviewed Respondent's procedural defenses and dismissed a portion of

Petitioner's Claims I, V, VII, and XI and all of Petitioner's Claims IX, XIII, and

XV.  ([37]).  On June 20, 2017, the Court denied Petitioner's motions for discovery

and an evidentiary hearing.  ([54]).  The parties briefed Petitioner's remaining

claims, which the Court now considers.

## II.    Standard of Review Under 28 U.S.C. § 2254

Pursuant to 28 U.S.C. § 2254, a federal court may issue a writ of habeas

corpus on behalf of a person held in custody pursuant to a judgment of a state court

if that person is held in violation of his rights under federal law.  28 U.S.C.

§ 2254(a).  This power is limited, however, because a restriction applies to claims

that have been "adjudicated on the merits in State court proceedings."  28 U.S.C.

§ 2254(d).  Under § 2254(d), a habeas corpus application "shall not be granted

with respect to [such a] claim . . . unless the adjudication of the claim"

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

This standard is "difficult to meet," <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011), and "highly deferential," demanding "that state-court decisions be given the benefit of the doubt," <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002) (citation and internal quotation marks omitted), and requiring the petitioner to carry the burden of proof. <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) (citing <u>Visciotti</u>, 537 U.S. at 25). In <u>Pinholster</u>, the Supreme Court further held

> that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.

<u>Id.</u> at 181-82; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003) (holding that state court decisions are measured against Supreme Court precedent at "the time the state court [rendered] its decision.").

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court analyzed how federal courts should apply § 2254(d). To determine whether a particular state court decision is "contrary to" then-established law, this Court considers whether that decision "applies a rule that contradicts [such] law" and how the

7

decision "confronts [the] set of facts" that were before the state court. <u>Id.</u> at 405, 406. If the state court decision "identifies the correct governing legal principle" this Court determines whether the decision "unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. This reasonableness determination is objective, and a federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was incorrect. <u>Id.</u> at 410. In other words, it matters not that the state court's application of clearly established federal law was incorrect so long as that misapplication was objectively reasonable. <u>Id.</u> ("[A]n unreasonable application of federal law is different from an incorrect application of federal law."). Habeas relief contrary to a state court holding is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." <u>Harrington</u>, 562 U.S. at 102 (internal quotation marks omitted); <u>see</u> <u>Landers v. Warden, Atty. Gen. of Ala.</u>, 776 F.3d 1288, 1294 (11th Cir. 2015). In order to obtain habeas corpus relief in federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

Not all errors of constitutional magnitude warrant habeas relief, and "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." Chapman v. California, 386 U.S. 18, 22 (1967). A habeas petitioner is entitled to relief only if the error "had substantial and injurious effect or influence in determining the jury's verdict," resulting in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court's review of Petitioner's claims is further limited under § 2254(e)(1) by a presumption of correctness that applies to the factual findings made by state trial and appellate courts. Petitioner may rebut this presumption only by presenting clear and convincing evidence to the contrary.

Finally, the Court notes that in Wilson v. Sellers, 138 S. Ct. 1188 (2018), the United States Supreme Court reversed the Eleventh Circuit's holding in Wilson v. Warden, Ga. Diagnostic Prison, 842 F.3d 1155 (11th Cir. 2016) that addressed how a state appellate court's summary treatment of a claim should be analyzed under § 2254(d). Rather than analyze the arguments or theories that could have supported the state court's summary decision as previously held by the Eleventh

Circuit, federal courts should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rational and presume the that the unexplained decision adopted the same reasoning.  See Wilson v. Sellers, 138 S. Ct. at 1192-97 (discussing the "look through" analysis).  approach announced in Ylst v. Nunnemaker, 501 U.S. 797 (1991).  The Court applies the "look through" approach in evaluating under § 2254(d) the Georgia Supreme Court's summary denial of Petitioner's application for certificate of probable cause to appeal the denial of habeas corpus relief.

## III.    Discussion of Petitioner's Claims for Relief

### A.     Claim I: Ineffective Assistance of Counsel

#### 1.    Legal Standard

Petitioner contends in Claim 1 that his trial counsel rendered ineffective assistance in several ways.  Strickland v. Washington, 466 U.S. 668 (1984), provides the standard for evaluating claims of ineffective assistance of counsel.  The analysis is two-pronged, and the Court may "dispose of the ineffectiveness claim on either of its two grounds."  Atkins v. Singletary, 965 F.2d 952, 959 (11th Cir. 1992); see Strickland, 466 U.S. at 697 ("There is no reason for a court

deciding an ineffectiveness claim . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one.").

Petitioner must first "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment" and show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The court must be "highly deferential," and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). As the Eleventh Circuit has stated, "[t]he test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). Rather, the inquiry is whether counsel's actions were "so patently unreasonable that no competent attorney would have chosen them." Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987). Courts must "allow lawyers broad discretion to represent their clients by pursuing their own strategy," White v.

Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992), and must give "great deference" to reasonable strategic decisions, Dingle v. Secretary for Department of Corrections, 480 F.3d 1092, 1099 (11th Cir. 2007). "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000).[2]

To meet the second prong of the Strickland test, Petitioner must demonstrate that counsel's unreasonable acts or omissions prejudiced him. Strickland, 466 U.S. at 691-92. That is, Petitioner "must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would

---

[2] In his reply memorandum, Petitioner maintains that Chandler "is not the last word" in making a sufficiency of representation determination. ([72] at 10-11). In support, Petitioner misquotes the Supreme Court for the proposition that "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of *effectiveness* in the absence of such an evaluation." ([72] at 11 (emphasis supplied), quoting United States v. Cronic, 466 U.S. 648,665 (1984)). But Cronic addressed whether a presumption of *ineffectiveness* is appropriate for inexperienced trial counsel. Cronic had been convicted of mail fraud, and he raised a claim of ineffective assistance of counsel by, in part, contending that the youth and inexperience of his trial counsel rendered counsel's performance deficient. The Supreme Court discounted that argument, stating, "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of *ineffectiveness* in the absence of such an evaluation. Cronic, 466 U.S. at 665 (emphasis supplied). Cronic does not undermine the presumption of effectiveness required by Strickland.

have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome," id. at 694, requiring "a substantial, not just conceivable, likelihood of a different result."  Pinholster, 563 U.S. at 190 (quotation and citation omitted).

The Court's review of the Georgia Supreme Court' rejection of Petitioner's claim of ineffective assistance of counsel is "doubly deferential."  Id. at 190 (quotation and citation omitted).  The Court takes a "highly deferential look at counsel's performance [under] Strickland . . . through the deferential lens of § 2254(d)."  Id.

> 2. Ineffective Assistance of Counsel During the Penalty Phase of the Trial
>
> a. Background

Petitioner first claims that his trial counsel rendered ineffective assistance by failing to adequately investigate and present mitigation evidence during the penalty phase of his trial.  According to Petitioner, trial counsel failed to uncover evidence relating to Petitioner's social history, family background, sexual abuse that he suffered as a child, his mental deficits, and his abuse of drugs.  Petitioner claims that, if trial counsel had discovered and properly presented this evidence, a

reasonable probability exists that the outcome of the penalty phase of his trial would have been different.

As found by the Georgia Supreme Court, trial counsel's effort to prepare for the penalty phase of Petitioner's trial included first traveling to Kentucky and Ohio for a week to investigate Petitioner's case and to speak with potential witnesses. Sears v. Humphrey, 751 S.E.2d at 372.  While on that trip, trial counsel met Petitioner's mother, and she directed trial counsel to individuals who could appear to testify for Petitioner during the penalty phase.  Id. at 372-73  Trial counsel interviewed "approximately a dozen potential mitigation witnesses" and "explored pertinent areas of mitigation."  Id.  In addition to members of Petitioner's immediate family, "trial counsel talked with a variety of people, including neighbors, long-time family friends, [Petitioner's] former high school counselor, a woman for whom he had babysat, and a young woman who had attended school with him."  Id. at 374.

Trial counsel asked Petitioner's mother to obtain his school records, but trial counsel never received them.  Id. at 375; see also ([21.12 at 28]).  Trial counsel was, however, able to learn about Petitioner's schooling from Petitioner's parents and the school guidance counselor they talked to.  For a variety of reasons that will

be discussed at greater length below, trial counsel also opted not to have a mental health evaluation performed on Petitioner.  Id.

Trial counsel's mitigation defense "involved showing that Petitioner came from a respected, well-liked family; that, despite some problems at school, Petitioner was also well-liked, had never been in any serious trouble, had no history of violence, and was considered polite and well-mannered by teachers, friends, and neighbors; that [codefendant] Williams' influence, Petitioner's own youth and immaturity, and the fact that he was stranded over 400 miles away from home all contributed to his commission of uncharacteristically violent crimes; that he cooperated with police; and that sentencing him to death would devastate his parents, his family, and their friends, who were well-regarded members of his community."  Id. at 377.

During the penalty phase of the trial, counsel presented the testimony of people who knew Petitioner well, including Petitioner's mother, adults who knew Petitioner when he was growing up, and Petitioner's friends.  The witnesses testified that Petitioner was generally friendly and well behaved, that he got along well with his family, and that it was a shock to learn that Petitioner had committed the crimes for which he was convicted.  See id. at 378-80.  They all also pleaded

with the jury to spare Petitioner's life because his death would cause so much pain

to his family.  Id.

> In his closing argument, [trial counsel] asked the jurors to consider the following mitigating factors: (1) [Petitioner's] youth and immaturity at the time of the crimes; (2) his non-violent history; (3) the fact that [Petitioner] was asking for the same "harsh sentence" as Williams, who had pled guilty to the same indictment on which Petitioner was being tried and who counsel argued was a drug dealer, a thief, and "the detail man in this case"; (4) the fact that [Petitioner] would also "be tried, convicted, and punished in Kentucky, . . . where the murder occurred" and where the prosecution was also seeking the death penalty; (5) the fact that Williams initially lied to the police, whereas "Petitioner was candid from the start" and cooperated with police by accompanying them to his parents' home and directing them to the physical evidence; (6) the character of Petitioner's family and the impact sentencing Petitioner to death would have on its members; and (7) a pretrial letter from defense counsel to the district attorney confirming Petitioner's offer to plead guilty to the charges in exchange for two consecutive life sentences, which the defense entered into evidence as authorized by the law at that time.

Id. at 380.

The Butts County Superior Court, in its first order denying habeas relief

[21.12], found that trial counsel's performance during the penalty phase of

Petitioner's trial was inadequate because counsel's investigation to uncover

mitigating evidence was not thorough.  (Id. at 27).  The court concluded, however,

that Petitioner had failed to show prejudice, noting that Petitioner "failed to

establish that there is a reasonable likelihood that the outcome of his trial would

have been different if his counsel had done more investigation." ([21.12] at 29-30). The state habeas corpus court noted that trial counsel presented a reasonable theory of mitigation and that it was impossible to determine "what effect a different mitigation theory would have had" on the jurors. (Id. at 30).

After the Georgia Supreme Court summarily denied review, the United States Supreme Court identified two errors in the Superior Court's Strickland analysis: (1) "the court curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory;" and (2) "the court failed to apply the proper prejudice inquiry" under Strickland which "would have taken into account the newly uncovered evidence of [Petitioner's] significant mental and psychological impairments [introduced in the state habeas corpus proceeding] along with the mitigation evidence introduced during [Petitioner's] penalty phase trial." Sears v. Upton, 561 U.S. at 953-56.

On remand, the Butts County Superior Court assigned a new judge to review the case. In denying relief the second time, the Superior Court expressly declined to address the question of whether trial counsel had been ineffective in failing to perform an adequate investigation in preparation for the penalty phase. ([21.36] at 7). The court, however, made "findings of fact regarding trial counsel's

performance . . . in order to adequately address and analyze the prejudice components of Petitioner's ineffective assistance of counsel claim." (Id. at 8). The court considered the evidence uncovered by trial counsel, evaluated trial counsel's strategy in presenting that evidence and declining a mental health examination, and compared that evidence to the new evidence in evaluating prejudice. (Id. at 7-20). The court found that "even if the evidence presented at the state habeas hearing were presented before the jury, the evidence was not significant enough to reasonably suggest that Petitioner's sentence would have been different." ([21.36] at 20). After reviewing all of the case law cited by Petitioner, as well as additional affidavits, the court concluded that Petitioner was not prejudiced by trial counsel's performance during the penalty phase of the trial because "after weighing the total evidence, of aggravating and mitigating nature, presented at trial and in these proceedings, there is no reasonable likelihood of a different outcome" and denied Petitioner's claim. (Id. at 27).

The Georgia Supreme Court affirmed the Superior Court, providing an equally in-depth analysis. But the Georgia Supreme Court specifically addressed trial counsel's investigation and concluded that "trial counsel conducted a reasonable investigation for mitigating evidence." Sears v. Humphrey, 751 S.E.2d

at 376.  The Georgia Supreme Court further agreed with the Superior Court that, even if trial counsel had been deficient in the investigation for the penalty phase, Petitioner had failed to demonstrate prejudice under <u>Strickland</u>.  <u>Id.</u> at 377.

Having carefully reviewed the Georgia Supreme Court's opinion in light of the record and Petitioner's arguments, this Court concludes that the state court's decision was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," nor did it result "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

      b.    <u>Claim that the State Courts Violated the Supreme Court's Mandate</u>

Petitioner argues that the Georgia Supreme Court's holding is not entitled to § 2254(d) deference and should be reviewed *de novo*, because the U.S. Supreme Court resolved the adequacy of counsel's performance "conclusively," and the issue "was not within the purview of the Georgia Supreme Court to revisit."  ([60] at 59).  The Georgia Supreme Court reasoned that it had authority to address the adequacy of trial counsel's investigation and doing so did not violate the Supreme Court's mandate:

As an initial matter, we address [Petitioner's] claim that the habeas court violated the Supreme Court's mandate in several ways. First, [Petitioner] contends that the habeas court violated the mandate by addressing trial counsel's performance in its 2011 Order. The habeas court concluded in the 2008 Order that [Petitioner] had demonstrated that his counsel's sentencing phase investigation was constitutionally deficient based upon its finding that "counsel's investigation into mitigation evidence [was] limited to one day or less, talking to witnesses selected by Petitioner's mother." The habeas court concluded nevertheless that, "[b]ecause counsel put forth a reasonable theory with supporting evidence," [Petitioner] had failed to prove prejudice. Because the Supreme Court concluded that the habeas court erred in its "analysis regarding whether counsel's facially inadequate mitigation investigation prejudiced [Petitioner]," Sears v. Upton, 130 S. Ct. at 3264, [Petitioner] claims that the habeas court violated the mandate issued by the Supreme Court by re-examining trial counsel's performance when that issue was not before the habeas court on remand. See Briggs v. Penn. R. Co., 334 U.S. 304, 306 (1948) (holding that "an inferior court has no power or authority to deviate from the mandate issued by an appellate court"); In re Sanford Fork & Tool Co., 160 U.S. 247, 255 (1895) ("When a case has been once decided by th[e Supreme C]ourt on appeal, and remanded to [a lower c]ourt, whatever was before th[e Supreme C]ourt, and disposed of by its decree, is considered as finally settled.").

However, we do not read the language of Sears v. Upton as establishing that the Supreme Court "disposed of" either prong of [Petitioner's] ineffective assistance claim. See In re Sanford Fork & Tool Co., 160 U.S. at 256 (stating that "[t]he opinion delivered by th[e Supreme C]ourt, at the time of rendering its decree, may be consulted to ascertain what was intended by its mandate"). Rather, we read the remanding opinion as showing that the Supreme Court only assumed for the purposes of its discussion the correctness of the 2008 Order's conclusion that trial counsel conducted a "'constitutionally inadequate'" investigation. Sears v. Upton, 130 S. Ct. at 3261 (stating that the evidence that [Petitioner] presented in his habeas proceeding

"was not brought to light" at the time of his trial "because – *in the words of the state [habeas] court* – Petitioner's counsel conducted a penalty phase investigation that was 'on its face . . . constitutionally inadequate'") (quoting [Petitioner's] App. to Pet. for Cert. 27B (emphasis supplied)); id. at 3264 (stating that "*[i]n [the habeas court's] view*, the cursory nature of counsel's investigation into mitigation evidence . . . was 'on its face . . . constitutionally inadequate' ") (quoting [Petitioner's] App. to Pet. for Cert. 27B (emphasis supplied)).

Our reading of the Supreme Court's opinion is sound. First, the Supreme Court did not explicitly engage with any evidence in the record regarding trial counsel's performance. Compare, e.g., Wiggins v. Smith, 539 U.S. 510, 523-34 (2003); Williams v. Taylor, 529 U.S. 362, 395-96 (2000); Strickland, 466 U.S. at 699. Second, the Supreme Court never stated that it agreed with the habeas court that the assistance rendered by [Petitioner's] trial counsel was constitutionally deficient. Compare Kimmelman v. Morrison, 477 U.S. 365 (1986) (stating that the Court "agree[d] with the District Court and the Court of Appeals that the assistance rendered [to the defendant] by his trial counsel was constitutionally deficient"). Therefore, we conclude that neither prong of [Petitioner's] ineffective assistance of counsel claim was finally disposed of by the Supreme Court.

Sears v. Humphrey, 751 S.E.2d at 369-70 (footnotes omitted, some alterations in original).

The Court agrees with the state court that nothing in the United States Supreme Court's opinion prevented the state courts from revisiting the question of trial counsel's performance. At a minimum, fairminded jurists "could disagree on the correctness of the state court's decision," Harrington, 562 U.S. at 102 (internal

quotation marks omitted), and habeas relief on this basis is therefore precluded. That the United States Supreme Court denied certiorari and declined to address whether the state court violated its mandate provides additional evidence that fairminded jurists could find that the Georgia Supreme Court had authority to address the adequacy of trial counsel's investigation. Whether the state court actually had this authority is not at issue. Rather, under the rubric of § 2254(d), this Court is concerned only with whether Petitioner has met his burden of demonstrating that the state court's conclusion that trial counsel's performance was constitutionally adequate was objectively unreasonable either in comparison to constitutional law as described by the Supreme Court or in light of the facts as determined by the Georgia Supreme Court. The Supreme Court did not evaluate the state court's initial determination that trial counsel's investigation was deficient, much less "conclusively" dispose of the issue as Petitioner contends.

Even if the Georgia Supreme Court improperly considered the performance prong of the Strickland test, Petitioner has failed to demonstrate entitlement to relief with respect to the prejudice prong, as explained below. Either way, Petitioner's Strickland claim fails.

c.    Trial Counsel's Decision to Forego a Mental Health Evaluation

Petitioner next argues that the Georgia Supreme Court unreasonably determined that trial counsel's decision to forego hiring a mental health expert did not amount to ineffective assistance.  Petitioner criticizes the Georgia Supreme Court's finding that trial counsel had no indication that he had a significant or noticeable mental disorder, see Sears v. Humphrey, 751 S.E.2d at 376, as having no record support.

Petitioner contends trial counsel had ample indication that he suffered from some mental abnormality.  Petitioner argues that trial counsel signed an affidavit characterizing Petitioner's behavior as "odd," "bizarre," "disturbed," "out of touch with reality," and "erratic," and noting that his significant impulsiveness indicated that "he could have some psychological imbalance."  ([60] at 60).  Petitioner maintains that it was obvious that trial counsel should have had Petitioner evaluated, that such an evaluation would have revealed mitigation evidence, and that this new evidence would have a reasonable probability of changing the outcome of the penalty phase of Petitioner's trial.

The record reveals significant countervailing factors that led trial counsel to forego a mental health examination.  Trial counsel initially filed a motion for funds

to hire a mental health expert, but after they returned from their trip to Ohio and Kentucky, counsel withdrew the motion for a variety of reasons. Key among those reasons was the evidentiary rule established in Sabel v. State, 282 S.E.2d 61 (Ga. 1981), which was then the law of Georgia. Under Sabel, if trial counsel had hired a mental health expert, they would have had to turn that expert's report over to the prosecution, and the prosecution would be permitted to call that expert to the stand even if the defense opted not to. Id. As a result, even if the expert's evaluation revealed something that trial counsel wanted desperately to keep the jury from learning – for example, a diagnosis of psychopathy – prosecutors would have access to that information and would be free to tell the jury about it as well as point out that trial counsel was trying to hide this information from the jury. Trial counsel also harbored concerns that Petitioner might divulge incriminating information to the examiner during a psychological examination, and that information might be reflected in the report that prosecutors would see. (See [20.32] at 47).[3]

---

[3]      Petitioner also contends that the effect of the rule in Sabel, was to deny him of effective assistance. ([60] at 68-70). In his Claim II, discussed below, Petitioner argues that he was deprived of a fair trial because the of how the trial court applied the rule in Sabel. This Court considers Petitioner's claim that the trial court's

Finally, at that time, when faced with requests for a mental health examination, Superior Court judges in Cobb County had the practice of appointing a mental health expert employed by the state, and to trial counsel, "it appeared that probably we were going to get a whitewash, for want of a better word, from that type of expert." (Id. at 27-28).

As found by the Georgia Supreme Court:

Trial counsel testified that, in deciding to withdraw the motion [for an expert mental health evaluation], they considered the fact that the trial judge who was assigned to the case routinely appointed a Georgia Regional Hospital doctor when indigent defendants sought expert psychological assistance. Based on their own experience and discussions with other attorneys who were experienced in obtaining mental health evaluations for their indigent clients in Cobb County, trial counsel did not think that a mental health evaluation by a state doctor was likely to yield anything helpful to [Petitioner]. In addition, given [Petitioner's] inclination to present himself as a "tough guy," counsel were concerned that, even if he received the warnings required by Estelle v. Smith, 451 U.S. 454 (1981), and Miranda v. Arizona, 384 U.S. 436 (1966), [Petitioner] might make damaging statements that could be recounted by a court-appointed psychiatrist at trial. Thus, counsel stated that, because of the law at the time, they feared that an evaluation would almost certainly benefit the prosecution.

Sears v. Humphrey, 751 S.E.2d at 375.

---

Sabel ruling caused his trial counsel to be ineffective to be a part of that broader claim.

The Georgia Supreme Court acknowledged trial counsel's affidavit statements and deposition testimony concerning Petitioner's "bizarre" speech and demeanor, but the state court noted that trial counsel also "testified that they never had any trouble communicating with [Petitioner]." Id. at 375-76. Trial counsel further testified that they never "saw any behavior by [Petitioner] indicating any type of mental deficiency that could be used in mitigation and that, if they had, they would have had [Petitioner] evaluated despite the fact that the rule in Sabel was in effect at the time of [Petitioner's] trial." Id.

The Georgia Supreme Court also noted:

> Counsel discussed their options with [Petitioner], "advis[ing] him that it was problematic whether the appointment of a mental health expert would be advantageous or necessary to the defense." Both attorneys testified that, after consulting with counsel, it was [Petitioner's] choice not to be evaluated. See Strickland, 466 U.S. at 691 (stating that it is proper for counsel to base their actions on "informed strategic choices made by the defendant").

Id.

The record establishes that trial counsel carefully considered the decision not to have Petitioner undergo a mental health evaluation. The Georgia Supreme Court based its conclusion that trial counsel was not ineffective for failing to secure such an evaluation on a broad range of evidence. It was based, in part, on

trial counsel's considered opinion that a mental health evaluation would not reveal helpful mitigating evidence. It was further based on trial counsel's reasonable strategic decision that the possible benefits of a having Petitioner evaluated were far outweighed by the potential costs, especially given the possibility that Petitioner may disclose something harmful, the disclosure requirements imposed in Sabel, and the small likelihood that the court-appointed mental health expert would render a helpful opinion. Even trial counsel's affidavit, so heavily relied upon by Petitioner, highlights trial counsel's struggle in wrestling with the decision to withdraw their motion for an evaluation and that they had a reasonable strategic basis for doing so. After considering the Sable ruling and Cobb County's practice concerning the appointment of psychological experts for indigent criminal defendants, they "determined that we could not have [Petitioner] examined pretrial without facing an untenable risk of doing more harm than good." ([19.11] at 97). Further:

> As an alternative to seeking a mental health evaluation which was likely to be harmful overall to our client, under Georgia law at the time, we developed an alternate strategy for the sentencing phase of trial. It was our hope that the Sears family, neighborhood friends and other lay witnesses could portray [Petitioner] as a previously non-violent teenager who committed a terrible crime which was out of character for him, thereby avoiding the ultimate punishment.

([20.32] at 108-09).

Such reasoning is the essence of strategic thinking under Strickland.  The Court thus concludes that the Georgia Supreme Court did not error in holding that trial counsel's decision to forego a mental health evaluation for Petitioner did not render counsel's assistance ineffective.

Petitioner mischaracterizes the Georgia Supreme Court decision in stating that the court "ruled that unless counsel is able to observe a 'significant and noticeable disorder,' counsel is absolved of the duty to explore their client's mental health."  ([60] at 64).  The Georgia Supreme Court actually said that it agreed with the Butts County Superior Court "that 'without any indication that Petitioner was suffering from any *significant*, noticeable disorder,' trial counsel made a reasonable strategic decision not to have him evaluated by a mental health expert *under the circumstances facing counsel at the time*."  Sears v. Humphrey, 751 S.E.2d at 377 (quoting [21-36 at 11]) (emphasis supplied).  The Georgia Supreme Court explained at length that, while some evidence existed that Petitioner had some mental dysfunction, trial counsel reasonably declined a mental health evaluation given the significant countervailing factors trial counsel faced at the

time (i.e. the <u>Sabel</u> disclosure rule and the likely opinion of a court-appointed expert). This Court agrees.

        d.     <u>The Georgia Supreme Court's' Conclusion that Trial Counsel Conducted a Reasonable Investigation</u>

In his final brief, Petitioner dedicates significant argument to his contention that the Georgia Supreme Court unreasonably determined that trial counsel conducted a reasonable investigation in preparation for the penalty phase of the trial. According to Petitioner, trial counsel spent only a single afternoon of their trip to Ohio interviewing mitigation witnesses and never followed up on the information that they learned. ([60] at 80-88). It was on this basis that the Butts County Superior Court originally determined that trial counsel's performance was deficient. ([21.12] at 27).

Petitioner further contends that many of the Georgia Supreme Court's findings regarding trial counsel's investigation are not supported by the record. For example, the state court found that trial counsel talked to Petitioner "about recording evidence from him regarding his background, family history, [and] social history," and that trial counsel collected names of potential mitigation witnesses from Petitioner. <u>Sears v. Humphrey</u>, 751 S.E.2d at 372. Petitioner contends that because trial counsel's files contain no evidence regarding

background or a list of witnesses provided by Petitioner, the state court's finding has no support. ([60] at 84). However, in his deposition, trial counsel testified that he told Petitioner that he needed to provide trial counsel with evidence on his background, his family history, and his social history. ([20.32] at 77). Trial counsel further testified that Petitioner had provided names of mitigation witnesses to talk to. ([20.35] at 35-36). Petitioner does not refute this testimony. That trial counsel's files lack additional evidence supporting this testimony does not render the state court's finding incorrect, and the record supports the state court's finding.

Petitioner next argues that none of the mitigation witnesses that trial counsel interviewed in Ohio were selected by trial counsel "as part of a specific effort to uncover evidence of [Petitioner]'s background or mental impairment." ([60] at 75). Rather, Petitioner contends, trial counsel relied entirely on Petitioner's mother to identify which witnesses should be interviewed, and, as a result, the witnesses "were not chosen by a professional with an understanding of what constituted relevant, admissible evidence." (Id. at 76).

Petitioner mischaracterizes the evidence. While Petitioner's mother gathered the witnesses to her home that day, the people that she chose were based on counsel's description of the types of people trial counsel wanted to interview.

([20-32] at 57). Trial counsel, who did not know Petitioner or his family and did not live in Ohio, acted reasonably in describing to Petitioner's mother the types of people he needed to talk to and allowing her to arrange a meeting with those people.

This case is distinguishable from Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011), cited by Petitioner. ([60] at 76). In Ferrell, the Eleventh Circuit concluded that the Georgia Supreme Court was unreasonable in concluding that trial counsel had not been deficient in investigating Petitioner's background and mental health. Ferrell's jury never heard that:

> Ferrell suffers from extensive, disabling mental health problems and diseases including organic brain damage to the frontal lobe, bipolar disorder, and temporal lobe epilepsy. Nor did they learn that the defendant had attempted suicide at age eleven, or that because of these mental health issues, Ferrell exhibits increased impulsivity and decreased sound judgment; that his conduct was not entirely volitional; or that his judgment and mental flexibility were significantly impaired by organic brain damage. Nor, finally were they ever told that Ferrell's father was physically abusive to his children, especially to Ferrell, waking them in the middle of the night to beat them (sometimes after stripping them naked) with razor strops, fan belts, and old used belts; that the family was repeatedly evicted from their homes and hungry, and lived in fear of those to whom the father owed gambling debts; or that Ferrell's mother suffered from clinical depression, suicidal ideations, rage blackouts, and urges to physically injure her children.

Id. at 1203.

The evidence presented in Ferrell's state habeas corpus proceeding included evidence that Ferrell suffered from daily seizures, and that "the actions of an individual with Ferrell's types of impairment "are not entirely volitional," because "[d]uring a complex partial seizure a person is overtaken by a powerful emotion, usually anger or fear, by hallucinatory voices or visions, or by a vivid flashback," and "[s]eizures also alter the behavior which takes place between or after the seizures, or interictally, resulting in lack of awareness, dullness, and confusion as neurofibers in the brain readjust." Id. at 1213. Ferrell's original trial counsel, who represented Ferrell briefly, testified that Ferrell's mental health problems were "overt and fairly apparent to anyone who cared to look closely." Id. at 1227-28. The investigator who was charged with collecting mitigating information regarding Ferrell, "admitted that in preparation for trial, she had only asked statutory character evidence questions of the potential witnesses, and only followed up with them if they said anything positive about Ferrell." Id. at 1216.

Ferrell's trial counsel had obtained a mental health evaluation, but it was limited to "whether Ferrell was retarded and whether he suffered from any problems that would affect the waivers of Miranda rights he had signed for the police," and there was no diagnosis of any of Ferrell's significant mental health

deficits.  Id. at 1211.  Ferrell's jury also never heard any of the available

humanizing evidence, such as Ferrell's "kind personality, strong work ethic, and

other personal characteristics."  Id. at 1220.

Unlike Ferrell, trial counsel in this case had a reasonable basis to forego a

mental health evaluation, and as will be discussed below, the mental health

evidence that Petitioner presented at the state habeas corpus proceeding is not

compelling.  Moreover, while trial counsel may have interviewed mitigation

witnesses for a single day, their questioning of those eleven witnesses was

extensive – comprising some fifty-two pages of single-spaced transcript – and

provided trial counsel with sufficient information to make the reasonable strategic

decision to present the mitigation theory they ultimately used.  ([19.17] at 12-64).

In questioning those witnesses, trial counsel asked (1) whether Petitioner had

ever done anything that might indicate that he might commit this type of crime; (2)

whether he took drugs or drank alcohol; (3) whether he carried knives or other

weapons; (4) what his relationship was like with his parents and his siblings; (5)

whether they felt that he needed psychiatric treatment or whether they felt

something was wrong with him; (6) whether he hated white people or was a violent

person; (7) whether Petitioner was mentally deficient.  ([19-17] at 12-64).  The

eleven witnesses were all individuals who knew Petitioner well. They included family friends who were Petitioner's parent's age, as well as his peers. At least three of them worked as mental health nurses. One, a psychiatric nurse, indicated that she thought he needed to see a psychiatrist because he wouldn't interact with other children his age but would stand off by himself with a blank look on his face. (Id. at 13-16). Trial counsel also talked to Petitioner's high school guidance counselor about Petitioner's schooling. She told trial counsel that Petitioner had trouble in school staying on task and that his behavior was distractive to other students rather than violent, and that Petitioner had been placed in the Severe Behavioral Handicap Unit. (Id. at 19). Other witnesses interviewed by trial counsel stated that Petitioner got along well with his parents and that he had a good family life. (E.g., [20.33] at 70). It is thus clear that trial counsel in this case performed a much more thorough investigation than trial counsel in the Ferrell case, and that their investigation was sufficient for them to make informed choices regarding trial strategy during the penalty phase of the trail.

Petitioner next argues that trial counsel's failure to obtain Petitioner's school records rendered their investigation deficient. Trial counsel, however, was aware of Petitioner's problems in school. According to the Georgia Supreme Court, trial

counsel's file "contained the names and addresses of the schools [Petitioner] attended and notes summarizing [Petitioner's] school history, including that he transferred to a different high school after 'encounter[ing] behavior problems,' that he had 'numerous suspensions' at both schools, that he left school and moved out of his parents' home in October of 1990, and that he returned home a couple of weeks later." Sears v. Humphrey, 751 S.E.2d at 375 (quoting exhibits). Given that trial counsel knew about Petitioner's troubles in school, their strategic decision not to dig deeper into Petitioner's school records was sufficiently informed to meet the constitutional standard.

Although trial counsel never testified that they chose not to obtain Petitioner's school records for strategic reasons, this Court must "presume, in accordance with the general presumption of attorney competence, that counsel's actions are strategic. In the absence of any evidence to overcome the presumption, no constitutional error is shown." Stanley v. Zant, 697 F.2d 955, 970 (11th Cir. 1983) ("We decline to infer from such silence an absence of strategy.").[4]

---

[4]     Petitioner's habeas corpus counsel had the opportunity to question trial counsel regarding their strategy in connection with Petitioner's school records and Petitioner's background at their depositions. When Ray Gary, Jr., testified, Petitioner's habeas corpus counsel asked him only questions about whether he met Petitioner's father for the first time before the trial or during the trial and the

35

Petitioner has presented no evidence to overcome this presumption, and this Court concludes that counsel's conduct was not "so egregious as to raise an inference that it could not reasonably be part of any legitimate strategy." Id. at 969. As discussed in the next subsection, trial counsel developed a reasonable theory for the penalty phase, and it was thus reasonable for trial counsel to determine that Petitioner's school records were not pertinent to that theory.

Based on the record, the Court concludes that "fairminded jurists could disagree on the correctness" of the Georgia Supreme Court's conclusion that trial counsel carried out a reasonable investigation into mitigation evidence, and relief on this claim is precluded under § 2254(d). Harrington, 562 U.S. at 101.

               e.     Trial Counsel's Mitigation Theory was Reasonable

The Georgia Supreme Court also concluded that "trial counsel developed a reasonable mitigation strategy that included showing the good character of [Petitioner] and his family and the impact that a death sentence would have on his

---

reasons that trial counsel did not have him testify at Petitioner's trial. ([20.35] at 46-55). When Julian Michael Treadaway testified, Petitioner's counsel asked him no questions. ([20.32] at 90). The affidavit of trial counsel that Petitioner submitted in the state habeas corpus proceeding discussed only (1) the Sabel issue, (2) trial counsel's decision to withdraw their motion for a mental health examination, (3) the mitigation witnesses they interviewed, and (4) their theory of defense during the penalty phase of Petitioner's trial. ([20.32] at 99-113).

family." <u>Sears v. Humphrey</u>, 751 S.E.2d at 377.  Petitioner contends that trial counsel's investigation was so inadequate that trial counsel did not have sufficient information to reasonably decide to pursue their theory of mitigation.  However, the Court concludes that the Georgia Supreme Court's finding that the investigation was reasonable is entitled to deference under § 2254(d).  The Court further concludes that, given the information known to counsel, it cannot be said that no reasonable attorney would have pursued trial counsel's theory of mitigation, and the Georgia Supreme Court's conclusion regarding trial counsel's theory is likewise entitled to § 2254(d) deference.

The Court concludes that Petitioner has failed to demonstrate that the Georgia Supreme Court's conclusion that trial counsel's performance was adequate is not entitled to deference under § 2254(c).

       f.    <u>Prejudice</u>

              i.    <u>Evidence Presented in the State Habeas Corpus Proceeding</u>

In its order affirming the denial of state habeas corpus relief, the Georgia Supreme Court provided an in depth description of the evidence that Petitioner introduced in the state habeas corpus proceeding.  <u>See</u> <u>Sears v. Humphrey</u>, 751 S.E.2d at 380-88.  That evidence concerned Petitioner's brain damage,

"debilitating psychiatric symptoms," difficult childhood, drug use, and childhood sexual abuse.[5] Petitioner contends that if this evidence had been presented to the jury, the outcome of Petitioner's trial would have been different.

The Court turns first to the evidence of Petitioner's neurological and psychological deficiencies that he introduced at the state habeas corpus hearing. Dr. Tony Strickland, a neuropsychologist, examined Petitioner and concluded that Petitioner has significant frontal lobe abnormalities caused by head injuries and adolescent drug use. The abnormalities resulted in deficits in Petitioner's ability to control his reactions and behaviors, and to plan. ([18.27] at 6). According to Dr. Strickland, Petitioner's "biggest challenge is one of impulsivity, poor planning, poor judgment and a compromise in autonomy." ([18.25] at 43). Dr. Strickland testified that Petitioner had "a marginal capacity for reflection and decision-making, particularly when faced with distracting stimuli. His ability to organize his choices, assign them relative weight and select among them in a deliberate way is grossly impaired. He instead reacts to problems impulsively and becomes disorganized and confused." ([18.27] at 8).

---

[5] Petitioner also presented evidence in the state habeas corpus proceeding regarding his unusual behavior as a child that he did not raise in his final brief before this Court.

Dr. Richard G. Dudley, Jr., a psychiatrist, also examined Petitioner. Dr. Dudley concluded that his "assessment established a picture of [Petitioner] as severely compromised in his capacity for sound decision-making and reasoned behavior." ([18-28] at 31). Specifically, Dr. Dudley concluded that Petitioner "exhibits extreme impulsivity, drastically impaired executive functioning, inappropriate affect, mood disturbance and grandiose thinking that is so severe that his contact with reality is at times tenuous." (Id.). According to Dr. Dudley, Petitioner is "substantially disabled under the best of circumstances," and that with the addition of stress, his "functioning rapidly decompensates even further and purposeful behavior all but ceases." (Id. at 59). Dr. Dudley stated that in his "professional opinion . . . [Petitioner]'s specific psychiatric, emotional and cognitive disturbances directly lead [sic] to the events of that weekend careening beyond his control." (Id. at 62-63).

Regarding Petitioner's childhood, Petitioner introduced evidence at the state habeas corpus hearing regarding the dysfunction in his immediate family. According to this evidence, Petitioner's parents argued frequently, and these disagreements occasionally became physical. Petitioner portrays his parents' physical fights as frequent, but he mentions only two instances where the children

witnessed a physical altercation. On one occasion, Petitioner's father dragged Petitioner's mother by the hair. ([19.9] at 31). On the other occasion, Petitioner's parents were engaged in an argument when Petitioner's father "just snapped." He "came at" Petitioner's mother, and she screamed at Petitioner's brother to bring her a knife which the brother did. (Id. at 58). Petitioner's evidence further indicates that his parents often demeaned each other and that his mother cheated on his father.

As to Petitioner's treatment by his parents, Petitioner's mother is portrayed as being distant and uninterested in her children, especially Petitioner. When she felt that the children were bothering her, she would beat and verbally abuse them. ([18.28] at 51). Some witnesses noted that Petitioner's mother openly favored Petitioner's brother. (Id. at 53).

Petitioner's father, who was wheelchair-bound as the result of an accident[6] while he was in the Army, was more engaged, but according to Petitioner's evidence, his attention to him was negative. He beat the children and used disciplinary practices that were borrowed from his military service. After Petitioner and his brother broke a window, their father made them dig a hole in the

---

[6] The record is unclear as to whether Petitioner's father was injured in a helicopter accident or a skydiving accident.

back yard that was big enough to bury the window. (Id. at 48). Petitioner's father was also particularly critical of Petitioner, and when Petitioner failed to meet his unrealistic expectations, he would openly criticize him. (Id. at 49-50).

Petitioner also introduced evidence that he was sexually abused by an older cousin. According to Petitioner's brother, the cousin liked to take the younger children into a closet and try to rub their genitals or grind his genitals on them. ([18.28] at 45). Petitioner's brother never saw the cousin molest Petitioner, but he claimed that he saw the cousin take Petitioner into the closet. (Id. at 46). Petitioner himself has never claimed that he was sexually abused, but one witness testified that while he was smoking "weed" with Petitioner, Petitioner told him that "someone" had "molested" him and his brother when they were young but did not provide any further details. Sears v. Humphrey, 751 S.E.2d at 385.

### ii. The Georgia Supreme Court's Prejudice Analysis

In weighing the mitigation evidence that Petitioner presented in the state habeas corpus proceeding, the Georgia Supreme Court first pointed out that it agreed with the Butts County Superior Court's conclusion that much of the evidence that Petitioner presented was unreliable. The affidavits Petitioner submitted "'contained a great deal of hearsay and speculation testimony, which

41

would have not been allowed before the jury,'" Id. at 380 (quoting the state habeas

corpus court), and the affidavit testimony on which the mental health experts relied

was weak. Id.

Regarding Petitioner's social history and family background testimony, the

Georgia Supreme Court found that much of that evidence would not have been

admissible or relevant. Id. at 381. Of the admissible evidence, the court concluded

that much of it was inconsistent. For example, Petitioner's evidence of

maltreatment by his parents was countered by other evidence that indicated that

"both parents were involved with their children and attempted to provide the best

for them," and that Petitioner's father, in particular, worked hard to make

Petitioner a better person. Id. at 384.

The state court further concluded that Petitioner's evidence of his

dysfunctional family pales in comparison to the type of dysfunction evidence the

omission of which the United States Supreme Court has found prejudicial.

> "In any event, all of the family dysfunction testimony, even taken
> together and credited as true, is weak and a far cry from the horrific
> childhood circumstances that have been held sufficient to satisfy the
> prejudice prong in a capital case." DeYoung v. Schofield, 609 F.3d
> 1260, 1291 (11th Cir. 2010) (finding that the defendant was not
> prejudiced by the omission of mitigating evidence that included
> testimony that his father was "hyperrational, judgmental,
> authoritarian, obsessive, and emotionally distant" and that his parents

"showed [him] little affection"). <u>Compare</u> <u>Rompilla v. Beard</u>, 545 U.S. 374, 391-92 (2005) (stating that omitted mitigating evidence included evidence that the petitioner's parents were alcoholics; that his father frequently beat his mother, bragged about his infidelity, beat the petitioner, and locked him in an excrement-filled dog pen; and that the petitioner slept in an unheated attic and went to school in rags); <u>Wiggins</u>, 539 U.S. at 534-35 (noting omitted mitigating evidence, inter alia, of "severe privation and abuse in the first six years of . . . life" and "physical torment, sexual molestation, and repeated rape during . . . subsequent years in foster care"); <u>Williams</u>, 529 U.S. at 395 (finding that omitted mitigating evidence of defendant's "nightmarish childhood" included his parents' imprisonment for criminal neglect of him and his siblings, his severe and frequent beatings by his father, and his commitment to an abusive foster home). Thus, we conclude that trial counsel's failure to present [Petitioner's] new evidence about his allegedly damaging home environment did not result in prejudice sufficient to support the success of his overall ineffective assistance of trial counsel claim.

<u>Id.</u> at 384-85.

With respect to Petitioner's evidence that he was sexually abused, the

Georgia Supreme Court noted that the only evidence that Petitioner himself ever

claimed that he was abused was the hearsay affidavit testimony of another witness.

The remaining evidence was all based on the claims made by Petitioner's brother,

Demetrius. With regard to that evidence, the Georgia Supreme Court concluded:

[T]his evidence would have carried little weight with the jury for several reasons. Regarding Demetrius' testimony, we conclude that the jury would not have found it very persuasive, considering its equivocal nature, Demetrius' obvious interest in his brother's case, and, . . . the fact that he was subject to impeachment based on his

prior felony convictions. As to [another witness]'s hearsay affidavit testimony, he testified that he had only known [Petitioner] for a relatively short period of time when he and [Petitioner] began to get "high" together on "weed" every morning and that it was during one of their conversations while they were "hanging out" that [Petitioner] told him only that "someone" had "molested" him and Demetrius when they were young without providing any further details. Thus, [Petitioner] failed to show that this testimony is anything other than unreliable hearsay. See Gissendaner v. State, 532 S.E.2d 677 (Ga. 2000) (holding that the rules of evidence are not suspended in the sentencing phase but that they may, under proper circumstances, yield to the need to present reliable mitigating evidence). Most significantly, [Petitioner] did not report that he had ever been sexually abused to either of the habeas mental health experts who examined him, and, as Dr. Strickland noted in his report and affirmed through his affidavit, [Petitioner] denied any sexual abuse to the mental health professionals treating him at the Georgia Diagnostic and Classification Center. Thus, we conclude that the omission of the weak evidence submitted in the habeas proceedings that [Petitioner] was sexually abused as a child did not result in prejudice sufficient to support the success of his overall ineffective assistance of trial counsel claim.

Id. at 385.

After reviewing the mental health evidence that Petitioner presented at the

state habeas corpus proceeding, the Georgia Supreme Court held:

While the testimony that [Petitioner] suffers from some brain impairment and mental health problems is uncontroverted and certainly has potential mitigating value, we conclude that he was not prejudiced by the omission of this evidence at trial for the following reasons: (1) the weakness of much of the evidence upon which [Petitioner's] mental health experts relied to support their testimony and diagnoses; (2) the aggravating potential of this evidence; (3) the

testimony's inconsistency with the evidence at trial; and (4) the strength of the aggravating circumstances in [Petitioner's] case.

Id. at 388.

The state court pointed out that, in making his diagnoses, Dr. Strickland relied in part on Petitioner's history of brain trauma and the substance-induced changes in brain function that accompany cocaine abuse. Id. at 389. The court then noted:

> the only records of medical treatment received by [Petitioner] before his incarceration that are in the record concern his burned hand at age 15, and Dr. Strickland reported that [Petitioner] told him that this was the only occasion that he had ever been hospitalized. Thus, Dr. Strickland testified, he relied on [Petitioner's] self-reporting, family affidavits, and the fact that [Petitioner] has two scars on his head to verify his history of head injuries.

Id.

The Georgia Supreme Court acknowledged that Petitioner had provided evidence that he had suffered from head injuries, but found that the Butts County Superior Court

> was authorized to consider the evidence upon which Dr. Strickland's opinion was based and, specifically, to consider that [Petitioner] submitted no medical records to verify the severity of these head injuries or to show whether [Petitioner] could have possibly suffered brain injuries as a result of these head injuries. See Windom v. Sec'y, Dept. of Corr., 578 F.3d 1227, 1249 (11th Cir. 2009) (finding it unlikely that a death row petitioner's expert testimony "would have had much impact on the [sentencer's] choice of sentence" considering,

among other things, that the opinions "lacked a medically verifiable foundation, e.g., hospital records confirming that [the petitioner] in fact suffered head trauma leading to brain damage").

Id.

The Georgia Supreme Court further noted that Dr. Strickland relied on

Petitioner's "significant" history of drug abuse, but pointed out that

> Dr. Strickland acknowledged that he relied upon [Petitioner's] self-reporting for the information that he had a "significant history of marijuana and cocaine use that began at [ages] 12 to 13 and increased in its intensity through ages 14 to 18 up to incarceration" and that he did not review any documents or interview anyone who corroborated [Petitioner's] account. At trial, the State would certainly have challenged Dr. Strickland's diagnosis, given the fact that there was no testimony that [Petitioner] ever used cocaine or that his marijuana use began before the age of 16. See Humphrey v. Nance, 744 S.E.2d 706 (2013) (finding it reasonable to conclude that an expert's testimony had been discredited, where the State "challenged the source and veracity of several alleged events in [the defendant]'s history" that the expert relied on to form his diagnoses based on the lack of testimony, or on "arguably contradictory testimony," regarding the alleged events).

Id.

With respect to Dr. Dudley's diagnosis, the Georgia Supreme Court pointed

out that he relied on Petitioner's parents' psychological and physical abuse in

determining that Petitioner suffered from self-esteem and abandonment issues, and

noted that

[t]he evidence regarding [Petitioner's] parents' verbal and physical abuse of him is hardly compelling. Moreover, the presentation of testimony that [Petitioner's] parents' "abandonment" and abuse were responsible for his "profound" personality disorder and that his own voluntary drug use was partly responsible for his brain damage and cognitive deficiencies would have negated or displaced the strong testimony that trial counsel presented at trial regarding the good character of [Petitioner] and his family. See Cannon v. Gibson, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (finding that a death row petitioner was not prejudiced by the omission of mitigating evidence of his "serious brain damage" and lack of impulse control, where such evidence would have "negated" or "displaced . . . the mitigation evidence actually adduced at trial" that portrayed him as a "kind, compliant, and responsible individual whose involvement in the murder was an aberration").

Id. at 389-90.

Regarding Dr. Dudley's diagnosis, the Georgia Supreme Court further concluded that the Butts County Superior Court finding that Dr. Dudley admitted that Petitioner would not discuss the facts of the crime with him is not clearly erroneous. The Georgia Supreme Court noted that Dr. Dudley admitted in his testimony that "he and [Petitioner] did not talk 'that much' about that trip or the facts of the crime," that Petitioner "'was unclear about the rape,'" and that Petitioner "'didn't want to talk about'" the murder. Id. As a result, the Georgia Supreme Court concluded that "this testimony would discredit Dr. Dudley's

opinion that [Petitioner's] deficits were responsible for his behavior at that time."
Id.

The Georgia Supreme Court also pointed out that Petitioner's school records
indicated that he was of average intelligence and that his troubles in school were
caused by Petitioner not working hard enough, not behaving, and not taking
responsibility for the organization of his school work.  Id.  Accordingly, the court
held, Drs. Dudley's and Strickland's claim that Petitioner suffered from significant
mental deficits from an early age was unsupported.  Id. at 390-91.

In summarizing its view of the mental health evidence, the Georgia Supreme
Court stated:

> In light of the guilt/innocence phase evidence that [Petitioner]
> committed four violent capital felonies in quick succession and the
> sentencing phase evidence that the commanding officer at the Cobb
> County detention center could not recall an inmate in his 17 years of
> experience who had caused more trouble than [Petitioner] . . . a
> reasonable jury could have viewed evidence that [Petitioner] suffers
> from frontal lobe damage as aggravating.  See Martinez v. Dretke, 404
> F.3d 878, 889-890 (5th Cir. 2005) (stating that "evidence of organic
> brain injury presents a 'double-edged' sword" because of its
> association with poor impulse control and a violent propensity and,
> thus, future dangerousness).  Moreover, this evidence could have been
> used by the prosecuting attorney to support his sentencing phase
> closing argument that [Petitioner] was "a Defendant out of control"
> who "cannot comply with the rules of a community" or "a structured
> . . . pretrial detention center."

. . . .

Given the fact that, [at the time of the trial, Petitioner] was apparently three years removed from any substance use and yet, according to . . . testimony, was still exhibiting bad behavior in a structured and controlled environment [in jail], we conclude that the jury would not find very persuasive Dr. Strickland's opinion that [Petitioner's] behavior would improve once he was "far removed from the substance use." Moreover, the basis that Dr. Strickland offered for his opinion at the habeas proceeding, a history that did not reveal "a pattern of problems and difficulties" within the highly controlled and monitored environment of death row, did not even exist at the time of trial.

Furthermore, we conclude that a jury would likely have found Dr. Strickland's testimony that [Petitioner] exhibited a "narcissistic sort of grandiosity" to be aggravating.

Id. at 391-92.

The Georgia Supreme Court next pointed out that Drs. Strickland's and Dudley's testimony was contradicted by the evidence presented at Petitioner's trial that, on the day of the crimes, Petitioner was clearly the leader:

[A]ll four witnesses who encountered [Petitioner] and Williams on the day of Wilbur's abduction, including three Waffle House customers and a police officer, testified that [Petitioner] did "all the talking"; all three Waffle House customers testified that [Petitioner] alone had control of the briefcase containing knives, brass knuckles, and a set of handcuffs; [Petitioner] led police to the discovery of the brass knuckles on his bedroom closet shelf and the briefcase containing knives under his bed; [Petitioner] alone raped Wilbur with no encouragement or assistance from Williams; and [Petitioner] alone murdered Wilbur without encouragement or assistance from Williams.

Id. at 393.

The Georgia Supreme Court further pointed out, in a detailed description of Petitioner's crimes, that Petitioner clearly demonstrated careful planning and that he committed his crimes in a deliberate and calculated manner. Id. at 393-94. "Thus, the jury could reasonably have concluded that the evidence depicted a man capable of planning and executing criminal acts and willing to victimize anyone who would get in his way, which would have been more than sufficient to lead a reasonable jury to find the testimony of Drs. Strickland and Dudley unpersuasive." Id. at 394-95 (quotation alteration and citation omitted).

Also with respect to Petitioner's claim of drug abuse, the Georgia Supreme Court first pointed out that trial counsel unquestionably knew about Petitioner's drug use because they argued that Petitioner's admission to police was made while Petitioner was under the influence of drugs. Id. at 386. The court further found that Petitioner's evidence presented in the state habeas corpus court supported only the fact that he smoked marijuana beginning at age sixteen – not at an extremely young age – and it did not "show that he ever used cocaine." Id. at 387. Because evidence of Petitioner's drug use would have negated trial counsel's mitigation strategy of showing Petitioner's good character, the Georgia Supreme Court

concluded that the jury would not have found the evidence of Petitioner's drug use to be "significantly mitigating." Id.

Finally, the Georgia Supreme Court weighed the mitigating evidence against the aggravating evidence presented at Petitioner's trial to determine "whether 'the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Id. at 395 (quoting Strickland, 466 U.S. at 695). Based on its analysis, the court concluded that "considering all of the expert mental health and lay witness testimony that [Petitioner] presented in his habeas proceeding along with the mitigating evidence actually presented at trial, we still conclude that the new mitigating evidence presented in the habeas proceedings would not in reasonable probability have resulted in a different sentencing verdict for [Petitioner's] brutal crime." Id. (citing to Sochor v. Sec'y, Dept. of Corr., 685 F.3d 1016, 1030 (11th Cir. 2012) for the proposition that it is difficult to show "prejudice as the result of failing to present mitigating evidence in a death penalty case involving a murder 'accompanied by torture, rape or kidnapping'").

iii.  The State Court Opinion is Entitled to Deference

Petitioner contends that the Georgia Supreme Court did not conduct a reasonable analysis of the evidence of Petitioner's background because the "court

focused upon the strength of the mitigating factors presented at trial, and the purported reasonableness of that theory, while discounting the weight that reasonable jurors would give to the evidence of [Petitioner's] troubled upbringing, particularly in light of the challenges presented by his brain damage and mental illness." ([60] at 117). Petitioner contends that this was unreasonable because it focused "on the reasonableness of a strategy that was unsupported by a proper investigation." (Id.) However, the Georgia Supreme Court concluded that trial counsel's investigation was sufficient and this Court determined that this conclusion was not unreasonable.

Petitioner then repeated his family history and background evidence at length, (compare id. at 39-43 with id. at 118-125), before contending that the Georgia Supreme Court made four errors:

> (1) The court repeatedly compared the habeas evidence to the trial evidence arrived at after trial counsel's less than thorough investigation, rather than weighing the newly presented evidence together with the trial evidence. (2) The court failed to account for the way in which the family background evidence would have undercut one of the State's principle arguments in aggravation. (3) The court placed undue reliance on the fact that some of the new mitigation evidence also revealed unflattering information. And (4) the court wrongly concluded that a large portion of the evidence would not have been admitted at trial.

([60] at 125-26).

Petitioner's first enumerated error rests partially on the notion that trial counsel's investigation was inadequate, an argument already rejected by this Court. Petitioner further argues that, under Strickland, reviewing courts must "consider 'the totality of the available . . . evidence – both that adduced at trial and that adduced in the habeas proceeding' – and 'reweig[h] it against the evidence in aggravation.'" Porter v. McCollum, 558 U.S. 30, 41 (2009) (citing Williams, 529 U.S. at 397-98). According to Petitioner, the Georgia Supreme Court did not properly apply this standard because the court "repeatedly weighed the habeas evidence against the trial evidence." ([60] at 127). Petitioner does not, however, explain how he thinks that the Georgia Supreme Court weighed the evidence incorrectly. Rather, Petitioner cites to portions of the Georgia Supreme Court's opinion, Sears v. Humphrey, 751 S.E.2d at 383-84, 386, in which the court merely points out the weaknesses of the evidence that Petitioner presented in the state habeas corpus proceeding. Nowhere does it appear that the Georgia Supreme Court improperly applied the Strickland standard. In discussing the Strickland standard for evaluating prejudice, the Georgia Supreme Court stated that it "must consider the totality of the available mitigating evidence in reweighing it against the evidence in aggravation, while being mindful that a verdict or conclusion with

overwhelming record support is less likely to have been affected by errors than one that is only weakly supported by the record." Id. at 377 (citing Williams, 529 U.S. at 397-98 and Strickland, 466 U.S. at 696). After careful review of the Georgia Supreme Court's opinion, the Court concludes that the court correctly applied the Strickland standard.

Petitioner's second enumerated error that the Georgia Supreme Court did not account "for the way in which the family background evidence would have undercut one of the State's principle arguments in aggravation," overlooks the state court's exhaustive analysis of that issue. The "State's principle argument" to which Petitioner refers is the prosecution argument that Petitioner was not a "deprived child from an inner city, a person who[m] society has turned its back on, . . . [b]ut . . . a person privileged in every way." Sears v. Upton, 561 U.S. at 947; ([60] at 130-31). Petitioner contends that the family background evidence that he presented at the state habeas corpus hearing establishes that the state's argument was wrong, and that Petitioner's family life was dysfunctional, chaotic and violent. Petitioner further contends that the Georgia Supreme Court did not properly evaluate how his family background evidence would have undercut the state's argument. The Georgia Supreme Court explained, however, that Petitioner's

evidence did not decisively undercut the prosecution argument.  According to the
court:

> [Petitioner's father,] Mr. Sears testified in the habeas proceeding that
> he had "tried to influence [his] children to adopt a strong work ethic,"
> that he had "attempted to show [his children] by example how to
> provide for a family," that he had used the disciplinary methods that
> he had learned in the military in that he had rewarded [Petitioner] for
> good behavior and withheld privileges for bad behavior, and that he
> had sometimes used a belt for punishment but that the mere threat of
> physical punishment had often been sufficient.  Mr. Sears lamented
> that, "[i]n retrospect, [his] discipline approach [had] failed," and he
> admitted that he was "still perplexed as to what discipline would
> [have] work[ed] with [Petitioner]." Mr. Sears also testified that he had
> had a conversation with Sears about his goals and purpose in life
> approximately a year prior to his arrest and that [Petitioner] had told
> him that he just wanted to use people and that he had no interest in
> working, and Mr. Sears testified that there was nothing that he could
> do to motivate [Petitioner] to work either at home or at an outside job,
> which "frustrated and baffled [him]."  The jury could  have reasonably
> concluded from this testimony that Mr. Sears cared about Sears and
> that his approach to discipline, while stern, was not so unreasonable
> that it significantly mitigated [Petitioner's] moral culpability for his
> horrendous acts.

> Moreover, some of the testimony showed that, while [Petitioner's]
> parents may have had different child-rearing philosophies and may
> have lacked some parenting skills, both parents were involved with
> their children and attempted to provide the best for them, as it showed
> that [Petitioner's] parents took an active part in his education,
> involved him in extracurricular activities, participated in extended
> family activities, and ensured that he attended school regularly at least
> until he turned 18.  Affiants also stated that, despite being in a
> wheelchair, [Petitioner's] father was independent, tried to teach his
> sons to be independent, spent time with them fishing and playing

basketball, and worked with [Petitioner] to help him excel in sports and outdoor activities. Ms. Sears testified that Mr. Sears made his sons lift heavy weights when they were little "[not] because he was mean, but in order to make them better prepared for life." Although Demetrius testified that he could not recall his father's ever hugging him or [Petitioner], telling either of them that he loved them, or complimenting them, he also stated that his father thought that the way to demonstrate his love for them "was to toughen [them] up." The prosecuting attorney could have used this testimony in conjunction with the testimony that Mr. Sears was a good provider and spent time with [Petitioner] to argue that [Petitioner's] father did love and care for him but simply did not express it in a demonstrative way.

In addition, much of the testimony submitted in the habeas proceeding is not entirely favorable to [Petitioner], as it depicts his childhood as being one of privilege and permissiveness. [Petitioner's] aunt testified that [Petitioner's] parents gave their children too many material things and too many privileges. Other affiants testified that [Petitioner's] family had "a big house with a swimming pool and two cars," that the boys were always well-dressed, and that the Sears children had allowances bigger than any other child in the neighborhood. This testimony would have further supported the prosecuting attorney's argument at trial that, in [Petitioner], "we have a person, privileged in every way, who has rejected every opportunity that was afforded him."

Sears v. Humphrey, 751 S.E.2d at 383-84.

The evidence Petitioner introduced at the state habeas corpus proceeding was, at best, equivocal in blunting the prosecution argument that Petitioner had led a privileged life. Petitioner argues that "reasonable jurors . . . may have concluded that the emotional support, stability, and acceptance that [Petitioner] was denied

were more important than the material comforts that he was provided" and that the jurors might have concluded that Petitioner's parents damaged Petitioner "despite their best intentions." ([60] at 133-34). Those arguments, however, merely offer an alternative view of the evidence rather than establish that the Georgia Supreme Court's conclusion was unreasonable.

The Court also disagrees with Petitioner's third enumerated error, that the Georgia Supreme Court overly relied on its finding that Petitioner's new mitigation evidence also revealed unflattering information. The state court exhaustively reviewed all of the evidence that Petitioner presented in the habeas corpus proceeding. As discussed above, the court found that some of the evidence was not reliable, some of the evidence was weak or unconvincing, and some of it was flatly inconsistent with other evidence. Contrary to Petitioner's argument, this case is not similar to Porter v. McCollum, 558 U.S. 30 (2009), where the Supreme Court held that the state court improperly discounted significant mitigating evidence presented in post-conviction proceedings. In Porter, the petitioner's trial counsel put up scant evidence during the penalty phase of the trial, limited to "inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." Id. at 32. In his post-conviction

hearing, however, Porter presented evidence that he was a war hero in the Korean War where he was twice wounded, that he suffered from severe post traumatic stress disorder and other significant mental deficiencies that were only partly disputed by the state, and that he suffered through an abusive childhood that was significantly worse than that described by Petitioner in this case. Id. at 33-34.

In contrast, as this Court has found, Petitioner's trial counsel developed a reasonable trial strategy based on their adequate investigation and presented adequate evidence in support of that strategy. See Harrington, 562 U.S. at 110 ("Strickland does not guarantee perfect representation, only a reasonably competent attorney.") (quotations and citations omitted). While Petitioner did present evidence at the state habeas corpus hearing that could well be considered mitigating, that evidence was not so compelling that only an incompetent attorney would fail to present it.

In his final argument regarding the Georgia Supreme Court's treatment of his family background and social history evidence, Petitioner complains that the court wrongly concluded that a large portion of the evidence would not have been admitted at trial. However, while the Georgia Supreme Court did state that some of Petitioner's evidence was inadmissible, Sears v. Humphrey, 751 S.E.2d at 381,

it did not identify that evidence, and it provided a lengthy description of admissible mitigating evidence, id. at 381-87, similar to Petitioner's own narrative of his family background and social history. As a result, it appears that the Georgia Supreme Court considered most of the evidence that Petitioner presented in the state habeas corpus proceeding. While "the hearsay rule may not be applied mechanistically to defeat the ends of justice," Chambers v. Mississippi, 410 U.S. 284, 302, (1973), Petitioner offers no example of reliable hearsay evidence that the Georgia Supreme Court failed to consider.[7]

---

[7]    This is not a case like Green v. Georgia, 442 U.S. 95, 97 (1979), cited by Petitioner ([60] at 140), where "substantial reasons existed to assume [hearsay evidence] reliability." In Green, the trial court refused to allow introduction of hearsay evidence that petitioner's co-defendant, Moore, confessed to killing the victim after ordering petitioner to run an errand. The Supreme Court considered this hearsay evidence reliable because:

> Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it.

Green, 442 U.S. at 97. None of the hearsay evidence here is supported by similar indicia of reliability.

Petitioner instead challenges the Georgia Supreme Court's conclusion that Petitioner's evidence of childhood sexual abuse was unreliable and "weak." The Court concludes, however, that, at worst, fairminded jurists would disagree over the question of whether the record supports the state court's finding that ample reasons existed for the jury to find Petitioner's sexual abuse evidence unpersuasive. As the state court noted, Petitioner's brother, who provided the bulk of this evidence, was clearly an interested witness, he never actually saw Petitioner being molested, and his testimony was subject to impeachment based on his prior felony convictions. Sears v. Humphrey, 751 S.E.2d at 385. The Court further agrees with the state court that the jury likely would have discounted the hearsay testimony of Petitioner's friend that Petitioner had told him of abuse while they were smoking "weed." It is also highly significant, as the Georgia Supreme Court noted, that Petitioner himself denied to mental health professionals that he had ever been molested. Id.; see Henyard v. McDonough, 459 F.3d 1217, 1245 (11th Cir. 2006) (denying ineffective assistance claim for failure to uncover evidence of sexual abuse in childhood where the defendant denied a history of sexual abuse).

Petitioner challenges a number of Georgia Supreme Court findings as unreasonable in arguing that § 2254(d) deference should not be accorded to the

court's conclusion that Petitioner's mental health evidence failed to establish prejudice under Strickland. Petitioner claims that the state court's finding that Dr. Strickland's head injury findings were undermined because "[P]etitioner submitted no medical records to verify the severity of these [childhood] head injuries or to show whether [Petitioner] could have possibly suffered brain injuries as a result of these head injuries." ([60] at 95, citing Sears v. Humphrey, 751 S.E.2d at 388). Petitioner further argues that Dr. Dudley's failure to discuss the crimes with Petitioner cast doubt on the expert's conclusion that Petitioner's deficits were responsible for his behavior. ([60] at 101-02).

The Georgia Supreme Court's criticisms of the opinions offered by Drs. Strickland and Dudley constitute a reasonable evidentiary assessment of the mental health evidence presented by Petitioner. While those criticisms alone may not justify a finding that Petitioner's mental health evidence failed to establish prejudice, the Georgia Supreme Court based its lack of prejudice determination on additional substantial reasons that Petitioner failed to effectively dispute.

Petitioner claims that the Georgia Supreme Court erred in questioning the evidence of Petitioner's early-age drug use that Dr. Strickland relied on in determining that Petitioner had damaged the frontal lobe of his brain. The state

court, however, carefully examined the evidence presented in the state habeas corpus proceeding and found that there was no evidence supporting Petitioner's contention that he used cocaine and the court further found that Petitioner's marijuana use did not start until he was sixteen. Sears v. Humphrey, 751 S.E.2d at 387.

Petitioner disagrees with the Georgia Supreme Court's conclusion that Petitioner's evidence of frontal lobe damage and grandiosity would be seen as aggravating by the jury, arguing that the conclusion is unreasonable. Petitioner fails, however, to explain why that conclusion is unreasonable other than citing to the United States Supreme Court opinion's statement that the evidence "might well have helped the jury understand [Petitioner], and his horrendous acts – especially in light of his purportedly stable upbringing." ([60] at 108, citing Sears v. Upton, 561 U.S. at 951). While that evidence might have been helpful, it might also have convinced the jury that Petitioner is incorrigible. The Eleventh Circuit has "often acknowledged that juries may infer that a defendant's . . . impulsive behavior that is triggered by organic brain damage is aggravating." Lance v. Warden, Georgia Diagnostic Prison, 706 Fed. Appx. 565, 573 (11th Cir. 2017) (citing Rhode v. Hall, 582 F.3d 1273, 1285-86 (11th Cir. 2009) ("Counsel reasonably believed that the

jury would see Rhode's impulsive behavior, which more than one expert believed was triggered by his organic brain damage, as aggravating."). Accordingly, no basis exists to conclude under § 2254(d) that the state court's conclusion was unreasonable.

Petitioner similarly fails to demonstrate the unreasonableness of the state court's conclusion that the evidence presented at trial would have rendered the experts' opinions unpersuasive. As discussed above, the experts testified that Petitioner suffered from "profoundly debilitating" cognitive and emotional impairment; that his "biggest challenge is one of impulsivity, poor planning, poor judgment and a compromise in autonomy;" ([18.25] at 43), that his capacity for sound decision making and reasoned behavior was severely compromised; and that his "contact with reality is at times tenuous," ([18.28] at 31).

The Georgia Supreme Court addressed countervailing evidence at Petitioner's trial:

> Williams, who knew how to hot-wire an automobile, had suggested that they . . . steal an unoccupied automobile in order to travel home to Ohio. However, [Petitioner] had deliberately rejected [that option] and had told Williams that they were going to wait until dark to take a vehicle. Then [Petitioner], who was over six feet tall, patiently waited until Wilbur drove into the Kroger parking lot and selected her – a five feet four inch 59-year- old wife and mother weighing less than 125 pounds – as his victim because her automobile appeared capable

of making the trip back to Ohio. He watched Wilbur enter the grocery store and, while she purchased her groceries, he prepared for her abduction and eventual rape and murder by removing from his briefcase a set of brass knuckles, a pair of handcuffs, and a knife with its accompanying holster, which he put around his belt. While waiting, he also had Williams exchange coats with him, which enabled him to avoid the possibility that any witnesses who happened to see his brutal attack of Wilbur in the parking lot would later describe her attacker as wearing a coat like the distinctive "Raiders' jacket" that several witnesses had seen him wearing earlier that day and also enabled him to later tell the police that Williams had access to his brass knuckles because they were in the pocket of his coat that Williams was wearing. He also put on gloves, which he would wear during the entire time that he was inside Wilbur's automobile, thereby preventing the police from connecting him with the vehicle through fingerprints.

After watching Wilbur come out of the store, put her groceries in the trunk, replace her cart, and put her key in her automobile's door lock, [Petitioner] assaulted her about the face and head with the brass knuckles as she entered the automobile, knocking her to the ground. Despite Wilbur's desperate attempts to escape, including screaming for help and attempting to climb onto the vehicle's hood, [Petitioner] shoved her, bleeding and injured, inside the automobile and picked up Williams, who drove while he pulled Wilbur into the back seat and bound her hands "directly" behind her back with a set of handcuffs that he knew had no key. [Petitioner] went through Wilbur's purse, taking her money to purchase gasoline for the trip and fast food for himself and Williams. For a significant portion of the trip, including before entering the gas station and driving through the fast food restaurant, he made Wilbur lie wedged face down on the floorboard between the front and rear seats, covered with overcoats and book bags, and he threatened to kill her if she made a sound. An hour into the abduction, [Petitioner] again climbed into the back seat area with the victim, tore most of the clothing she was wearing off of her, raped her, and then threw her clothing out the window.

Once they reached a deserted stretch of highway in Kentucky, he told Williams to pull over and Wilbur to get out of the automobile. When Wilbur begged to remain inside, [Petitioner] told her that he was going to let her go and walked her sixty feet from the highway, down an embankment, and into shoulder-high grass, where he made her get down on the ground while she repeatedly pleaded for her life. Then, taking the knife that he had strapped to his belt prior to her abduction more than five hours earlier, he stabbed her at least twice in the neck, striking a vertebra. Leaving her partially nude body lying where it was not likely to be quickly discovered, he went back to Wilbur's automobile and told Williams that he would drive the rest of the way home, and he "flung" the knife and its holster out the window sometime "through the course of that night." Before abandoning Wilbur's automobile the following morning when it became disabled, he and Williams removed all items connected to them and Wilbur's purse, which they threw in a dumpster. After his arrest and before making a statement to police, he asked two different officers what was "the maximum penalty time . . . for these things," and he told police in his statement that he "knew [his] time was coming," that "[he] did what [he] did," and that he was "about to pay [his] consequences."

Sears v. Humphrey, 751 S.E.2d at 393-94.

The Court agrees with the Georgia Supreme Court that these are not the actions of an individual suffering from profoundly debilitating cognitive and emotional impairment manifested in poor planning and a compromise in autonomy, and the jury would have very likely questioned the reliability of the experts' diagnoses. At the least, the Georgia Supreme Court's conclusion that "[t]he testimony of Drs. Strickland and Dudley loses much of its impact when

viewed together with the evidence presented at trial," <u>Sears v. Humphrey</u>, 751 S.E.2d at 393, is not objectively unreasonable.

Petitioner characterizes the Georgia Supreme Court's analysis of countervailing evidence as principally relying on the contested testimony of Williams. Petitioner maintains:

> The court's premise relies principally on the testimony of Williams, who was the only eyewitness to the crime. The only evidence of Mr. Sears "planning" the kidnapping is Williams' testimony that Sears rejected his proposal to hotwire a car, and instead carefully selected the victim, armed himself with a knife and brass knuckles, then lay in wait for the victim to exit the Kroger and put her key in the vehicle. But that testimony was hotly disputed at trial.

([60] at 109).

Petitioner overlooks that Petitioner's own confession to police fully supports most of the state court's lengthy narrative of Petitioner's actions that undercut the testimony of Drs. Strickland and Dudley. In that confession, Petitioner admitted that he (1) put handcuffs on Ms. Wilbur, (2) raped and murdered her, (3) wore gloves, (4) changed coats with Williams, (5) threw Ms. Wilbur's clothes and the knife out the window, and (6) threw Ms. Wilbur's purse away. ([15.18] at 68-73, 83-84, 87-89). Moreover, as explained below, <u>see</u> <em>infra</em> § III.A.3, the jury may

well have believed Petitioner's contention that Williams initiated the kidnapping of Ms. Wilbur and nonetheless opted to sentence Petitioner to death.

Petitioner discounts the fact that Petitioner "did all the talking," Sears v. Humphrey, 751 S.E. 2d at 393, to the Waffle House witnesses and to the policeman that Petitioner and Williams encountered as "entirely consistent with Petitioner's documented inability to self-censor" and the fact that Williams appeared shy but was actually "sneaky." ([60] at 111-12). He further argues that while Petitioner may have attempted to hide his guilt, "tossing the victim's belongings from the moving vehicle are hardly beyond the capabilities of a brain-damaged eighteen year-old" and points out that Petitioner also engaged in behavior that would insure that he got caught. (Id. at 112). Petitioner's alternative view of the evidence, even if reasonable, fails to establish that the Georgia Supreme Court's conclusion was unreasonable.

Finally, with respect to Petitioner's evidence of his neuropsychological deficits, this Court points out that Petitioner has done nothing to refute trial counsel's testimony that at the time of Petitioner's trial, Superior Court judges in Cobb County had the practice of appointing a mental health expert employed by the state to save the county money, and that those experts' evaluations very rarely

produced a diagnosis that would have been helpful to the defense.  (See [20.32] at

28).  The record demonstrates that trial counsel would not have had access to the

diagnoses of Drs. Strickland and Dudley.[8]  See also Davis v. Singletary, 119 F.3d

1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the

fact, a mental health expert who will testify favorably for him does not

demonstrate that trial counsel was ineffective for failing to produce that expert at

trial.").

    For the foregoing reasons, the Court finds that the Georgia Supreme Court's

conclusion that Petitioner failed to establish prejudice with respect to his claim of

ineffective assistance during the penalty phase was not unreasonable under

§ 2254(d).

---

[8]    To the extent Petitioner may claim that the trial court's practice of
appointing state employees as mental health experts violates due process under
McWilliams v. Dunn, 137 S. Ct. 1790 (2017), this Court's conclusion below that
Petitioner cannot establish actual prejudice to demonstrate a due process violation
in connection with his Sabel claim likewise forecloses a claim under McWilliams.

3. <u>Ineffective Assistance of Counsel During the Guilt Phase of the Trial</u>

In his only claim of ineffective assistance during the guilt phase argued in his final brief,[9] Petitioner contends that trial counsel was ineffective in failing to properly investigate the background of Petitioner's codefendant, Phillip Williams. Williams was a significant witness for the prosecution, and Petitioner claims that a proper investigation by trial counsel would have revealed significant impeachment evidence that trial counsel could have used to challenge Williams' credibility. As described above in the Georgia Supreme Court's description of Petitioner's crimes, <u>see</u> <i>supra</i> § I.B, the only factual dispute between Williams' and Petitioner's version of events concerned who first approached and attacked Wilbur, with each claiming that the other had done so. According to Petitioner, if trial counsel had

---

[9] Petitioner withdrew the portion of his Claim I in which he asserted that trial counsel had a conflict of interest. ([60] at 272-73). In addition, in his amended petition, Petitioner raised, in bullet point form, a raft of allegations of ineffective assistance which accuse trial counsel of virtually every trial mistake imaginable, starting with the pretrial investigation and continuing with voir dire, opening statements, the state's presentation of the case, their presentation of the defense, closing arguments, and the preservation of issues to appeal. Petitioner did not brief these claims in his final brief, and as these claims are presented in decidedly conclusory fashion, without any factual or legal support, this Court concludes that Petitioner has not demonstrated that he is entitled to relief with respect to those claims.

obtained and used the available impeachment evidence, the jury would have been more likely to believe that Williams had initiated the kidnapping.

Although this Court has already determined that this claim is properly exhausted because Petitioner raised a version of the claim in his state habeas corpus petition, ([37] at 39-40), Respondent nonetheless contends that the claim is unexhausted under Hittson v. GDCP Warden, 759 F.3d 1210, 1232 n.23 (11th Cir. 2014), because Petitioner did not raise this claim before the Georgia Supreme Court in his certificate of probable cause to appeal the denial of his state habeas corpus petition. Regardless of the procedural approach this Court takes in addressing this claim the result is the same because Petitioner cannot demonstrate prejudice to either remove the procedural bar or to establish his ineffective assistance claim.

The weight of the evidence of Petitioner's guilt presented at trial precludes a finding of prejudice from any lack of evidence impeaching Williams. As described by the Georgia Supreme Court, when police questioned Petitioner, he immediately admitted to police that he raped Wilbur and stabbed her in the neck to kill her. Sears v. Humphrey, 751 S.E.2d at 371. He also consented to a search of his parents' home and showed the police the brass knuckles he used on Wilbur as well

as the briefcase that contained the knives, handcuffs and brass knuckles that witnesses saw on the day of Wilbur's abduction.  Id at 372.  Petitioner's audiotaped confession to police was played to the jury.  ([15.18] at 50-90).

The evidence presented by the state against Petitioner at trial, including his detailed confession to police, was so overwhelming that even the most talented attorney could not have been expected to convince the jury to acquit Petitioner.  In view of the substantial evidence of guilt, Petitioner cannot demonstrate prejudice even if the Court accepted his allegations of counsel ineffectiveness.  Without a showing of prejudice, Petitioner cannot prevail on his claim that trial counsel rendered ineffective assistance during the guilt phase of the trial by failing to introduce additional evidence impeaching Williams.

In relation to the penalty phase, trial counsel established that Williams was a bad actor.  During cross examination of Williams, trial counsel had him admit that he initially lied when questioned by police, that he lied repeatedly about many things, ([15.19] at 60-71), and that he lied to trial counsel's investigator even after he had confessed to police, (id. at 66-67).  Trial counsel also elicited testimony that Williams dealt drugs in high school.  (Id. at 60).  As part of trial counsel's case in mitigation during the penalty phase, trial counsel elicited testimony from a friend

of Petitioner's that "Williams was spiteful, 'purposely mean' to teachers and students, and intimidating, particularly to women." <u>Sears v. Humphrey</u>, 751 S.E.2d at 379. Any additional evidence regarding Williams' bad nature would be largely cumulative of what the jury already knew. <u>Pinholster</u>, 563 U.S. at 173 (holding that the petitioner did not establish prejudice in part because "[t]he 'new' evidence largely duplicated the mitigation evidence at trial").

The evidence trial counsel supposedly missed is not compelling in light of what the jury already knew about Williams' character. According to Petitioner, "Williams had previously punched an Ohio robbery victim in the face, once struck his own *mother*, and planned the beating of a fellow inmate whom he 'ran up on' and 'hit, kicked, punched and kneed' while the victim was on the ground." ([60] at 154 (emphasis in original)). That evidence would have done little, if anything, toward convincing jurors that it was Williams, not Petitioner, that struck the victim in the face in order to obtain her car. That the jury did not hear these facts does not undermine the Court's confidence in the outcome of the penalty phase. It is quite possible, if not probable, that the jury believed Petitioner's version of events. Petitioner immediately admitted to police that he had abducted, raped, and killed Wilbur, while Williams told numerous lies and changed his story several times.

Petitioner had no reason to lie about who perpetrated the initial attack when he had admitted culpability for far more serious actions. In contrast, Williams repeatedly attempted to lessen his own culpability. As a result, the jury had good reason to believe Petitioner and not Williams regarding the initial attack. No reasonable probability exists that the additional evidence that Petitioner now claims trial counsel should have presented to the jury would have made a difference in their choice of a sentence.

The Court disagrees with Petitioner's contention that the issue of whether Williams or Petitioner initiated the kidnapping "was the focal point of an evaluation of both [Petitioner's] guilt and his culpability." ([60] at 237). If Williams did attack Ms. Wilbur in the Kroger parking lot, it would not lessen Petitioner's guilt because Petitioner participated fully in the kidnapping and was the one that, without Williams' participation, raped and killed Ms. Wilbur. Any lessening of Petitioner's moral culpability would only be slight given the nature of the crimes Petitioner confessed to committing and not enough to affect the Court's confidence in the outcome of the penalty phase of the trial.

That the jury did not hear evidence of Williams' jailhouse battery does not undermine the Court's confidence in the outcome of Petitioner's sentencing trial.

Petitioner contends that evidence would counter the prosecution's evidence, presented during the penalty phase, regarding Petitioner's bad reputation at the jail. Jim Burns, a major in the Cobb County Sheriff's Department and a assistant division commander at the Cobb County Adult Detention Center, testified during the penalty phase that Petitioner had been reassigned as many as thirty-eight times for disciplinary reasons, ([15-21] at 37), and that in Burns' seventeen years with the department, he had never had more trouble with an inmate than he had with Petitioner, (id. at 43). Evidence of Williams' battery conviction would not have undermined Burns' testimony. That one inmate at a jail would attack another inmate is hardly surprising, and the single isolated incident involving Williams does nothing to disprove or even blunt Burns' testimony. Petitioner's disciplinary history at the jail stands on its own. That other disciplinary issues have occurred at the jail is not noteworthy, and it does not serve to lessen the impact of the testimony regarding Petitioner.

4.    <u>Cumulative Effect</u>

Petitioner's contention that the "combined impact of trial counsel's multiple unreasonable omissions" resulted in prejudice fails because the Court has not

identified any unreasonable actions or omissions by trial counsel or resulting

prejudice, and, as a result, no cumulative prejudice exists to analyze.

5.     Failure to Perfect the Record Regarding the *Sabel* Issue

In his final assertion of ineffective assistance of counsel, Petitioner contends

that trial counsel failed to adequately perfect the record with regard to the trial

court's Sabel order because they withdrew their motion for a mental health

evaluation without stating their reason for doing so.  Setting aside Respondent's

contention that this claim is unexhausted, the Court concludes Petitioner cannot

prevail on this claim because, as is discussed in connection with his Claim II,

Petitioner cannot demonstrate actual prejudice arising from the omission of expert

testimony from his trial.  See *infra* discussion regarding Claim II at § III.B.

**B.     Claim II: Trial Court's Application of Rule from Sabel v. State
Violated Petitioner's Rights**

As discussed above in conjunction with Petitioner's claim of ineffective

assistance of counsel, the holding in Sabel v. State, 282 S.E.2d 61, 68-69 (Ga.

1981), applied when Petitioner was tried.  Under the rule in Sabel, the trial court

ordered that Petitioner was required to disclose the identities and reports of all

expert witnesses consulted by the defense, whether or not those experts would be

called to testify.  Petitioner's trial counsel strongly objected to this ruling and filed

two separate motions to avoid having to comply.  As also discussed above, the trial

court's <u>Sabel</u> ruling was a significant reason for trial counsel's decision not to have

Petitioner undergo a mental health evaluation before trial.

In <u>Rower v. State</u>, 443 S.E.2d 839 (1994), the Georgia Supreme Court

modified the <u>Sabel</u> requirements, holding that the state may discover any written

reports of experts that the defendant intends to introduce at trial, but the defendant

is not required to disclose all experts consulted, have the opinions of experts

reduced to writing, nor produce any report that the defendant does not present at

trial.  <u>Id.</u> at 841-42.  The state court concluded that the <u>Sabel</u> rule, as it had been

interpreted by the Superior Courts, violated defendants' due process rights under

the United States Supreme Court's opinion in <u>Wardius v. Oregon</u>, 412 U.S. 470

(1973).  <u>Wardius</u> stands for the proposition that a discovery rule that requires a

criminal defendant to disclose evidence that is not reciprocal (e.g., that does not

require the same disclosures by the state) violates due process.  When <u>Sabel</u> was

decided, the state did not have a reciprocal burden to provide criminal defendants

with their expert's identities or reports if that expert would not testify.  <u>See</u> <u>id.</u> at

475 ("[D]iscovery must be a two-way street. The State may not insist that trials be

run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses.").

In Wellons v. Hall, 554 F.3d 923, 931 (11th Cir. 2009), *vacated on other grounds*, 558 U.S. 220 (2010), the Eleventh Circuit confronted a claim similar to that raised here by Petitioner. The Eleventh Circuit determined that the trial court's Sabel order in Wellons' case was clearly a due process violation under Wardius, id. at 939, and this Court is thus compelled to reach the same conclusion.

The Eleventh Circuit further noted, however, that not "all federal constitutional errors committed during the course of a criminal trial require reversal of subsequent convictions." Id. (citing Chapman v. California, 386 U.S. 18, 21–22 (1967) for the proposition that "judgments shall not be reversed for errors or defects which do not affect the substantial rights of the parties."). Rather, federal courts confronting this type of error under § 2254 analyze it under a "substantial-and-injurious-effect" standard under which the petitioner must establish "actual prejudice" arising from the constitutional violation. Id. at 939-40 (applying the standard announced in Brecht v. Abrahamson,507 U.S. 619

(1993)).[10]  As such, this Court can grant relief only if Petitioner establishes that the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

Petitioner contends that he can demonstrate actual prejudice based on the chilling effect that the Sabel order had on his trial counsel's decision to forego a mental health evaluation.  Trial counsel testified that he would have had Petitioner evaluated by a mental health expert if the Sabel rule had not been in effect.  According to Petitioner, he has demonstrated actual prejudice by producing the evidence of his mental deficits – the testimony of Drs. Dudley and Strickland – that was discussed in relation with his ineffective assistance of counsel claim.  Petitioner contends that because Sabel prevented his trial counsel from obtaining and presenting this evidence to the jury, it had a substantial and injurious effect.

---

[10]  Although Petitioner's Sabel claim is clearly a due process claim, he also raises a Sixth Amendment right to counsel claim and an Eight Amendment right to present mitigating evidence claim in connection with the trial court's Sabel order.  This Court concludes, however, that regardless of how the claim is presented, the prejudice analysis discussed in Wellons and Brecht applies.  This is also the case regarding Petitioner's claim that his due process rights were violated under Ake v. Oklahoma, 470 U.S. 68 (1985), and McWilliams v. Dunn, 137 S. Ct. 1790 (2017).  See McWilliams, 137 S. Ct. at 1801.

Petitioner raised a due process claim regarding the trial court's <u>Sabel</u> ruling in his direct appeal.  The Georgia Supreme Court concluded that Petitioner did not establish prejudice:

> The record fails to support [Petitioner's] assertion that the trial court required his experts to provide written reports and release them to the state.  [Petitioner] initially sought public funds to hire a psychiatrist, microanalyst, and forensic odontologist and filed a motion in limine to bar the state from calling his expert witnesses at trial.  Before the trial court could rule on the motions, and without presenting any argument at the ex parte hearing, [Petitioner] withdrew his motion for funds for a psychiatrist to assist in the guilt-innocence phase of the trial.  The trial court later approved the hiring of a microanalyst and forensic odontologist to review the materials used by the state's expert to establish the identity of the victim.  In approving their employment, the trial court ordered [Petitioner] to reveal their identity to the state.  At no time did the trial court order the defendant's experts to produce written reports and give them to the state.  Given that [Petitioner] withdrew his request for a psychiatrist before any court ruling, did not consult a microanalyst, and eliminated the need for the odontologist's testimony by stipulating at trial to the victim's identity, he has failed to show any chilling effect or other harm from the ruling that he must give the name of his experts to the state.

<u>Sears v. State</u>, 493 S.E.2d at 183.

The state habeas corpus court concluded that Petitioner's <u>Sabel</u> claim was barred under the doctrine of *res judicata* because the Georgia Supreme Court had already rejected it.  ([21.12] at 6).  Petitioner contends that his claim before the state habeas corpus court was qualitatively different because, when the claim was

before the Georgia Supreme Court, that court did not have the testimony of trial

counsel regarding the chilling effect of the trial court's <u>Sabel</u> order or the expert

testimony regarding Petitioner's mental deficits.  Petitioner contends this Court

should review the merits of his claim *de novo*.

As is discussed at length above in rejecting Petitioner's claim of ineffective

assistance in his state habeas corpus proceeding, the Georgia Supreme Court

specifically held that Petitioner failed to demonstrate prejudice in the penalty phase

of his trial based on the omission of the mental health evidence he presented in the

state habeas corpus proceeding, and this Court has determined that the state court's

conclusion was not unreasonable under § 2254(d).

In <u>United States v. Dominguez Benitez</u>, 542 U.S. 74 (2004), the United

States Supreme Court announced that the substantial-and-injurious-effect

standard[11] for establishing actual prejudice requires a demonstration that "but for

[the error claimed], the result of the proceeding would have been different," <u>id.</u> at

81-82 (alteration in original), which is the same standard for establishing prejudice

---

[11]    In <u>Dominguez Benitez</u>, the Court discussed the  substantial-and-injurious-effect standard adopted by the Court in <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946).  The <u>Kotteakos</u> standard is the standard adopted by the Supreme Court in <u>Brecht</u> and further adopted by the Eleventh Circuit in <u>Wellons</u> for evaluating a <u>Sabel</u> due process claim.

under <u>Strickland</u>.  This Court has already determined that Petitioner cannot show actual prejudice as a result of the trial court's <u>Sabel</u> ruling.  The Court concludes that Petitioner is not entitled to relief with respect to his claim that the trial court violated his due process rights by requiring compliance with <u>Sabel</u>.

### C.    Claim III: Juror Misconduct

In his Claim III, Petitioner alleges that a lone-holdout juror who wanted to sentence Petitioner to life in prison was improperly pressured by other jurors to agree to sentence Petitioner to death.  Petitioner further claims that another juror failed to disclose during voir dire that his daughter had been a victim of rape.  During jury deliberations that juror told the others that his daughter had been raped.

#### 1.    <u>Juror Fisher: the Lone Holdout</u>

The lone-holdout juror, Angel Fisher (Fisher), an African-American woman, testified before the trial court on remand that she was the only juror who would not agree to sentence Petitioner to death.  ([17.9] at 36).  According to Fisher, the other jurors reacted with hostility and put a great deal of pressure on her.  The foreman told her that she might be tried for perjury because Fisher did not believe in the death penalty but had testified during voir dire that she could vote for a death

sentence.  (Id.)  The foreman went so far as to send a note to the judge requesting a transcript of the juror's voir dire testimony along with the statutory definition of perjury.  ([15.24] at 11).  Fisher also testified that this made her feel afraid, because even though she knew that she had not lied during voir dire, she did not want to be prosecuted for perjury, and that was "part of the reason" why she changed her vote to death.  ([17.9] at 37).  Fisher testified that she wrote a note to the trial judge, complaining that the foreman was being hostile towards her, but the judge did not respond.  (Id. at 46).

The Georgia Supreme Court addressed this claim after remanding the case to permit evidentiary development of Petitioner's claims of juror misconduct.

> [Petitioner] contends the testimony of juror Fisher, adduced upon remand, demonstrates that the actions of the trial court had a coercive effect upon her verdict.  In this regard, [Petitioner] points out that Fisher testified she was afraid of being prosecuted for perjury, and she believed the trial court wanted her to change her vote because it singled her out by name and urged the jury to continue deliberating when it knew the nature of the jury's numerical division.  We cannot accept this contention.
>
> Fisher, a school teacher, had a bachelor's degree in criminal justice and had attended graduate school.  She was the lone holdout for a life sentence-until she changed her mind.  Although she testified that she felt bullied by the threat of perjury, she knew that she had not lied under oath.  She felt intense pressure from the other jurors.  ("I remember being yelled at basically because I was – they were angry at me.  They wanted me to change my mind.  So they were insulting my

82

character and things like that.")  Ultimately, she gave in to that pressure.  ("I changed my mind because they had – I mean I was ostracized.  And I was just – I was basically made to change my mind by the other jury members.")  Viewing Fisher's testimony as a whole, it is clear that she voted for the death penalty because she felt pressured to do so only as a result of the "normal dynamic of jury deliberations."  United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990).

Sears v. State, 514 S.E.2d at 433.

This Court concludes that the state court's holding was not an unreasonable

application of federal law.  Rule 606(b) of the Federal Rules of Evidence provides:

**(b) During an Inquiry Into the Validity of a Verdict or Indictment.**

**(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**(2) Exceptions.** A juror may testify about whether:

**(A)** extraneous prejudicial information was improperly brought to the jury's attention;

**(B)** an outside influence was improperly brought to bear on any juror; or

**(C)** a mistake was made in entering the verdict on the verdict form.

Rule 606(b) applies to § 2254 proceedings.  Fed. R. Evid. 1101(e); see e.g.,

Fields v. Brown, 503 F.3d 755, 776 (9th Cir. 2007); Williams v. Price, 343 F.3d

223, 230 n.3 (3d Cir. 2003); <u>Gosier v. Welborn</u>, 175 F.3d 504, 511 (7th Cir. 1999).[12] Rule 606(b) would apply to prevent this Court's admission into evidence of testimony by the individual jurors regarding their discussion and actions during deliberations.  <u>See</u> <u>United States v. Stansfield</u>, 101 F.3d 909, 914 (3d Cir. 1996) ("Testimony concerning intimidation or harassment of one juror by another falls squarely within the core prohibition of the Rule.").

The avenues of inquiry in determining whether jury misconduct occurred are limited to determining if either (1) prejudicial external information (e.g., from outside the courtroom and jury room) was improperly supplied to the jury or (2) prejudicial external influence or coercion was improperly brought to bear upon any juror.  <u>Fullwood v. Lee</u>, 290 F.3d 663, 680 (4th Cir. 2002).  The exceptions to Rule 606(b) – which appear in the text of the rule itself – are designed to permit testimony regarding such external information or influences.  Otherwise, what

---

[12]    The Court is mindful that some federal circuit courts have suggested that state evidentiary rules, rather than federal rules, are relevant when a habeas petitioner first introduced such evidence in state court.  <u>See</u> <u>Loliscio v. Goord</u>, 263 F.3d 178, 185-88 (2d Cir. 2001); <u>Doan v. Brigano</u>, 237 F.3d 722, 735 n.8 (6th Cir. 2001) <u>abrogated on other grounds</u> <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003). However, in this instance the federal rule and the Georgia rule are materially the same.  <u>See</u> former O.C.G.A. § 9-10-9 ("The affidavits of jurors may be taken to sustain but not to impeach their verdict."); O.C.G.A. § 24-6-606.

happened during jury deliberations cannot serve as a basis to abrogate the jury's verdict.

"[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." <u>Tanner v. United States</u>, 483 U.S. 107, 127 (1987). Rule 606(b) of the Federal Rules of Evidence bars consideration of Fisher's allegations that she was subjected to pressure by other jurors for being a holdout for a life sentence. <u>See</u> <u>United States v. Norton</u>, 867 F.2d 1354, 1366 (11th Cir. 1989) (noting that "alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict"); <u>see also</u> <u>United States v. Lakhani</u>, 480 F.3d 171, 184-85 (3d Cir. 2007) (discussing the rationale for the rule and noting that "[t]estimony concerning intimidation or harassment of one juror by another falls squarely within the core prohibition of the Rule") (citation and quotation omitted); <u>United States v. Decoud</u>, 456 F.3d 996, 1019 n.11 (9th Cir. 2006); <u>United States v. Briggs</u>, 291 F.3d 958, 961 (7th Cir. 2002) (barring evidence of one juror being "'intimidated' by other jurors into finding [the defendant] guilty"); <u>United States v. Brito</u>, 136 F.3d 397, 414 (5th Cir. 1998) (deeming evidence of internal coercion inadmissible per Rule 606(b)); <u>United States v. Tallman</u>, 952 F.2d 164, 167 (8th Cir. 1991) ("To admit proof of

contentiousness and conflict to impeach a verdict under Rule 606(b) would be to eviscerate the rule.").

In <u>Jacobson v. Henderson</u>, 765 F.2d 12, 14 (2d Cir. 1985), the Second Circuit concluded there was no basis to impeach the verdict even in the event of "screaming, hysterical crying, fist banging, name calling . . . the use of obscene language, by other jurors" and a thrown chair in the jury room. In <u>United States v. Roach</u>, 164 F.3d 403, 413 (8th Cir. 1998), the court, relying on Rule 606(b), rejected defendants' argument that they were entitled to a new trial based upon juror misconduct. In <u>Roach</u>, a juror submitted a post-trial affidavit claiming she had been unwilling to convict defendants but that other jurors had pressured her into changing her vote. One juror threatened her with incarceration, and there were overt racial comments in the jury room because she was one of two Native American jurors and the only holdout against convicting three Native American defendants. <u>Id.</u>; <u>see also</u> <u>United States v. Barber</u>, 668 F.2d 778, 786 (4th Cir. 1982) (no basis to impeach verdict where juror claimed that foreman "scared [her] to death"); <u>United States v. Bassler</u>, 651 F.2d 600, 602 (8th Cir. 1981) ("intimidation or harassment among jurors" not competent to impeach verdict).

Petitioner's reliance on <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241 (1988), and <u>Jenkins v. United States</u>, 380 U.S. 445, 446 (1965), for the proposition that he is entitled to an uncoerced verdict is misplaced because in those cases the Supreme Court addressed coercion by the judge for the jury to reach a verdict. This Court also does not credit Petitioner's attempts to conflate the pressure that Fisher felt from other jurors with his Claim IV, in which he complains that the trial judge's instruction to the deadlocked jury to keep deliberating improperly pressured jurors. While the Court in <u>Jenkins</u> may have advocated an approach where courts reviewing possible coercion of a jury by a judge to look at "all the circumstances of [the] case" in determining whether a particular instruction was excessively coercive, <u>Jenkins</u>, 380 U.S. at 446, the Court does not read that direction as an exception to Rule 606(b).

The Court concludes that Petitioner is not entitled to relief with respect to his claim regarding juror Fisher.

        2.     <u>Juror Makant and the Rape of his Daughter</u>

As part of the voir dire process of Petitioner's trial, the members of the jury venire filled out a questionnaire. One of the questions asked the potential jurors whether they or their family members had been a victim of a violent crime. ([16.3]

at 33).  The questionnaire asked what the crime was, whether anyone was arrested for it and whether anyone was convicted.  (Id.)  Juror Ken Makant (Makant) answered that neither he nor any of his family members had been the victim of a violent crime when, in fact, his daughter was a rape victim.  Makant testified at the hearing before the trial court after the Georgia Supreme Court remanded the case for that purpose.  According to his testimony, he misread the question to mean that an affirmative response would mean that he or a family member had been a victim of a crime and that someone had been arrested and convicted of the crime.  ([17.8] at 11).  In the case of his daughter's rape, the rapist had been a family member and the crime had not been reported to police.  (Id. at 30).  Makant's daughter was thirteen years old at the time of the rape.

According to Makant during deliberations, when he was trying to convince Fisher to change her mind and vote in favor of the death penalty, he said to her and to the other jurors that Petitioner's crimes were serious and that his "daughter experienced a rape."  (Id. at 23.)[13]  He further testified that the fact of his

---

[13]     Juror Makant testified that this occurred during deliberations after the guilt phase of the trial, but his description of the event indicates that it occurred during penalty phase deliberations.

daughter's rape was not a consideration in his decision to vote for the death penalty and did not prevent him from being a fair and impartial juror. (Id. at 22, 25).

One of the attorneys that served as a prosecutor in Petitioner's trial also testified and said that if Makant had filled out the questionnaire properly and included the fact that his daughter had been raped, it would have been an "absolute disqualifier" of Makant as a juror. (Id. at 50.) If he had known about the rape, he would have sought to have the trial judge strike Makant, and failing that he would have used a peremptory strike. (Id. at 50).

Petitioner contends that Makant's actions caused two violations to his right to a fair trial. First, his incorrect answers to the voir dire questionnaire deprived him of an impartial jury, and, second, his discussion of his daughter's rape introduced prejudicial outside information.

In affirming Petitioner's convictions and sentences, the Georgia Supreme Court discussed these claims:

> In order for a defendant to secure a new trial because a juror did not give a correct response to a question posed on voir dire (or, as here, a juror questionnaire), the defendant must show that the juror failed to answer the question truthfully and that a correct response would have been a valid basis for a challenge for cause. Royal v. State, 465 S.E.2d 662 (Ga. 1996); Gardiner v. State, 444 S.E.2d 300 (Ga. 1994); Isaacs v. State, 386 S.E.2d 316 (1989). The evidence does not show that Makant lied when he answered [the] question. Instead, it shows

that he answered the question truthfully, as he understood it. See <u>Dyer v. Calderon</u>, 151 F.3d 970 (9th Cir. 1998) (jurors must answer truthfully but "we must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment"). Even if it could be said that Makant lied, a correct response to the question would not have provided a valid basis for a challenge for cause. <u>Isaacs</u>, *supra*; <u>see</u> <u>Grogan v. State</u>, 497 S.E.2d 589 (Ga. Ct. App. 1998) (correct response would have only allowed for exercise of peremptory strike, not a challenge for cause).

. . .

The fact that juror Makant injected his daughter's rape into the jury's deliberations is of no import. Makant testified that he only raised the issue because he believed the holdout juror was not taking the deliberations seriously. Besides, the circumstances of the rape of Makant's daughter differed markedly from the kidnapping, rape and murder in this case. It cannot be said that Makant's behavior in the jury room rose to the level of juror misconduct. See <u>Hilburn v. Hilburn</u>, 135 S.E. 427 (Ga. 1926) (jurors must bring their life experiences to the jury room). <u>See also</u> <u>Oliver v. State</u>, 461 S.E.2d 222 (Ga. 1995) (jurors' limited discussion of news story about murder of state's witness did not provide basis for new trial).

<u>Sears v. State</u>, 514 S.E.2d at 433-34.

With respect to Petitioner's claim that Makant's false statement deprived him of an impartial jury, this Court first notes that the evidentiary basis for this claim is juror Makant's testimony and, perhaps statements of other jurors who heard Makant mention the fact that his daughter had been raped. In <u>Warger v. Shauers</u>, 135 S. Ct. 521, 525 (2014), the Supreme Court held that "Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to

secure a new trial on the ground that a juror lied during voir dire." In other words, under <u>Warger</u>, Makant's and other jurors' testimony is not admissible before this Court to establish that Makant answered the question falsely.

The Court further finds that the Georgia Supreme Court's conclusion that Petitioner received a fair trial was not unreasonable under § 2254(d). The United States Supreme Court established the standard for vacating a verdict because of false statements by a juror on voir dire in <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 556 (1984):

> [T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

The Georgia Supreme Court applied the standard properly. While Petitioner's trial counsel might well have wanted to know about the rape of Makant's daughter, Petitioner has failed to provide clear and convincing evidence to overcome the presumption of correctness of the state court's factual finding that Makant made an honest mistake in omitting the rape from the questionnaire. 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence.");

Barnes v. Sec'y, Dep't of Corr., 888 F.3d 1148, 1156 (11th Cir. 2018). The

Georgia Supreme Court's determination that Makant "answered the question

truthfully, as he understood it" is not unreasonable. 28 § 2254(d)(2); Conner v.

Polk, 407 F.3d 198, 206 (4th Cir. 2005) (finding that court's conclusion regarding

juror's interpretation of question alleged to be falsely answered was not

unreasonable). Petitioner's claim fails on the first prong of the McDonough test

quoted above.

The claim likewise fails on McDonough's second prong. Petitioner has

failed to cite to, and this Court has been unable to locate, precedent, binding or

otherwise, that indicates that Makant should have been struck for cause based on

the fact that his daughter had been raped. No support exists in the record

establishing that Makant was unable to put his daughter's rape aside and to decide

the case solely on the basis of the evidence presented at Petitioner's trial and the

trial court's instructions. Instead, Makant testified that his daughter's rape had no

bearing on his verdict. ([15-3] at 76, 79, 82).

The record provides no basis to impugn Makant's testimony that his

daughter's rape did not impair his ability to render an impartial verdict. The Tenth

Circuit decision in United States v. Powell, 226 F.3d 1181 (10th Cir. 2000), is instructive. In Powell, a jury convicted the defendant of kidnapping a thirteen-year-old girl and repeatedly sexually assaulting her. One of the jurors' daughters had been raped ten years before the trial. During voir dire, the juror made several equivocal responses regarding whether her daughter's rape would prejudice her against the defendant, until she eventually agreed that she would be able to put her personal feelings aside and follow the instructions of the court. Id. at 1187. The judge denied the defense's motion to strike her for cause, the defense ran out of peremptory challenges, and the woman served on the jury. Id. at 1186.

The Tenth Circuit concluded that the trial judge did not err in refusing to strike the juror. The court explained that an implied bias arises when a juror who believes she can be impartial "is so closely connected to the circumstances at issue in the trial that bias is presumed," based on "similarities that would inherently create in a juror a substantial emotional involvement adversely affecting impartiality." Id. at 1188-89 (citations and quotations omitted). Based on that standard, the court concluded that the facts surrounding rape of the juror's daughter and the facts at issue in the criminal case were not "sufficiently congruous" to result in an implied bias. Id. at 1189.

Here Petitioner's rape of an elderly woman is not sufficiently congruous to the rape of the juror's thirteen-year-old daughter by an adult family member to result in an implied bias. The Court has reviewed juror Makant's voir dire testimony and notes that he repeatedly testified that he was impartial, that he would equally consider all of the sentencing options, and that he could listen to the evidence and form his own independent opinion as to each issue presented to him by the court. ([15-3] at 76, 79, 82). Based on the dissimilarities between the rape of Makant's daughter and Petitioner's rape of his victim, Makant's voir dire statements, and his post trial statements regarding his impartiality, the Court concludes that there was no constitutional requirement that Makant be struck for cause if the trial court had known about his daughter's rape.

The Court further holds that the Georgia Supreme Court's conclusion that Makant did not engage in misconduct by bringing up the rape of his daughter during deliberations was not unreasonable under § 2254(d). As noted by the state court, jurors are expected to bring their life experiences with them when called to deliberate in judgment of their peers, see Head v. Hargrave, 105 U.S. 45, 49 (1881), and the manner in which Makant raised the matter during deliberations did not render Petitioner's trial unfair.

The Court holds that Petitioner is not entitled to relief with respect to his

claims regarding juror Makant.

**D.    Claim IV: The Trial Court's <u>Romine</u> Charge Violated Petitioner's Rights**[14]

Petitioner's jury twice sent notes informing the trial court that they were

deadlocked.  After the first note from the jury, the trial court instructed the jury as

follows:

> You all have only been deliberating on this case for six hours. I would like you all to consider continuing your deliberations and see what you can do with the case.  I'm not putting any pressure on you to do
>
> anything one way or another.  Whatever your decision is, that's your decision.  But I feel like you need to deliberate on the case longer. I'm going to send you to lunch, and I want you to come back after you've had your lunch hour, and I want you to continue with your deliberations.

([15.23] at 24-25).

After the second note from the jury, the trial court gave a more formal

charge which was approved in <u>Romine v. State</u>, 350 S.E.2d 446 (Ga. 1986), and

modeled after the charge in <u>Allen v. United States</u>, 164 U.S. 492 (1896).

---

[14]    In the order of June 20, 2017, denying discovery and an evidentiary hearing, the Court reviewed Petitioner's claims regarding the trial court's modified <u>Allen</u> charge extensively and concluded that Petitioner was not entitled to discovery or an evidentiary hearing because he failed to show that the Georgia Supreme Court's adjudication of this claim was based on unreasonable factual determinations or on an unreasonable application of clearly established federal law.  ([54] at 49).

Mr. [Foreman], I've received your note. And in light of your note, I believe it's appropriate to give you some further instructions at this time. You've been deliberating a while, and I deem it proper to advise you further in regards to the desirability of agreement, if possible.

This case has been exhaustively and carefully tried by both sides. It has been submitted to you for a decision and verdict, if possible. While the verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard and deference to the opinion of each other. A proper regard for the judgments of others will greatly aid us in forming our own judgments. Each juror should listen to the arguments of other jurors. If the members of the jury differ in their views of the evidence, or the mitigating or aggravating circumstances, such differences of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their opinion. It's your duty to decide the issues that have been submitted to you, if you can conscientiously do so. Do not hesitate to change an opinion if you become convinced it's wrong. However, you should never surrender honest convictions or opinions in order to be congenial or reach a verdict solely because of the opinions of other jurors.

Members of the jury, the aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the Court.

([15.23] at 30-31) (the "Allen charge").

Petitioner first challenges this charge as improper in view of the pressure applied to the lone-holdout juror, Fisher, by other jurors as explained in Petitioner's Claim III. Petitioner maintains that this charge "exacerbated the

impact" of the alleged misconduct and that the judge should have done more to "ensure that each juror voted his conscience and was not influenced by improper considerations." ([60] at 230). However, this Court has already determined that the other jurors did not apply improper pressure on juror Fisher. The trial court also repeatedly instructed the jury that they should hold to their honest convictions and that they should not reach a verdict solely because of the opinions of other jurors.

The Court further notes that the issues concerning juror Fisher did not arise until after the trial court gave the <u>Allen</u> charge. After the jury foreman and Fisher sent their notes to the judge indicating some discord between Fisher and the other jurors, the judge merely responded to those notes. In response to the foreman's question about whether the jury could impose the death penalty even though they had not convicted Petitioner of murder, the judge instructed the jury that they may impose the death penalty if they found the presence of a statutory aggravating circumstance. ([15.24] at 29-30). The judge then refused the foreman's request that the jury have access to the voir dire transcript or the statutory definition of perjury. (<u>Id.</u> at 30). Finally, the judge provided a brief description of the duties of the foreman and further noted that all jurors have a duty to participate in

deliberations. (Id. at 30-31). After confirming that the jury had been deliberating that morning, the judge said nothing further and sent the jury back to their deliberations. (Id.) The trial court did not repeat the Allen charge or otherwise pressure the jury following the indication of discord among the jurors.

Petitioner further complains that the trial court's Allen charge "improperly indicated that the inability to reach a unanimous verdict would result in a new trial," [60 at 234], and that the judge required further deliberations even after the jury told the judge that they were deadlocked. As a result, according to Petitioner, Fisher, as the lone holdout felt that the judge wanted her to change her vote to reach a unanimous decision.

The Georgia Supreme Court held that, because the trial court "made it clear that, although the jurors should consider the opinions of other jurors, they must never surrender their honest opinions for the sake of expediency," the Allen charge was not coercive. Sears v. State, 514 S.E.2d at 432.

The court further stated:

The trial court's other instructions, urging the jury to reach a consensus, and to participate in the deliberations, were not coercive either. They did not put pressure on the jurors "one way or the other," see Romine, 350 S.E.2d 446; they did not exhort "the minority to reexamine its views in deference to the majority, or to suggest that the majority's position is correct." United States v. Norton, 867 F.2d

1354, 1366 (11th Cir. 1989).  Nor did they urge the jurors "to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors. [Cit.]"  Harris v. State, 435 S.E.2d 669 (Ga. 1993).

Although the jury twice stated that it was at an eleven to one "deadlock," the trial court was not bound by those pronouncements. Todd v. State, 255 S.E.2d 5 (Ga. 1979) (court is not required to accept jury's feeling that it is "hopelessly deadlocked").  On the contrary, the trial court, in the exercise of a sound discretion, was required to make its own determination as to whether further deliberations were in order.  Romine, 350 S.E.2d 446.

The jury first indicated it was deadlocked after only six hours of deliberation.  And it announced it was deadlocked again, after just another three hours.  We cannot say that the trial court abused its discretion in requiring the jury to deliberate further, see United States v. Kramer, 73 F.3d 1067 (11th Cir. 1996) (jury not deadlocked after deliberating seven days); Holt v. State, 385 S.E.2d 787 (Ga. Ct. App. 1989) (jury not deadlocked after four days, "more time than it had taken to try the case"), especially since, after the second announcement of a "deadlock," the jury deliberated more than five hours before reaching a verdict.  See Allen v. State, 390 S.E.2d 848 (Ga. 1990) (fact that Allen charge was not coercive can be inferred from length of time jury continues to deliberate); United States v. Norton, *supra* (lapse of four hours following Allen charge suggests absence of coercion).  Moreover, it cannot be said that the verdict was coerced simply because the trial court gave a modified Allen charge after the jury revealed its numerical division (11-1 in favor of the death penalty). See id.; Sanders v. United States, 415 F.2d 621, 631-32 (5th Cir. 1969) (court should not be precluded from giving Allen charge because jury volunteered nature and extent of its division).

Sears v. State, 514 S.E.2d at 432–33.

As this Court already has noted in reviewing Respondent's procedural defenses, ([54] at 24), at the time of Petitioner's direct appeal, <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988), was the only Supreme Court decision addressing the constitutional rule against coercive jury instructions.  <u>See</u> <u>Wong v. Smith</u>, 131 S. Ct. 10, 11 (2010) (Alito, J., dissenting).  "As a result, the clearly established law in this area provides very little specific guidance.  About all that can be said is that coercive instructions are unconstitutional, coerciveness must be judged on the totality of the circumstances, and the facts of <u>Lowenfield</u> (polling a deadlocked jury and reading a slightly modified <u>Allen</u> charge) were not unconstitutionally coercive."  <u>Id.</u> at 11-12.  "A general standard such as this gives state courts wide latitude for reasonable decisionmaking under [section 2254(d) ]." <u>Id.</u>; <u>see</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

As also discussed at length by this Court, ([54] at 24-26), <u>Early v. Packer</u>, 537 U.S. 3 (2002), involved a more extreme example of a trial judge giving an <u>Allen</u> charge and requiring a jury to continue deliberating for a significantly longer period of time in the face of a lone-holdout juror.  After days of deliberations, the

jury eventually returned with a guilty verdict on two murder counts. The state court found that the trial court's actions were not coercive, and the defendant sought federal habeas relief under § 2254. The Ninth Circuit granted relief and the Supreme Court reversed, under § 2254(d) stating "[e]ven if we agreed with the Ninth Circuit majority . . . that there was jury coercion here [by the trial judge], it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand." Id. at 11.

In its own review of the trial court's Allen charge, the Court concludes that it was not coercive, even in light of the internal pressure that other jurors might have placed on juror Fisher. While the trial judge clearly indicated the desirability of a unanimous verdict, the judge also instructed that "the verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors in order to reach an agreement," that jurors "should never surrender honest convictions or opinions in order to be congenial or reach a verdict solely because of the opinions of other jurors," and that "the aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the Court." ([15.23] at 30-31).

Given United States Supreme Court precedent as well as this Court's own impression of the trial court's <u>Allen</u> charge and the circumstances surrounding it, Petitioner's arguments that the Georgia Supreme Court's conclusion is not entitled to § 2254(d) deference are unconvincing. The Court concludes that Petitioner is not entitled to relief with respect to his Claim IV.

**E.    Claim V: Petitioner's Claim that the Prosecution Violated Petitioner's Rights under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)**[15]

As discussed above, Petitioner's codefendant, Phillip Williams, testified for the prosecution at Petitioner's trial. In the Court's April 8, 2016, Order, the Court concluded that it is undisputed that the prosecution failed to disclose that Williams had been convicted of battery for a premeditated assault he committed at the Cobb County Adult Detention Center. ([37] at 21). As a result, the Court further concluded that Petitioner had demonstrated cause and prejudice to overcome the

---

[15]    In the order of April 8, 2016, ruling on Respondent's procedural defenses, this Court dismissed those portions of Claim V (1) that the prosecution violated his rights as expressed in <u>Giglio v. United States</u>, 405 U.S. 150 (1972), by presenting the false testimony of Williams, ([37] at 24), (2) raising a claim of prosecutorial misconduct because the prosecutor vouched for Williams' credibility, (<u>id.</u> at 47), (3) raising a claim of prosecutorial misconduct because the prosecutor argued the worth and value of the victim during his sentencing phase closing argument, (<u>id.</u> at 48), and (4) raising a claim of prosecutorial misconduct because the prosecutor violated <u>Giglio</u> with the false testimony of other witnesses (<u>id.</u> at 51, 52).

procedural default of his <u>Brady v. Maryland</u> claim.  This Court discussed the <u>Brady</u>

<u>v. Maryland</u> standard as follows:

> In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to  punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87.  This "duty to disclose such evidence is applicable even though there has been no request by the accused," and includes "impeachment evidence as well as exculpatory evidence." <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999).  "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u> (internal quotations omitted). "In order to comply with Brady, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." <u>Id.</u> at 281 (citing <u>Kyles v. Whitley</u>, 514 U.S. 419. 437 (1995)).  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Id.</u> at 281-82.

([37] at 19-20).

Respondent contends that this claim is unexhausted and that he has not

waived the defense, even though he failed to raise exhaustion regarding this claim

when he briefed his procedural defenses.  Regardless of the procedural approach

the Court takes in addressing Petitioner's claim the result is the same because

Petitioner cannot demonstrate prejudice to either remove the procedural bar or materiality to establish his Brady claim.

The Court disagrees with Petitioner's contention that the earlier cause and prejudice determination indicates that Petitioner is entitled to relief on his Brady claim "[b]ecause the cause and prejudice inquiry is coextensive and coterminous with the standard by which the underlying claim is measured." ([60] at 236). The Court has not analyzed the merits of Petitioner's claim. Rather, the Court merely determined that if Petitioner has a valid Brady claim, Respondent cannot defeat it with a procedural defense.

Having now analyzed the claim, the Court concludes that Petitioner cannot demonstrate prejudice because the evidence was not material under Brady. The prejudice that Petitioner must establish under Brady is the same prejudice standard that applies under ineffective assistance of counsel claims under Strickland. Tanzi v. Sec., Fla. Dept. of Corrections, 772 F.3d 644, 661-62 (11th Cir. 2014). In discussing Petitioner's claim of ineffective assistance of trial counsel, the Court determined that, given Petitioner's full confession to police, the evidence against Petitioner was overwhelming. Additional evidence impeaching Williams would not have made a difference during the guilt phase of the trial.

Likewise, in discussing Petitioner's claim that trial counsel failed to properly investigate Williams' background, the Court determined that the existence of additional evidence impeaching Williams not presented to the jury did not undermine the Court's confidence in the outcome of the penalty phase of the trial because: (1) any additional evidence of Williams' bad nature was cumulative of what the jury had already heard; (2) the evidence that trial counsel supposedly missed, which included the battery at the Cobb County Adult Detention Center, was not compelling in light of what the jury already knew; (3) the jury already had good of reason to believe Petitioner's version of events over Williams'; and (4) the evidence of Williams' conviction would not have effectively countered the prosecution's evidence regarding Petitioner's disciplinary history at the jail. *Supra* § III.A.3. Put simply, the Court found that the evidence did not have a reasonable probability of changing the outcome of the penalty phase of the trial, and based on that finding, the Court must further conclude that the evidence of Williams' battery conviction was not material under <u>Brady</u>.

The Court also agrees with the state habeas corpus court's conclusion in the alternative that Petitioner failed to establish a <u>Brady</u> claim because he did not demonstrate his inability to obtain evidence of Williams' conviction on his own

with reasonable diligence. ([21.36] at 60-61). In his reply memorandum, Petitioner contends that <u>Brady</u> does not require that Petitioner prove that he could not have obtained the evidence with reasonable diligence. ([72] at 49). For years, however, the Eleventh Circuit has held that in order to establish a <u>Brady</u> claim, the defendant must show that he "does not possess the evidence and could not obtain the evidence with any reasonable diligence." <u>United States v. Stein</u>, 846 F.3d 1135, 1146 (11th Cir. 2017); <u>United States v. Vallejo</u>, 297 F.3d 1154, 1164 (11th Cir. 2002); <u>United States v. Meros</u>, 866 F.2d 1304, 1308 (11th Cir. 1989); <u>United States v. Valera</u>, 845 F.2d 923, 927-28 (11th Cir.1988); <u>United States v. Prior</u>, 546 F.2d 1254, 1259 (5th Cir. 1977). Records of criminal convictions are a matter of public record, and trial counsel, or his investigators, could have discovered the conviction with reasonable diligence.

The state habeas corpus court, in its first order denying relief, also concluded that Petitioner failed to establish his <u>Brady</u> claim. ([21.12] at 32-33 (holding that "there is not a reasonable likelihood the result of either phase [of] Petitioner's trial would have been different" if Petitioner had access to the information regarding Williams' battery conviction)). Petitioner has not presented any argument that the

state court's conclusion was unreasonable under § 2254(d). The Court concludes that the state court was correct.

For the foregoing reasons, the Court concludes that Petitioner failed to demonstrate that he is entitled to relief on Claim V.

### F. Claim VI: First Trial Judge's Failure to Recuse

Judge Grant Brantley, who left the bench in 1992, first presided over Petitioner's criminal case. At Petitioner's first appearance, Judge Brantley noted that he knew the victim, Gloria Wilbur, and her husband socially. Petitioner filed a motion for the judge to recuse. In a deposition, Judge Brantley testified that he knew the Wilburs, especially Mr. Wilbur, whom he considered a friend. ([14.14] at 17-26).

Nonetheless, Judge Brantley denied the motion to recuse and went on to rule on several motions, most notably, Petitioner's motion to suppress the statement that he had given to police and the fruits of the search of Petitioner's home. ([14.12] at 55-56, 58-59). Judge Brantley left the bench before Petitioner's trial.

Petitioner filed an interlocutory appeal challenging the judge's failure to recuse. The Georgia Supreme Court affirmed Judge Brantley's denial of the recusal motion stating:

The victim's husband was an attorney. He and the trial judge served in the Air National Guard (the "ANG") assigned to the State Headquarters. The judge is a judge advocate, the husband (now retired from the ANG) was not. They were in different departments.

The husband and the trial judge were never associated as co-counsel in a case, and never handled cases as opposing counsel. The husband has appeared before the trial judge only in one contested case (and an occasional uncontested divorce).

Socially there has been minimal contact. Both attended a retirement function for another member of the ANG. The judge went to a birthday party at the husband's house "several years ago." From time to time, both dined with a group of ANG staff, and might have sat at the same table. The judge testified that the victim's husband was a friend, but not a close personal friend.

One time the victim talked to the judge at his office about some domestic relations problems. He told her he could not get involved. The conversation may have lasted 30 minutes, the judge explaining:

> You know, if someone calls and says can I come by and talk to you for a few minutes, yes, sure, come by, this is what it's about, and by the time you pass the amenities, find out what it's about, and take the time in a courteous way to explain why you cannot get involved in the matter, I would guess that whatever time transpired it was doing those things, and I would guess, I don't know, could be thirty minutes by the time you do those things.

The focus here is not on bias in fact but whether the judge's impartiality might reasonably be questioned, keeping in mind the reality that any judge will have "come to the bench after having had extensive contacts with the community and the legal profession." Bonelli v. Bonelli, 570 A.2d 189 (Conn. 1990).

Recusal generally has not been mandated simply because the judge knew socially one or more of the parties or their attorneys. In <u>Bonelli v. Bonelli</u>, *supra*, recusal was not required even where the judge had been co-counsel with one of the attorneys in a related case that was still pending, where the co-counsel relationship was limited, the judge no longer had any financial interest in the related case, and there was no recent contact between the judge and the attorney about the case.

In <u>Smith v. State</u>, 375 S.E.2d 69 (Ga. Ct. App. 1988), the Court of Appeals upheld the denial of recusal where the victim of an alleged attempt to commit murder was the sheriff, with whom the judge had a regular working relationship.

Any analysis of the necessity for recusal is necessarily fact-bound, requiring an examination of the nature and extent of any business, personal, social or political associations, and an exercise of judgment concerning just how close and how extensive (and how recent) these associations are or have been.

While the victim's consultation with the judge about her domestic situation merits scrutiny, in view of the limited nature of the consultation, and the judge's refusal to get involved, it is not enough reasonably to call into question the trial judge's impartiality in this case. Given the limited social relationship and the lack of any legal relationship between the judge and the victim and her husband, we conclude that recusal is not necessary. <u>Compare</u> <u>Ward v. State</u>, 417 S.E.2d 130 (Ga. 1992).

<u>Sears v. State</u>, 426 S.E.2d at 555.

Petitioner attempts to demonstrate that the Georgia Supreme Court's decision is not entitled to deference, citing a series of cases that stand for the general proposition that judges should not be biased and should not appear biased.

He has not, however, produced clear and convincing evidence demonstrating that the state court's finding that the judge had a limited social relationship and no legal relationship with the victim or her husband was incorrect. 28 U.S.C. § 2254(e)(1); Barnes v. Sec'y, Dep't of Corr., 888 F.3d 1148, 1156 (11th Cir. 2018). Based on those findings, the Court concludes that the state court's conclusion was not an unreasonable application of United State Supreme Court precedent.

The Court alternatively concludes that Petitioner's Claim VI does not raise a viable § 2254 claim because it does not allege a constitutional violation. The Due Process Clause guarantees criminal defendants the right to "a judge with no *actual* bias against the defendant or interest in the outcome of his particular case." Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (emphasis supplied). However, "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause . . . establishes a constitutional floor, not a uniform standard." Id. (citations omitted). Indeed, the Eleventh Circuit has held that "there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision." Whisenhant v. Allen, 556 F.3d 1198, 1209 (11th Cir. 2009).

> [T]he Due Process Clause incorporates the rule at common law that mandated recusal only when the judge had a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case. Matters of kinship, personal bias, state policy, and remoteness of interest would seem generally to be matters merely of legislative discretion., and personal bias or prejudice alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause.

Norris v. United States, 820 F.3d 1261, 1266 (11th Cir. 2016) (citations omitted).

Here the trial judge's relationship with the victim and her husband did not amount to an actual bias. Petitioner has no constitutional claim and thus no right to relief under § 2254.

### G. Claim VII: Trial Court's Erroneous Instructions Violated Petitioner's Rights

In the order of April 8, 2016, this Court dismissed the portion of Petitioner's Claim VII wherein he argues that the trial court failed to properly instruct the jury regarding the crime of armed robbery during the sentencing phase. ([37] at 53). In his final brief, ([60] at 272-73), Petitioner withdrew the remaining portions of his Claim VII.

### H. Claim VIII: The Prosecution Violated Batson v. Kentucky

According to Petitioner, although only twenty percent of the jury venire was African-American, the prosecution used four of its six peremptory strikes to remove African-Americans Barbara Hartsfield, Christopher Evans, Sandra

Herrera-Johnson, and Elzie Hendrix, and the prosecution's sole alternate jury strike was African-American Michael Lyles. Petitioner contends that the prosecution exercised these five peremptory strikes in violation of <u>Batson V. Kentucky</u>, 476 U.S. 79 (1986), in which the Supreme Court held that striking a potential juror for reasons of race violated the Equal Protection Clause.

Under <u>Batson,</u> trial courts employ a three-step process for evaluating claims that a prosecutor used peremptory challenges to strike prospective jurors because of their race.

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

<u>Miller-El v. Dretke</u>, 545 U.S. 231, 276-77 (2005) (citations, quotations and alterations omitted). In evaluating a trial court's determination that the prosecution's race-neutral reason for striking a juror were adequate under § 2254(d), relief may be granted only "if it was unreasonable to credit the prosecutor's race-neutral explanations." <u>McGahee v. Alabama Dept. Of Corrections</u>, 560 F.3d 1252, 1256 (11th Cir. 2009) (citations and quotation omitted).

In his direct appeal, Petitioner challenged the prosecution's peremptory strikes for three of the five strikes – jurors Hendrix, Herrera-Johnson, and Lyles. These are the same strikes he raises in his petition. He did not raise a <u>Batson</u> challenge regarding jurors Hartsfield and Evans in his appeal or in his state habeas corpus petition.

Respondent concedes that he inadvertently failed to raise a procedural defense to Petitioner's claims regarding Hartsfield and Evans in his brief on procedural defenses. He points out, however, that under 28 U.S.C. § 2254(b)(B)(ii)(3), he cannot be deemed to have waived the exhaustion requirement unless he has done so expressly through counsel. He thus contends that the claims regarding Hartsfield and Evans are unexhausted and should be dismissed as procedurally defaulted. (<u>See</u> [37] at 7-8 (order discussing failure to exhaust)). In his reply brief, Petitioner concedes that Respondent's procedural defenses must be expressly waived, but contends that Respondent's failure to raise them in his brief on procedural defenses, [32], amounted to an express waiver.

Petitioner fails to cite to any case law that supports his argument, and the Court concludes that the § 2254(b)(B)(ii)(3) requirement means what it says – Respondent cannot be deemed to have waived a procedural defense unless he has

expressly done so. Accepting Petitioner's argument would be to recognize the existence of an "implied express waiver," which would have the effect of excising § 2254(b)(B)(ii)(3) from the habeas corpus statute. Accordingly, this Court concludes that Petitioner's <u>Batson</u> claims regarding jurors Hartsfield and Evans are unexhausted and procedurally defaulted and therefore dismissed.

In any event, Petitioner cannot establish his <u>Batson</u> claim regarding either Evans or Hartsfield. After the prosecution struck Evans, the trial court made a <u>Batson</u> inquiry. ([15.15] at 18). The prosecutor noted that Evans objected to capital punishment, and when questioned individually he stated that he was opposed to capital punishment and hesitated when asked whether he could impose the death penalty. Evans said that his personal beliefs were against capital punishment and he did not know whether he could vote for the death penalty. (<u>Id.</u> at 18-19). Petitioner's trial counsel did not respond. (<u>Id.</u> at 19).

With respect to Hartsfield, the prosecutor further noted this juror raised her hand when the jurors were asked whether they had any religious or moral objections to the death penalty. (<u>Id.</u> at 26). When questioned, she said that she was "deeply troubled" with the death penalty. (<u>Id.</u>). She further stated that she was "vehemently opposed to the manner in which the death penalty in this country

was being imposed," especially against African-Americans and that she would require, beyond a shadow of a doubt, any evidence before she would consider the death penalty. (Id.). Again, trial counsel did not respond. (Id. at 27). The Court finds that the prosecutor had valid race-neutral reasons for striking Evans and Hartsfield.

Regarding the three peremptory strikes that Petitioner raised in his appeal, the Georgia Supreme Court held as follows:

> The state used four of the six peremptory strikes that it exercised against African–American members of the jury panel and exercised its only strike during the selection of alternate jurors against an African–American. [Petitioner] contends that the state exercised three of its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky. The state explained that it struck one juror [Hendrix] because he expressed a mistrust for attorneys and the first witness for the state, the victim's husband, was an attorney; struck another juror [Herrera-Johnson] because she was breastfeeding her 10-month-old and sequestration would create a hardship for both mother and child; and struck a third juror [Lyles] who was a psychiatrist because he had six acute patients who needed constant attention and he had counseled prisoners in the past. In each instance, the trial court found that the state had offered a race-neutral reason for the strike and allowed the strike to stand. Because these findings are not clearly erroneous and [Petitioner] has failed to prove that the state acted with discriminatory intent in exercising its peremptory challenges, we conclude that there was no Batson violation.

Sears v. State, 493 S.E.2d at 185.

According to Petitioner, the state court's opinion is not entitled to deference because it failed to take into account that the prosecution "failed to strike white jurors who expressed similar views to those African-American jurors who were struck, such as a distrust of attorneys or a concern about family hardship. The prosecutor often failed to question white jurors about these matters entirely." ([60] at 258-59). Petitioner has entirely failed, however, to identify white jurors who expressed those similar views or provide citation to the record showing where those white jurors made such statements. In the absence of any evidentiary support for Petitioner's claim, this Court defers to the state court's conclusion. See Chavez v. Sec'y, Fl. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) (noting that district courts ruling on habeas corpus petitions have no obligation to mine the record searching for support for a petitioner's claims).

## I. Claim IX: Petitioner's **Witherspoon v. Illinois**, 391 U.S. 510 (1968), Claim

In his Claim IX, Petitioner contends that the trial court violated his rights under the holding in Witherspoon v. Illinois, 391 U.S. 510 (1968), by excusing for cause jurors whose views on the death penalty did not justify removal. In the order of April 4, 2016, ([37] at 15-17), the Court dismissed this claim after concluding

that the claim was procedurally defaulted and that Petitioner failed to demonstrate cause and prejudice to excuse the default.

### J.    Claim X: Trial Court Failed to Remove Jurors for Cause or Bias

Petitioner claims that the trial court should have removed panel members William Kujuwa, Michael Leberman, and Earl Morgan from the jury panel for cause because of the views they expressed during voir dire.  None of those three, however, served on Petitioner's jury.  Under Georgia law, death penalty defendants are entitled to 42 qualified jurors, and the erroneous qualifying of a single juror for the panel from which the jury was struck requires reversal.  Lively v. State, 421 S.E.2d 528, 529 (Ga. 1992).  Conversely, under federal constitutional law, if a biased or otherwise unfit panel member does not serve on the jury, Petitioner cannot have been prejudiced by the trial court's refusal to strike that individual for cause even though Petitioner might have been required to use a peremptory strike to avoid having that panel member serve.  "[I]f [a] defendant elects to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat," the Supreme Court has held that the criminal defendant "has not been deprived of any . . . constitutional right."  United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000).

The "use [of] a peremptory challenge to effect an instantaneous cure of the error" demonstrates "a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury." Id. at 316; see also Ross v. Oklahoma, 487 U.S. 81, 88 (1988) (rejecting "the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury").

Even if one of the three panel members had made it onto the jury, the Georgia Supreme Court concluded that "[a] review of the voir dire of each prospective juror shows that the trial court did not abuse its discretion in deciding that each juror was capable of impartial service and would consider both mitigating evidence and the trial court's instructions in determining the appropriate sentence," Sears v. State, 493 S.E.2d at 185, and Petitioner has failed to even attempt to demonstrate why that court's conclusion was unreasonable under § 2254(d).

The Court concludes that Petitioner is not entitled to relief on Claim X.

## K. Claim XI: Petitioner's Sentence Is Disproportionate and Excessive

In the order of April 8, 2016, ([37] at 25-30), this Court dismissed that portion of Petitioner's Claim XI wherein he contends that his cognitive and emotional impairments render him the legal equivalent of a juvenile offender. The surviving portions of Petitioner's Claim XI raise two distinct issues. He first

asserts that his death sentence for the crime of kidnapping with bodily injury violates the Eighth Amendment's prohibition of cruel and unusual punishments because it is excessive to that crime. Petitioner next asserts that the Georgia Supreme Court abdicated its statutory duty to carry out a meaningful proportionality review.

With respect to the first part of the claim, Petitioner contends that "the United States Supreme Court has disapproved the use of the death penalty in response to nonhomicide offenses." ([60] at 263-64). However, the cases that Petitioner relies on all qualify their holdings to note that the death penalty is not appropriate for non-homicide offenses where the offense does not result in the death of the victim. In Coker v. Georgia, 433 U.S. 584, 598 (1977), the Court held that "the death penalty . . . is an excessive penalty for the rapist who, as such, does not take human life." Eberheart v. Georgia, 433 U.S. 917 (1977), which involved kidnapping and rape but not the death of the victim, was a summary ruling that relied on Coker. Likewise, in Kennedy v. Louisiana, 554 U.S. 407, 421 (2008), the Supreme Court held that "a death sentence for one who raped but did not kill a child, and who did not intend to assist another in killing the child, is unconstitutional."

In Enmund v. Florida,458 U.S. 782 (1982), the Court held that the death penalty is excessive for a robbery conspirator who did not kill, attempt to kill or intend that deadly force be used by one of his coconspirators. But in Tison v. Arizona, 481 U.S. 137 (1987), the Court approved the death sentences for defendants who did not themselves kill the victims, but their involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.

Those cases stand for the proposition that the death penalty is not excessive for a defendant who commits a capital crime when that crime results in the intentional death of the victim. As the overwhelming evidence in this case establishes that Petitioner intentionally stabbed Wilbur to death after kidnapping, robbing and raping her, the Court concludes that his death sentence is constitutional.

As to Petitioner's claim regarding the Georgia Supreme Court's proportionality review, under O.C.G.A. § 17-10-35(c)(1), (3) the court was required to assure that Petitioner's "death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor" as well as determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." In

performing its review under the statute, the court held that "[t]he imposition of a death sentence in this case would not be excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant." <u>Sears v. State</u>, 514 S.E.2d at 437. The court then listed seven cases that "would support the imposition of the death sentence." <u>Id.</u>

Petitioner contends that the Georgia Supreme Court's proportionality review was not sufficiently rigorous to make certain that Petitioner's death sentence was not arbitrarily imposed. This Court concludes that regardless of the manner in which the state court carried out its proportionality review, Petitioner has no § 2254 claim regarding the review.

In <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), the Supreme Court struck down Georgia's system of imposing the death penalty in part because of the random nature in which the death penalty was imposed.

> The basic concern of <u>Furman</u> centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant.

> Left unguided, juries imposed the death sentence in a way that could only be called freakish.

<u>Gregg v. Georgia</u>, 428 U.S. 153, 206 (1976).

The main focus of <u>Furman</u> was the fact that the decisionmakers – juries or judges – in various state statutory death penalty schemes were not given adequate guidelines under which to impose death. <u>See</u> <u>Gregg</u>, 428 U.S. at 195 ("Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.").

After <u>Furman</u>, the Georgia legislature passed a new death penalty statute that the Supreme Court evaluated and approved in <u>Gregg</u>. The new statute included proportionality review. In approving Georgia's death penalty scheme, the Supreme Court cited favorably to the proportionality review requirement as a "provision designed to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants," <u>Gregg</u>, 428 U.S. at 204, and noted that "[i]t is apparent that the Supreme Court of Georgia has taken its [proportionality] review responsibilities seriously," <u>id.</u> at 205. The Court also noted:

> The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced

to die by the action of an aberrant jury.  If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

Id. at 206.

This Court stresses, however, that proportionality review is not required by the Constitution "where the statutory procedures adequately channel the sentencer's discretion,"  McCleskey v. Kemp, 481 U.S. 279, 306 (1987) (citing Pulley v. Harris, 465 U.S. 37, 50-51 (1984)), and Georgia's statutory procedures are adequate, Collins v. Francis, 728 F.2d 1322, 1343 (11th Cir. 1984) ("[I]t appears clear that the Georgia [death penalty] system contains adequate checks on arbitrariness to pass muster without proportionality review.") (internal quotations and citations omitted).  As the proportionality review is not required by the Constitution, it cannot be said that the Georgia Supreme Court's conclusion that Petitioner's sentence was proportional was an unreasonable application of constitutional law.  See also Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987) ("[W]e refuse to mandate as a matter of federal constitutional law that where, as here, state law requires [proportionality] review, courts must make an explicit, detailed account of their comparisons.").

For these reasons, the Court concludes that Petitioner is not entitled to relief based on his Claim XI.

## L.     Claims XII and XIII

The amended petition contained no Claim XII.  In the order of April 8, 2016, ([37] at 59-60), the Court concluded that Petitioner's Claim XIII – regarding the constitutionality of his prolonged stay on death row – did not state a cognizable § 2254 claim.

## M.     Claim XIV: The O.C.G.A. § 17-10-30(b)(7) Aggravating Circumstance Violated Petitioner's Rights

In his Claim XIV, Petitioner argues that his rights were violated when the State failed to provide him notice before the trial that it intended to rely on the statutory aggravating circumstance set forth in O.C.G.A. § 17-10-30(b)(7).  That provision permits the death penalty upon a jury finding that the offense was "outrageous or wantonly vile, horrible or inhumane in that it involved torture, depravity of the mind or an aggravated battery to the victim."  According to Petitioner, prosecutors did not inform his trial counsel about their plan to request that the trial court charge the (b)(7) circumstance until deliberations had begun at the close of the guilt phase of the trial.  The trial court agreed to charge the circumstance over trial counsel's objection.

Petitioner argues that the late introduction of the (b)(7) circumstance without charging it in the indictment violated the Supreme Court's holding in Jones v. United States, 526 U.S. 227, 229 (1999), that any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment.

The Georgia Supreme Court concluded that "[t]he trial court did not err in permitting the jury to consider [the (b)(7)] aggravating circumstance. It is not incumbent upon the state to notify a defendant before trial of every statutory aggravating circumstance that it might seek to prove. Sears v. State, 514 S.E.2d at 435 (citing Roberts v. State, 314 S.E.2d 83 (Ga. 1984) and Bowden v. Zant, 260 S.E.2d 465 (Ga. 1979). Presumably because the Georgia Supreme Court cited to state cases, Petitioner contends that the court failed to apply federal law and that § 2254(d) deference thus does not apply.

In Grim v. Sec'y, Fla. Dept of Corr., 705 F.3d 1284 (11th Cir. 2013), the Eleventh Circuit confronted a claim materially identical to Petitioner's Claim XIV. The state court had denied relief on Grim's claim on the basis that, because the statutory aggravating factors were limited, there was no reason to require the state to provide notice of which of the aggravating factors that it intended to prove. Id.

at 1288. The Eleventh Circuit, applying § 2254(d), concluded that there was no Supreme Court holding requiring the aggravating circumstance to appear in the indictment.

Because there is no federal standard requiring statutory aggravating factors to appear in the indictment, the Georgia Supreme Court's conclusion was not the result of an unreasonable application of federal law, and the Court concludes that the state court's holding is entitled to § 2254(d) deference.

The Court further notes that the jury unanimously found, beyond a reasonable doubt, the presence of three other aggravating circumstances, any one of which would support Petitioner's death sentence, and Petitioner has not challenged them. Even if the trial court erred in permitting the jury to consider the (b)(7) aggravating circumstance, any error was harmless. See Vieux v. Warden, 616 Fed. Appx. 891, 898 (11th Cir. 2015) (noting that Jones-based errors are subject to harmless error review).

### N.    Claim XV

In the order of April 8, 2016, ([37] at 60-62), this Court concluded that Petitioner's Claim XV – regarding the constitutionality of lethal injection as a method of execution – is not cognizable under § 2254 and dismissed the claim.

## O. Claim XVI: Cumulative Error

Finally, in his Claim XVI, Petitioner raises a claim of cumulative error, asserting that when all of the constitutional errors from his trial are viewed cumulatively, they cannot be deemed harmless, as they deprived Petitioner of a fundamentally fair trial.

> "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted). We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial. See United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997).

Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012).

For this Court to perform a cumulative-error analysis, there must be multiple errors to analyze. The only error that this Court has identified is the due process violation committed by the trial court when the court required Petitioner to comply with the requirements of Sabel v. State, 282 S.E.2d 61 (Ga. 1981), and as discussed above, see supra § III.B, Petitioner failed to demonstrate that he was prejudiced by that error. Accordingly, Petitioner is not entitled to relief for his Claim XVI.

## IV.     Conclusion

For the reasons stated above, the Court concludes that Petitioner has failed to establish that he is entitled to relief under 28 U.S.C. § 2254.  Accordingly, the petition for a writ of habeas corpus is **DENIED**, and the instant action is **DISMISSED**.

Pursuant to Rule 11 of the Rules Governing § 2254 Cases this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."

After review, the Court concludes that a Certificate of Appealability shall issue as to Petitioner's Claim I, but limited to his claim that his trial counsel was ineffective during the penalty phase of his trial, Claim II regarding the trial court's Sabel order, Claim III regarding Petitioner's assertions of juror misconduct, and Claim XIV regarding the use of statutory aggravating circumstance set forth in O.C.G.A. § 17-10-30(b)(7) without pretrial notice to Petitioner.

**SO ORDERED** this 23rd day of May, 2018.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE